**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**FOURTH DIVISION**

| | |
|---|---|
| JANE A.T. TURNER, | |
| Plaintiff, | **Civil No. 01-1407 (ADM/AJB)** |
| v. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** |
| JOHN ASHCROFT, ET AL., | |
| Defendants. | |

Plaintiff Jane Turner hereby files her opposition to Defendants' April 15, 2004 Motion for Summary Judgement or in the alternative, Motion for Partial Summary Judgement.

## STANDARD OF REVIEW

Defendants' may obtain summary judgment only if, on the basis of the record in this case, "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). "On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party." *Rueda v. West Side Community Health Services*, 2003 WL 22508089 (D. Minn. 2003) citing *Ludwig v. Anderson,* 54 F.3d 465, 470 (8th Cir.1995).

## STATEMENT OF FACTS

*A. Ms. Turner's Background*

Plaintiff Jane Turner began her career as a Federal Bureau of Investigation (FBI) Special Agent in October of 1978. Ex. 1, Affidavit of Turner, ¶ 1. Turner was one of the first 150 female

agents hired by the FBI.[1] She was the first female SWAT team member and first female Psychological Profiler. Ex. 3, Profiler Certificates. In February 1987, Turner successfully sought a Senior Resident Agent (SRA) position at the Minot, North Dakota Resident Agency (RA) of the Minneapolis Division, and became the first female SRA in the FBI. Ex. 1, ¶ 2. In Minot, she also became the first female Agent to hold full-time responsibility for two Indian Reservations. *Id*. She regularly worked difficult criminal cases. For example, the U.S. Attorney General thanked Turner for her "fine work" and "resourcefulness" in "apprehending the fugitive Christopher John Boyce." Ex. 4, AG Ltr.

From 1978 until April of 1999, she was formally rated as "Superior" or "Exceptional" on her Performance Assessment Ratings (PARs). Ex. 6. In fact, prior to any EEO controversy, the Supervisory Agent in Charge (SAC) of the Minneapolis Division nominated Turner for FBI management training:

> I have observed firsthand her outstanding liaison, the respect she has earned, and her overall effectiveness in the law enforcement community, both on and off the reservations . . . . I have every confidence in SA Turner, believe she has the dedication, determination, ability, experience, and desire to become one of the finest agents in the FBI.

Ex. 6, Minneapolis SAC to FBI Director, pp. 3-4.

Turner established a remarkable "reputation" within the North Dakota law enforcement community as the most highly qualified FBI Agent working in Indian Country. Ex. 8,

---

[1] Prior to 1972, the FBI had a discriminatory policy of forbidding female special agents. *See* Ex. 2, "Justification for Limiting the Position of Special Agent in the FBI to Males," ("Let us face reality. If the credibility of the FBI is to be maintained in the eyes of the public . . . and we are to continue a flexible, mobile, ready for anything force of special agents, we must continue to limit the position to males.").

Deposition of Asst. U.S. Attorney (AUSA), Clare Hochhalter, Tr. 20. Turner's dedication to the FBI's law enforcement mission was unparalleled: "she live(d) the FBI." Ex. 8, Tr. 26.[2]

*B. SSRA Application and Initial EEO Concerns*

In 1996, after working as an FBI Special Agent for eighteen years, the latter twelve of which in North Dakota, Turner applied for the Supervisory Special Resident Agent (SSRA) position in Fargo, N.D. Ex. 1, ¶ 4. Prior to this application Turner participated in the FBI's career development program to her goal to become an FBI manager. Ex. 6.

Turner was not the only woman who applied for the position. Special Agent Wendy Loucks, who had been the SRA in Fargo, applied for the position as well. According to Loucks, "SA Turner and I felt we were equally competitive for the position and submitted applications. Neither felt the other had an 'edge' for this position and we both assumed that one or the other of us would be named to this newly created SSRA position." Ex. 10, Sworn Statement of SA Wendy Loucks, p. 7. To their shock, however, the FBI Career Board recommended SA Craig Welken for the position instead of the two more experienced and highly qualified women.[3]

The two women later learned that Welken "had been 'tapped' (i.e., pre-selected) for this SSRA position by the (then) SAC Larry Collins." *Id*. They "both felt this was a 'slap in the face' given the years we have devoted to the CDP." *Id*. at p. 9. Neither woman was considered

[2] Likewise, while working in North Dakota she received numerous letters of commendation from the FBI and other state and federal law enforcement officials. *See* Ex. 7, Letters of Commendation. For example, in 1998 Russell Mason, Tribal Chairman of the Three Affiliated Tribes within the Fort Berthold Indian Reservation, wrote a letter to Director Louis J. Freeh expressing his "deep gratitude" for Turner's "superlative work, excellent dedication, and commitment to [Fort Berthold Reservation]." *Id*. at 9-11.

[3] In fact, Loucks did not even "believe he had any relevant experience in the career development program (CDP), didn't appear to be a viable candidate, and didn't appear qualified for it." *Id*. at 7-8. Loucks did not think that "SA Welken met the basic qualifications for it." *Id*. at 8.

available candidate for the position because of her sex. *Id.* at p. 9 (the FBI Career Board members used "verbage" (sic) to "denigrate women and minorities" during their decision-making process).[4]

*C. Statistics and FBI Discriminatory Practices*

Within the FBI, managers compiled "statistics" regarding the case work of investigatory special agents. These statistics were based on the work load and accomplishments of an agent. Ex. 1, ¶8. They were (and are) used by the FBI as a basis for evaluating performance, awarding bonuses and establishing a performance record which could be used to justify promotions or other favorable employment decisions. *Id.*

Turner developed a concern that female agents in North Dakota were not being properly credited for their work. In reviewing her own PARs, she learned that she was not being given "statistics" for cases she worked. In 1998, Turner asked SSRA Welken why she was not receiving Quality Step Increase Awards (QSIA) for their superlative performances. *Id.* at ¶ 8. This concern was based, in part, on Turner's understanding that the FBI's denial of some of her performance statistics could have a negative impact on her eligibility for QSIA's. *See* Ex. 14, Performance Appraisal System Employee Handbook, pg. 23. Mr. Welken was not responsive to this inquiry; instead he continued to give statistics to male agents, while at the same time denying these statistics to her. This enabled the male agents to be more eligible for promotional opportunities, cash awards, training, and quality step pay increases than Tuner. Ex. 1 at ¶ 8.

[4]The FBI's discriminatory culture toward female agents was recently documented in a Report by the Department of Justice Office of Inspector General. *See* Ex. 13. In the report, the Inspector details the gross double standard within the FBI with regards to discipline.

In addition to discrimination in the awarding of statistics, SSRA Welken also unequally distributed mileage reimbursements to Turner. Loucks cited to SSRA Welken's discriminatory mileage reimbursement as an example of his "disturbing" tactics used against Turner. Ex. 10 at p. 4. According to Agent Loucks, SSRA Welken intentionally manipulated specific Department of Justice regulations that, when applied strictly and enforced, were detrimental to Turner. *Id.* at pp. 4-5. Loucks stated:

> This is an example of a discriminatory, non-uniform application of policies, where finding a 'solution' by creating a fiction of not handling the paperwork in [ . . . ] cases, benefitted only the SSRA (and created additional work for me and another relief supervisor), whereas the strict application of a financial policy that affected SA Turner had the opposite, and obviously detrimental outcome.

*Id.* at p. 5.

*D. Discrimination as an SRA*

Turner was very proud to have been named the first female Senior Resident Agent (SRA) within the FBI. Ex. 1, ¶ 2. SRAs are "charged with the *supervisory responsibilities* for the resident office, the resident agency city activity, and the activity of Agents assigned to the resident agency when in the territory of that resident agency." Ex. 11 (emphasis added). They also have responsibility for "liaison," "press relations," "training" other "resident agency personnel" and "responsibility for the enforcement of the Bureau's rules and regulations." Ex. 11.

Instead of permitting Turner to perform the "supervisory" responsibilities of an SRA, FBI management approved downgrading her position and reduced her SRA status to a secretarial function. For example, in November of 1997, Mr. Peter Klockstad was transferred into the Minot office. Ex. 12, Peter Klockstad Deposition, Tr. 11, line 17. Mr. Klockstad had only nine

years of experience, and was not eligible to be an SRA. *Id*. at Tr. 6, line 11. When Turner attempted to assign various tasks to Mr. Klockstad, Mr. Klockstad simply refused to listen to his Resident Area "supervisor." Exhibit 1 at ¶ 7. He asked the other SA assigned to the Minot RA, Carl Florez, whether he should be responsive to Turner, to which SA Florez responded that she was "basically somebody that was supposed to order supplies." Ex.12 at Tr. 36, lines 6-14. When Turner objected to this treatment, Mr. Klockstad contacted SSRA Welken, who gave Klockstad permission to ignore Turner's role as the Minot RA "supervisor." Ex. 12, Tr. 38.

Turner was embarrassed of her treatment by the male agents. Ex. 1 at ¶ 8. She was extremely troubled that upper management ignored her protests and refused to require the male agents within her RA comply with the MAOP requirements. *Id*. at ¶ 7. Her treatment resulted in a loss of professional standing and directly interfered with Turner's working relationship with other male FBI agents. *Id*. Her job duties were diminished in a most humiliating manner. *Id*.

On March 19, 1998, after attempting to have the matter resolved through her chain of command, Turner submitted an Electronic Communication (EC) "relinquishing" her role as the SRA in Minot stating: "Due to the fact of no respect, nor support for the captioned Agent in the Senior resident Agent status, SA Turner is relinquishing this role." Ex.13.

On April 6, 1998, Turner contacted the FBI EEO and alleged sex discrimination in the Minot FBI office. On June 10,1998, Turner obtained a right to file notice from the FBI EEO, and she filed a formal EEO complaint alleging certain individuals were discriminating against her on the basis of her gender and reprisal for involvement in a protected EEO activity. Ex.15.

*E. Larry Froistad Investigation*

On July 15, 1998 Larry Froistad discussed murdering his own daughter in an internet chat room designed for alcoholics. *See* Exhibit 8 at Tr. 86. Froistad's internet "chat" soon became an international law enforcement sensation. The case was the first major crime in which a potential felon had made an incriminating admission in on the internet. Ex. 1 at ¶ 12. However, despite the admission, the case had many problems. Froistad's daughter's death was ruled an accident, there was no independent method to verify the veracity of the internet post as the communication had been made in a chat room designed to assist alcoholics, and thus a privilege may have attached to the only piece of hard evidence in the case. *Id*. at ¶ 13.

The crime occurred in North Dakota and was consequently assigned to the N.D. U.S. Attorney, Mr. John Schneider. Mr. Schneider was well aware of Turner's expertise in child-related crimes and knew of her expertise in obtaining confessions from suspects, especially in child abuse cases. *See* Exhibit 8, Tr. 21 ("[Schneider's] the one I think who asked her to be involved in Froistad. In fact, initially who told me that she should be involved. This case was perfect for her."). Consequently, Mr. Schneider requested that the FBI assign Turner to this very high profile case. SSRA Welken did not want to assign Turner to the case, and instead assigned a less qualified male agent. Ex. 1, ¶ 12.

On July 16, 1998, U.S. Attorney Schneider formally requested, in writing, that Welken assign Turner to the case. *See* Ex. 16. USA Schneider stated that "Special Agent Turner is an expert in child sexual abuse and violent crime investigation. We need her expertise in conducting interviews and gathering evidence to corroborate the sexual exploitation of [the] 5-year-old [victim]." *Id*. However, Mr. Welken continued to insist that a male agent who lacked Turner's expertise in child crimes obtain this potentially prestigious assignment. Ex. 1 at ¶ 13. SSRA

Welken, in his attempts to keep Turner off the case, told USA Schneider that Turner was mandated for Indian Country work. *Id*. USA Schneider insisted Turner was the best person for the job, and with that directive – over SSRA Welken's objection – Turner was assigned the case.

USA Schneider's assessment of both Turner's skills and the needs of this high-profile precedent setting case were completely correct. Turner developed a strategy to obtain Froistad's confession. Ex. 1 at ¶ 14. The prosecution team implemented the strategy, and Turner was personally able to extract a murder confession from Mr. Froistad. *Id*. The confession directly resulted in a guilty plea from Mr. Froistad. *See*, Ex. 17, USA Schneider Commendation Email. In a contemporaneous email, USA Schneider acknowledged Turner's key role in the Froistad case: "**Quite simply, that case and plea was your product.**" Ex. 17.

*F. Fall-out from the Froistad Case and the First Downgraded Performance*

On April 24, 1999, Turner obtained her first PAR after her success in the Froistad case. Her overall rating was "Superior." Exhibit 18, April '99 PAR. Nevertheless, Turner objected to the rating because Welken failed to include positive reference to a number of cases upon which she worked, most notably the review failed to properly credit her tremendous success in the Froistad case. Ex. 1 at ¶ 15. Even Loucks believed that Welken's decision to deny Turner statistics for the conviction was "unjustified, since SA Turner's participation in the [ . . . ] case was extensive and long term." Ex. 10, p. 12.

Turner was extremely concerned that this appraisal failed to properly recognize her major achievements for the rating period. Ex.1 at ¶15. Therefore, on June 11, 1999, Turner met with SSRA Welken and asked why she "did not receive" proper credit. Ex. 19, p. 1. At the meeting, Welken refused to change PAR and recognize Turner's contribution. Instead, he falsely accused

her of "poaching" the case and "sandbagging" him. *Id.* Welken was completely dismissive of Turner's "leadership," "statistical accomplishments" and "creative investigative efforts."*Id.*, p. 2.

Turner promptly informed Acting SAC Burrus of Mr. Welken's comments. Ex. 19. She wrote to Mr. Burrus that Welken had engaged in "discriminatory practices against SA Turner." *Id*, p. 2. She also informed Burrus that Welken's discriminatory practices had "increased" since Turner had filed her initial "EEO complaint." *Id*. at p. 2.

The FBI's reaction to Turner's June 18 Electronic Communication (EC) to Burrus was swift and retaliatory. On June 22, 1999, Burrus informed Turner that her request to have her June 18th EC placed in her personnel file was denied. Ex. 20. Moreover, he informed Turner that "since Craig [Welken] is not on the copy count and you have labeled this 'additional information for PAR review request,' I am forwarding him a copy for his consideration." Ex. 20. This referral to Mr. Welken violated FBI policy and requirements. Because Turner had informed Burrus that Welken engaged in "discriminatory practices" and had "increased" these practices after Turner had filed an EEO complaint, Mr. Burrus was required to report Turner's allegation to the FBI Office of Professional Responsibility. Ex. 21, Aff. of John Roberts. Instead of filing her allegation with OPR, Mr. Burrus improperly forwarded Turner's claim to Welken with instructions that he take Turner's EC into consideration in a PAR. Ex. 20.

On June 23, 1999, just 11 days after Turner filed her memorandum of complaint with Acting SAC Burrus, SSRA Welken *downgraded* her performance, and for the first time in her professional career Turner was rated as at a "minimally acceptable/unacceptable" level. Ex. 22, June 1999 PAR. Throughout her remaining tenure in North Dakota, the FBI would continue to rate Turner as the "minimally acceptable/unacceptable" level. Ex. 23-24. These ratings would

permit the FBI to punitively transfer Turner out of North Dakota in Nov. 1999. Ex. 1, ¶ 29.

*G. Ms. Turner's Performance Never Declined*

A material issue of fact for this case lies within Turner's PARs. According to the FBI, Turner's PARs were justified because: "In 1998, after eleven years working reservation crimes, Turner's work performance began to decline." FBI's Motion for Summary Judgment, p. 3. However, there was no decline in her performance. To be sure, members of the federal law enforcement community who worked directly with Turner during the 1998-99 time frame testified that she was an excellent FBI agent and that there was no decline in her performance.[5]

Mr. Clare Hochhalter, an AUSA in N.D., worked closely with Turner for eleven years (1988-99), and had an opportunity to carefully examine her work performance. When questioned at his deposition about Turner's performance his responses were as follows:

| | |
|---|---|
| Work Habits: | "Excellent"[6] |
| Relationship with law Enforcement: | "Excellent" |
| Availability, Reliability and Trustworthiness: | "Excellent" |
| Work ethic and professionalism: | "Excellent" |
| Responsiveness toward victims: | "Excellent" |
| Conducting investigations in IC: | "Excellent" "one of the best in the nation" |
| Ability to Develop Intelligence Base: | "Excellent" |
| Child related crimes: | "Superior" and the "best."[7] |
| Overall Work Performance: | "Whatever [the] highest rating is"[8] |

[5] Moreover, in late 1998 Turner was awarded the YWCA's "Women of Distinction" award in Minot, Ex. 25, after having been nominated by a fellow FBI agent. Ex. 26.

[6] According to Hochhalter, Turner "wanted to work all the time. . . . it didn't matter what time of day or night." Ex. 8, Tr. 27.

[7] Significantly, after Turner left North Dakota, the other agents completely failed to properly conduct child-related cases. The status of the crimes against children program on the Indian reservations after Turner's transfer was "dismal." Ex. 8, Tr. 31.

[8] In comparing Turner to a comparable male agent in Minot, Hochhalter observed that Turner had more "experience" and "skill" then Klockstad and Turner was "more effective in developing intelligence" on Indian reservations than Agent Klockstad. Tr. 16, lines 23-24; Tr. 45, lines 16-22. Mr. Klockstad's performance was not downgraded, and he was not transferred.

Ex. 8, Tr. 14-15, 20, 30-31, 36-39, 42, 44, 45.

Mr. Hochhalter summarized his assessment of Turner's performance: "**Particularly when it comes to Indian Country [Turner was] one of the best in the nation . . . if not the best that I've had experience with**." Ex. 8, Tr. 20. Mr. Hochhalter further testified that over the 11 years he worked with Turner (1988-99) he never witnessed a decline in her performance. Ex. 8, Tr. 36, line 9 - 39, line 9, Tr. 42.

Other objective law enforcement professionals who personally worked with Turner on criminal cases shared Mr. Hochhalter's opinion of Turner. Federal Customs Special Agent Anthony Onstead testified that "She was just as competent and as professional as the other agent that I worked with out of North Dakota." Ex. 27, Tr. 114. In regard Turner's questioning of Mr. Froistad (one of the items for which the FBI viciously attacked Turner performance) Onstead (who witnessed the questioning) testified as follows: "**[Turner was] always a professional . . . the epitome of an FBI agent. I mean, she was just totally professional when she was out doing her job.**" Ex. 27, Tr. 38-39.

AUSA Janice Morley testified that US Attorney Schneider "expressed disappointment" that Turner was being transferred out of North Dakota in 1999 because "she was a good agent," "she got confessions," she was "hard working," "available," and that she "didn't quit, not until she was satisfied." Ex. 9, Tr. 46-47.

Finally, the FBI's own performance ratings undercut the FBI's position on this issue. Throughout 1998 Turner was rated "Superior" in all areas, and there is no indication whatsoever

that she was counseled (even informally) regarding any so-called decline in performance. The FBI managers responsible for downgrading her evaluations in the June-November, 1999 time frame *never* actually observed Turner performing her law enforcement functions. Unlike Hochhalter, Schneider, Morley, and Onstead who actually worked cases with Turner, Welken's office was located hundreds of miles from her, and the Minneapolis office was even farther. Remarkably, the FBI managers never sought the input of the U.S. Attorney's Office (USAO) or other federal officials with whom Turner worked daily and relied upon the quality of her work product for their own jobs. Ex. 8, Tr. 51; 27, Tr. 109.

*H. FBI's 1999 Inspection Report*

In October-November 1999, the Minneapolis Division of the FBI, including the Minot resident agency, was subjected to an internal inspection by the FBI's Inspection Division. *See* Defendant's Ex. 11. The FBI relied heavily upon this inspection to justify a downgraded performance review and a disciplinary transfer of Turner from Minot to Minneapolis. *See*, Ex, 17, Tr. 68-72. As the FBI explained:

> Welken's and Domin's concerns about Turner were confirmed by the October, 1999 independent inspection of the Minneapolis Division . . . .the inspection team determined that Turner was not performing as a senior GS-13. The Inspection Report specifically recommended that Turner be transferred to an office where she could be more directly supervised . . . and given a Performance Appraisal Report reflecting her poor job performance.

Defendant's Amended Memorandum in Support of Summary Judgement, p. 4.

The validity of the inspection is quintessential to the FBI's case. It provided the FBI with the final justification for two major material adverse actions and provided a phony "objective" justification for many of the false accusations raised by FBI managers against

Turner. As a threshold matter, the inspection report was *not* objective or independent. According to the Inspector in charge of the Turner review, the inspectors did not independently review any facts related Turner. Exhibit 28, Deposition of SA James Casey, Tr. 30-31, 37, lines 13-22. For example, Turner was never questioned about the allegations her managers raised against her, and was never given an opportunity to present her side of the story or provide any facts whatsoever to the inspections related to the FBI allegations. *Id*. at Tr. 29, lines 18 - Tr 30, line 7. The inspectors *never* interviewed *any* FBI employee who actually witnessed Jane Turner performing her law enforcement functions, and failed to interview her co-agent on child crime cases (Anthony Onstead) and failed to interview any of the AUSAs with whom she worked.

What is even more remarkable was the FBI inspectors' justification for *not* conducting an independent review of any of the allegations filed against Turner. The inspector testified that he operated under an *assumption that Turner's supervisors were all truthful*. Ex. 28, Tr. 36, lines 14-15 ("If a supervisor tells me something, then I'm inclined to believe it"). SA Casey stated:

> Q: When you conduct these investigations . . . you operate under the assumption that supervisors will be fully candid?
> A: Yes.
> Q: And that is one of the reasons why, you know, essentially the assumption of the supervisor being candid, is that one of the reasons why in your mind you would not need to conduct independent verifications of information provided to you?
> A: Correct.

*Id*. at Tr. 37, lines 13-22.

In addition to conducting their "investigation" without performing any verification regarding allegations raised against Turner by her management, the inspector also confirmed that there were no safeguards whatsoever to ensure that EEO related discrimination did not impact

the inspection process. The inspector knew that Turner had filed EEO-related reprisal allegations, yet never questioned "anyone" as to whether any of the information "provided to" him may have been "in retaliation because Jane Turner was filing an EEO complaint." Ex. 28, Tr. 50, lines 16-20. No safeguards existed to protect Turner from her management misusing the inspection process by providing false or misleading information to inspectors:

> Q: [O]nce you learn that, that this employee has alleged that that supervisor has engaged in reprisal, is there a procedure you follow to address potential bias issues?
> A: Not that I'm aware of.

*Id*. at Tr. 53, lines 2-6.

Given the fact that the so-called "independent" investigation was premised on the assumption that Turner's managers were fully candid and truthful, and given that there was no independent fact-checking to ensure the accuracy of information provided from the very managers Turner had filed EEO complaints against, it is not surprising that the inspection report "confirmed" the false accusations raised by Turner's managers.

In addition to the procedural deficiencies in the so-called "independent" inspection report, the contents of that report demonstrate that Turner's managers fabricated evidence to show that Turner was not performing at the level of a GS-13 Agent.

First, the Report falsely set forth facts regarding the Froistad case. Although Inspector Casey admitted that the USAO was never contacted about the case, the report repeated the false accusations by Welken/Burrus/Domin that Turner "unilaterally" contacted the USAO and "informed that office that she had unique expertise in the area of child abuse." Ex. 29, p. 2. This accusation was false. The report stated that Turner "did not possess a higher level of expertise

than other Agents in the squad." Again, this was false. *See supra* p. 9, citing Ex. 8, Tr. 100, 102.

The Report then accused Turner of "jeopardiz(ing) the integrity of the [Froistad] investigation." Defendant's Ex. 11, p. 2. This was the most series allegation against Turner in the entire report. It was based on a series of examples set forth on pages 2-3 of the report. Not only does Turner deny these accusations, the major objective witness to these events, SA Onstead, swore under oath that these allegations were all false and that Turner's work on the Froistad case was "totally professional." Ex. 27, Tr. 38-39; *see also* Ex. 30.

In regard to the allegation that Turner questioned Froistad without reading his "rights," the FBI simply forgot to mention that the questioning of Froistad referenced therein occurred *after* Froistad had plead guilty. Ex. 8, Tr. 117 ("I don't know why [Froistad] would [need to be read his Miranda rights] because he pled guilty and didn't have any Fifth Amendment rights any more with regard to the offenses."). As part of the plea deal Froistad agreed to work directly with the FBI (at the time Agent Turner) and fully cooperate in discussing with federal agents the modus operandi of child pornographers on the internet. *Id*. at Tr. 118 ("interviews with Froistad concerned developmental lead and long-range thinking in terms of Internet pornographic crime."). Significantly, ten months before the Inspection Division was provided with false allegations concerning the post-conviction interrogation of Froistad, Mr. Welken had been provided explicit written notice that Froistad would be questioned, per his plea agreement, by the government concerning child pornography. *See*, Ex. 31.

On pages 3-4 the inspection report discussed a 9/24/99 child sex crimes case. This case concerned the criminal activity of Tony Vigestad. The report attempted to bolster the FBI's false allegation that Turner did not engage in proper liaison conduct in that case. Turner's co-

agent on that case was Mr. Onstead. He testified under oath that Turner "was always just totally professional when she was out doing her job." Ex. 27, Tr. 38-39. Moreover, the Ward County State's Attorney, Doug Mattson to whom the FBI alleged Turner acted unprofessionally, wrote a letter to the FBI explaining the incident and concluding that "I feel we worked it out between ourselves." Ex. 32. Likewise, the FBI possessed a Sep. 25, 1999 letter from Onstead providing further confirmation that Turner did not have a performance problem in this matter. Ex. 44.

The so-called incident with the three Indian police officials set forth on pp. 4-5 of the report was another attempt to present a misleading account of an otherwise unremarkable incident. As a threshold matter, Elmer Four Dance, who at the time of the Chief of Police for the BIA, testified under oath that he and Turner "always worked well together." Ex. 33, Deposition of Elmer Four Dance, Tr. 56. Moreover, the FBI was aware of the underlying facts related to this matter (i.e. that a local tribal police officer had attempted to close-out a rape case which involved the relative a the Tribal Chief). Turner knew, based on her years of successful police work in Indian reservations, that it was not uncommon for issues related to nepotism or family relationships to cause tension in law enforcement activity on a reservation. Ex. 1 at ¶ 25.

The FBI also knew that many of the derogatory inferences set forth in the report were not true. For example, on page 6 of the report the inspector discussed "disturbing statements" by Turner which indicated that Turner made "grandiose claims about her work." The example used by the inspector concerned Turner's attempt to take "credit for the arrest of" Mr. Christopher John Boyce. Incredibly, the FBI fully knew that this claim was not "grandiose" or "disturbing." The FBI knew that Turner's claim was true. Ex. 4 (U.S. Attorney General thanking Turner for her "skill, resourcefulness and hard work" in "apprehending" Boyce).

Finally, the FBI knew at the time the inspection report was completed that Turner had excellent relations with law enforcement community in North Dakota. Inspector Casey conceded that the relationship between an AUSA prosecuting a case and the agent assigned to investigate the case was very important. Ex. 28, Tr. 32. However, Casey did not interview anyone from the USAO with whom Turner worked. If he had, he would have learned that Turner's reputation within the law enforcement community was stellar.

Likewise, Tribal Chairman Mason explained that Turner "has always been a dedicated, professional, hard-working law enforcement individual who combines a special ability to work with a variety of people in obtaining their cooperation in sensitive matters, and yet is cognizant of cultural difference." Ex. 7, pp. 9-11. Chairman Mason admitted that the FBI is "a better place for both Indian and non-Indian residents" because of Turner. *Id.*

*I. Disparate Treatment: Statistics and Negligent Investigations*

At the very time the FBI was attacking Turner's performance, other agents within the FBI conducted sloppy and incompetent investigations of child-crime cases. These cases resulted in actual prejudice to the victims of the crimes. However, the agents who engaged in the sloppy and incompetent work were not disciplined, reprimanded, downgraded or transferred.

On or about July 2, 1999, a three year old Indian child from the Turtle Mountain Indian Reservation (TMIR) was treated at Minot hospital for perirectal tearing – injuries consistent with the sodomy and rape. Ex. 34, Hospital Report; *see also*, Ex. 9, Tr. 22, lines 9-10. The hospital staff "strongly" suspected sex abuse and contacted law enforcement. Ex. 35, p. 4 (Dr. Dar Interview). Dr. Ann Cadwalder examined the child and determined that it was the "clearest case of rectal penetration she had ever seen." Ex. 36, p. 1. No action was taken and the child was

discharged from the hospital on July 7th. *Id*. at p.2. The social worker who examined the child during in the July 2-7 time frame formed the opinion that the child had been sexually abused. However, "law enforcement would not help." The social worker believed that if the child was placed back into the "same household" the child would be in "danger." Ex. 37, pp. 3-4. Likewise, the nurse who treated the child concluded that the injury was caused by a sexual assault and that he was "very concerned about the child due to the fact that the parents behaved so inappropriately, and he felt the cuts on the boy's hand may have come when the boy tried to hide under a car after the assault, trying to get away." Ex. 38, p. 2.

A few weeks after the boy returned home, Turner visited the Minot hospital on an similar matter. Ex. 39 (Dr. Dar memo). Dr. Ellen Dar, who treated the boy, told Turner that the child was a victim of a sexual assault: "I usually cannot say with definite certainty that a child has been abused. However, the [boy's] case was a *no-brainer* . . . . This was a clear case of sodomy. There was no gray area. There was no ambiguity." Ex. 39, p. 1, Dr. Dar Memo, (emphasis added). Dr. Dar expressed her grave concerns over the welfare of the child and the fact that the child had been returned to his family without any government intervention. *Id*. She expressed concern that the FBI "failed to protect this small child."*Id*.

Based on her expertise in child crimes, Turner immediately recognized that the concerns of these doctors needed to be investigated. Ex. 1 at ¶¶ 18-19. After speaking with Dr. Dar, Turner returned to the office she asked SA Klockstad why he didn't pursue the case in general. *Id*. SA Klockstad told her that the matter was a car accident and that Dr. Dar "didn't know what she was talking about." *Id*. By this point, Special Agent Klockstad had already concluded that a car ran into the child, and ignored Turner's strong recommendations to open up an investigative

file. Ex. 8, Tr. 13, lines 24-25; *see also*, Ex. 9, Tr. 19, lines 4-8. The USAO, acting on the advice of Mr. Klockstad, had closed the case. Ex. 40.

Mr. Turner reviewed the case file and discovered that SA Klockstad had failed to conduct even the most rudimentary investigation into the matter. Ex. 1 ¶ 18. Turner, however, reopened the investigation and cracked the case. As Hochhalter explained, Turner was responsible for correcting the egregious mishandling of the case. *See* Ex. 8, Tr. 136-37. Her performance on the case was "Excellent. She made the case. I do not believed there ever would have been a prosecution" if she did not "dog" the case. *Id.* at Tr. 138.

While investigating the case, Turner learned that critical evidence relevant to investigating the crime had not been properly secured by the FBI. Exhibit 1 at ¶ 21. Specifically, based on her interviews with medical personnel, Turner learned that photos had been taken of the boy during his treatment in the hospital, Ex. 35, p. 5, but the pictures were not properly secured nor examined by the FBI prior to the initial declination.[9] Ex. 1 ¶ 21. Therefore, with the assistance from the entire emergency room staff, Turner located the photos, examined them, and determined that these photos were clear evidence that the boy had been brutally raped. *Id*. AUSA Hochhalter reported that it was "pretty obvious" from photos taken of the boy at the hospital that the child was a victim of child abuse. Ex. 8, Tr. 138, line 8.

Because of her involuntary transfer from North Dakota, after Turner had the case re-opened, she was removed from the case. The FBI reassigned the case back to SA Klockstad. At

[9] Taking pictures of a victim while the wound is fresh is standard investigatory procedure. The failure to take such pictures under these circumstances could be considered gross negligence. The review of the photos not only documents the extent of the injuries potentially caused by a rapist, but proper examination of the injuries recorded in photographs can document the true cause of the injuries.

the time of the reassignment, Turner recommended that a polygraph be conducted of the suspected rapist (the child's father). Klockstad never ordered the polygraph. Ex. 1 at ¶ 22. Instead, Turner had to pressure AUSA Hochhalter to obtain permission to polygraph the boy's father, who ultimately confessed to raping his three year-old son. *See* Ex. 8 Tr. 136.

After the conviction was obtained, the FBI refused to give Turner any statistical credit for the case. Mr. Klockstad was never counseled or disciplined for negligently closing such an obvious case of child rape. Instead, he was awarded statistical credit for the conviction. However, as Hochhalter recognized, "it was a difficult case, but in my opinion mishandled during the investigation." *Id*. And, Turner was responsible for "correcting the mishandling." *Id*.

As mentioned previously, in another 1999 case, Turner learned about an arrest of a Mr. Vigestad by the local law enforcement for child pornography. In that case Turner and Onstead learned that SA Florez had worked the case for approximately 18 days, "off the books," *i.e.*, without properly logging in the case. *See* Ex. 27, Tr. 63-65. They also learned that SA Florez had taken possession of evidence in the case – the suspect's computer – without a proper chain of custody and without freezing his internet account. *Id*. Agent Florez was never disciplined or reprimanded for working the case "off the books," failing to protect the chain of custody or for failing to secure the pedofile's internet account. Ex. 1 ¶ 24.

When Agent Klockstad was placed in charge of the case, the malfeasance continued. In violation of standard procedures, no search was conducted and no internet account freeze was ever placed on the pedophile's work computer. Ex. 27, Tr. 81-87, 98. Klockstad, in violation of standard and important investigatory practice, never even interviewed the one known victim of Vigestad's child abuse. Ex. 12, Tr. 136. Moreover, Klockstad learned that Vigestad had regular

contact with other young boys, including children from the nearby Indian reservation and a child at the television station where he worked. Ex.1 ¶ 25. Despite his failures, Klockstad's performance was never downgraded, he was never even counseled. Ex.12, Tr.10.

*J. The Transfer*

The FBI alleged that Turner was transferred to Minneapolis in order to somehow help her. However, the transfer resulted in the removal of Turner from the network of law enforcement professionals for which she successfully worked and held her in high esteem. She was transferred to an office for which she had no contacts and no friends.

Worse, the FBI rumor-mill had seriously harmed Turner's reputation, making her integration into a new work station nearly impossible. According to the sworn statement of one of the FBI Special Agents who worked in the Minneapolis office, Mr. John Payne, even before Turner arrived in Minneapolis, there was "gossip" in the FBI office that Turner was "someone to avoid" because she "was rumored to be prone to initiate administrative and civil action with little provocation." Ex.41, Sworn Statement of John Payne, p. 3. Mr. Payne also admitted to telling Turner that "people in the office were concerned that she may file some claim against them" and "as a result they were careful how they treated her." *Id.*

Another agent who also worked in the Minneapolis Division, Mr. Richard Waldie, also testified that derogatory statements were made about Turner at the time of her transfer to Minneapolis. Ex. 42, Deposition of Richard Waldie, Tr. 24-25. In fact, Waldie was actually laughed at for having to work with Turner: "[the other agents] were alluding to the fact that she [Turner] was somebody that you probably didn't want to work with." The agents made comments such as: "Ha, ha, ha. You have to work with her." The other agents in Minneapolis

also made fun of Turner's expertise in child crimes. Mr. Waldie testified that agents made remarks like "the porn twins" and "Ha, ha, ha, you're going to work with Jane Turner now. Ha, ha, ha, you guys are going to do child pornography together." *Id*. at Tr. 24. Mr. Waldie "didn't appreciate" these comments. *Id*.

The U.S. Attorney's with whom she worked stated that they did not support her transfer. More specifically, USA Schneider stated that he was "disappointed that Jane was being transferred because she was a good agent, and it was during the time that we were working the [young Indian boy] case." Exhibit 9 at Tr. 46. USA Schneider "thought she was a good agent because she got confessions, because she was hard working, she was available, and that she didn't quit, not until she was satisfied." *Id*. at Tr. 46-7.

According to AUSA Hochhalter, if he had been asked what he thought of Turner being transferred, he would have said:

> **Why the hell do you want to do that? Why would you take an agent with her experience and skill level away from her home base where she's comfortable and does a great job? Why would you want to remove her against her will?**

Ex. 8 at Tr. 52.

Transferring Turner out of North Dakota actually harmed the law enforcement mission of the FBI. According to AUSA Hochhalter, "I don't think we're as effective as when Jane was working Indian Country in identifying and successfully prosecuting child cases." *Id*. at 58 In fact, since Turner's transfer not one case has been investigated, much less prosecuted, for child sexual abuse. *Id*. at 57; *see also* Ex. 9 at Tr. 55, lines 12-16. As explained by AUSA Hochhalter: "In terms of child related criminal activity since Turner left, the skill level being applied is lower. Much lower. Dismal." Ex. 8, Tr. 30-31. AUSA Morley related an incident in which a

medical doctor on the reservation asked her why "Jane wasn't doing prosecutions in Forth Berthold anymore." When Morley told her that Turner had been transferred, the doctor responded the they had "lost a good person in our community." Ex. 9, Tr. 56, lines 11-25.

*K. Post Transfer*

In its motion for summary judgement, the FBI references various adverse actions which occurred after Turner was transferred to the Minneapolis Division. Those matters are the subject of a separate EEO complaint presently pending before the EEO and a separate Whistleblower Protection Act complaint pending before the U.S. Department of Justice. Due to complexity of this case, and for reasons of judicial efficiency, Turner has elected to pursue those issues in the EEO and DOJ forums.[10] As can be seen from the scope of the amended complaint, it primarily concerns the discriminatory actions that occurred up thru her transfer to Minneapolis. Additionally, in accordance with FRCP 56(f) these matters are not ripe for summary judgement. For example, during the discovery phase of this case plaintiff attempted to depose witnesses relevant to Turner's 2002 job performance. This included Turner's Minneapolis Division supervisor and the AUSA and a special agent who worked directly with Turner her major case (the Keiger case). The government objected to this discovery on the ground that Turner had

[10] For example, Turner's whistleblower complaint is currently in active litigation before the DOJ. The FBI filed a major motion to dismiss, in when Tuner filed a 45 page response, with numerous exhibits. The FBI actually *withdrew* its motion to dismiss as meritless after reviewing Turner's opposition. Ex. 45. Significantly, the DOJ Office of Inspector General also ruled that Turner's whistleblowing allegations in the 2002 time frame had merit. They found that her allegation that Minneapolis Division and other FBI agents improperly took property from the Ground Zero crime scene was valid. Ex. 46. In regard to the pending EEO actions, Turner was pursuing her post-transfer EEO claims within the EEOC. On March 21, 2004 the DOJ's EEO office issued its first determination on all of Turner's post-transfer claims. Turner has filed an internal EEO appeal of that matter. Ex. 50.

failed to exhaust her administrative remedies and that they were beyond the scope of the complaint. Ex. 47 and 48. No discovery whatsoever was conducted on these matters.

## ARGUMENT

### I. JANE TURNER WAS DISCRIMINATED AGAINST BECAUSE OF HER GENDER.

Title VII of the Civil Rights Act of 1991 makes it an unlawful employment practice for the FBI to "to discriminate against any individual . . .because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1) (2002).

To establish a claim for gender discrimination, Turner must establish the following: 1) she is a member of a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) this action occurred under circumstances which allow a court to infer unlawful discrimination. *Rueda v. West Side Community Health Services,* 2003 WL 22508089 (D. Minn. 2003).

Examining the totality of the circumstances in the light most favorable to Turner, there is overwhelming evidence that Turner satisfies these requirements. The first two elements are not contested: she is a member of a protected class (female) and she was qualified to be a Special Agent. In regard to adverse action, as set forth in the statement of the facts, Turner's claim includes the following harms: (1) denial of milage reimbursements; (2) denial of quality step salary increases; (3) interference with her ability to perform the function of an SRA (resulting in the constructive demotion of Turner from that position); (4) unsatisfactory performance ratings (under the FBI performance system, the rating given to Turner directly resulted in her ineligibility for quality salary increases, delayed her eligibility for "step"salary increases based

on seniority and blocked her transfer to a position in which she could be made eligible for a promotion); (5) a punitive transfer; and (6) a hostile work environment.

The facts in this case clearly establish that all of the adverse actions set forth above meet the criteria of harm in order to be cognizable under Title VII. The Eighth Circuit has held that "employment actions that are sufficiently adverse to sustain" a claim "must take the form of a material employment disadvantage." *Cross v. Cleaver II*, 142 F.3d 1059, 1073 (8th Cir. 1998), citing, *Manning v. Metropolitan Life Ins. Co., Inc.,* 127 F.3d 686, 692 (8th Cir. 1997) (employment actions that were sufficiently adverse to sustain a retaliation claim include "tangible change in duties or working conditions that constituted a material employment disadvantage," or an "ultimate employment decision"); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir. 1997) (discharge, reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, and "papering" of an employee's file with negative reports and reprimands); *Montandon v. Farmlands, Inc.,* 116 F.3d 355, 359 (8th Cir. 1997) (transfers involving changes in pay or working conditions, and negative evaluations).

"An unfavorable evaluation is actionable where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears v. Missouri Department of Corrections and Human Resources*, 210 F.3d 850, 854 (8th Cir. 2000) citing *Enowmbitang v. Seagate Tech., Inc.,* 148 F.3d 970, 973-74 (8th Cir.1998); *Montandon,* 116 F.3d at 359. In this case, the unfavorable evaluations materially altered the terms and conditions of Turner's employment status. Once SSRA Welken materially lowered Turner's PARs from "Superior" to "Minimally Acceptable" to "Unacceptable," Turner was no longer eligible to receive: a within-grade increase, a promotion, or a reassignment to a

position with greater promotional opportunity than the position (she) currently held." Ex. 43, Performance Appraisal Systems Employee Handbook.

Turner's involuntary transfer from North Dakota to Minnesota constitutes an adverse action. A transfer constitutes an adverse action when the transfer results in a significant change in working conditions. *See Spears v. Missouri Dept. of Corrections and Human Resources*, 210 F.3d 850, 853-54 (8th Cir. 2000); *Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir. 1997); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). *See also Tadock v. Powell*, 291 F.3d 541, 546-47 (8th Cir. 2002) (directed lateral transfer as adverse action); *Brown v. Cox*, 286 F.3d 1040, 1046 (8th Cir. 2002) (transfer that significantly hurt further career prospects as adverse); *Collins v. State of Ill.*, 830 F.2d 692, 704 (7th Cir. 1987) (transfer to new department where plaintiff is isolated ostracized and regulated to reference work).

In this case Turner was removed from her position, forced to sell her home and forced to move her child hundreds of miles from her home (and the child's father's home). Turner was uprooted from a community in which she had strong support and her years of developing contacts, informants and case leads were all lost. Ex. 1 ¶ 30. As explained by AUSA Hochhalter: "Why would you take an agent with her experience and skill level away from her home base where she is comfortable and does a great job?" Ex. 8, Tr. 52.

When Turner arrived in Minneapolis, she was isolated, ostracized and the subject of ridicule (*i.e.* a "Porn twin"). She was separated from all of her law enforcement contacts. She was not assigned cases in her areas of expertise and was never permitted to use her vast skills in profiling and interrogations. She never worked another child-crime case. She never again

worked cases like Froistad or [the three year-old boy] and never again was responsible for law enforcement in a large area such as the 24,000 square mile Fort Berthold she policed while in Minot. All of the prestige she built-up within the law enforcement communities was lost. Her ability to obtain promotions or superior performance ratings were prejudiced. Ex. 1, ¶ 36.

Other actions at issue in this case, although not as drastic as the unsatisfactory performance ratings and the transfer, unquestionably qualify as adverse action. For example, Turner was denied milage reimbursements which resulted in a concrete economic harm. Ex 10 p. 3. Turner was rated "below expectations" for an 11 month period of time, which reduced her service computation date by 11 months for the purposes of her qualification for a "step" salary increase from a GS-13 Step 8 to a GS 13 Step 9. *See*, Defendant's Amended Memorandum in Support for Summary Judgement, p.25, n. 7; *see also* Ex. 1¶ 36. Additionally, she was stripped of all of her supervisory duties as a Senior Resident Agent, causing her to resign from that post.

Finally, even if this Court were to hold that all of the adverse actions set forth above were somehow not cognizable, taken together these actions would constitute sufficient grounds for finding a hostile work environment. Summary judgement may be defeated solely on the basis of circumstantial evidence. *Desert Palace, Inc. v. Costa*, – U.S. –, 123 S. Ct. 2148, 2154, 156 L. Ed2d 84 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

The forth element under *Rueda* requires plaintiff to set forth circumstances which would permit a court to infer unlawful discrimination. The evidence on this element is overwhelming. Not only does the evidence of unlawful discrimination satisfy the requirements for setting forth a

prima facie case, the evidence strongly supports a finding of pretext and clearly controverts the FBI's justifications for the adverse action. *See Rueda*.

First, FBI Special Agent Wendy Loucks testified that Turner was discriminated against in North Dakota. Ex. 10. Ms. Loucks' testimony on this matter is extremely credible. Ex. 1 ¶ 4.

Second, Turner's treatment as the Senior Resident Agent (SRA) supports a finding of discrimination. Male agents in the Minot residency were permitted to treat Turner's SRA status as secretarial in nature (i.e. Turner had responsibility for ordering supplies). Taking supervisory responsibilities from a female SRA, and re-defining that position as secretarial in nature, raises an inference of discrimination based on sex.

Third, Turner was the most qualified agent in North Dakota to work on crimes against children cases. Her supervisor attempted to block her ability to work on a high profile child-crime case (Froistad) and attempted to assign that responsibility to a less-qualified male agent. When the United States Attorney for Dakota directly intervened and requested Turner's involvement on the case, the FBI reluctantly relented. Thereafter, the FBI improperly attacked Turner's performance on that case, fabricated misconduct allegations related to her work on that case and refused to credit her exceptional performance on that case. Both the FBI's attempt to have a less-qualified male assigned to the Froistad case and its fabrication of allegations demeaning to Turner about her conduct in that case strongly support a finding of discrimination. *See* supra sec. *B & F*

Fourth, the FBI's entire case is primarily premised on the assumption that Turner's performance declined in 1998-99. This assumption is necessary to support the adverse

performance reviews, the adverse inspection findings and the disciplinary transfer. However, the facts demonstrate that there was no performance decline. *See* supra, sec. *G*.

Fifth, the record contains evidence of disparate treatment. The two male agents in the Minot residency made major investigatory mistakes in two significant child crime cases. These mistakes actually harmed criminal cases and harmed the victims (or potential victims) of the crimes. *See* supra, sec. *I*. The performance ratings of these agents were not downgraded as a result of these documented performance failures. They were not transferred as a result of these failures. *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

The final category of evidence which supports a finding of discrimination is based on the inaccuracies within the FBI inspection report. *See* supra, sec. *F* & *H*. These inaccuracies are material and, in some cases, clearly fabricated. In *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 146-48, the Supreme Court held, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity fo the employer's explanation." The evidence on the record in this matter supports a finding that the FBI's justifications for the adverse action were false. Given the egregious nature of the false and misleading statements contained in the Inspection Report, under a *Reeves* analysis, standing alone, Turner has set forth sufficient facts to defeat the FBI's motion for summary judgement.

## II. THE DISCRIMINATION CREATED A HOSTILE WORK ENVIRONMENT

To succeed in this claim under Title VII, Turner must prove: 1) she is a member of a protected group; 2) she was subject to unwelcome harassment; 3) a causal relationship between the harassment and her membership in the protected group; 4) the harassment affected a term or condition of her employment and; 5) "the employer knew or should have known of the

harassment and failed to take prompt remedial action." *Rueda v. West Side Community Health Services*, 2003 WL 22508089, p. 5 D. Minn., Nov 03, 2003.

Turner has shown that the harassment she suffered rose to the level of a hostile work environment, as viewed from both an objective and a subjective perspective. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993). Its existence is determined by the totality of the circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." *Id.* at 23; *see also Howard v. Burns Bros.,* 149 F.3d 835, 840 (8th Cir. 1998).

The only other female agent who worked in North Dakota testified that Turner faced a discriminatory environment while being supervised by SSRA Welken. According to SSRA Loucks, "Based on the question, 'Are there any discriminatory practices being perpetrated in the [Minneapolis] Division' . . . . The brief answer to this question is **yes**." Ex. 10, p. 2 (emphasis added). Moreover, SSRA Loucks confirmed that Mr. Welken treated Turner unfairly: "In some cases, I have felt I have had to *stretch the bounds of rational reasoning* in order to justify SSRA Welken's decisions with respect to their impact on SA Turner." *Id*. at p. 11 (emphasis added). SSRA Loucks provided numerous examples of the discriminatory work environment. Ex. 10.

The hostility became overt and extreme when the two male agents in the Minot residency simply ignored the written procedures related to the Senior Resident Agent (SRA) position held by Turner. When Turner objected to this disrespectful treatment and provided Agent Klockstad with a copy of the FBI rules governing the SRA position, Klockstad simply called Turner's

supervisor and obtained permission to treat the SRA position as secretarial in nature. Once her ability to function as the SRA was undermined, Turner was humiliated and resigned the position.

Next, the FBI attempted to improperly block Turner's ability to work as a case agent on a major national high-profile child-crime case. This attempt failed when the United States Attorney directly demanded her involvement, but the FBI's hostile reaction to this matter was unending. Her performance was downgraded, the FBI failed to recognize her remarkable achievements, and the FBI fabricated false allegations of misconduct relate to the case.

The hostile environment became even worse, and included additional downgraded evlautations, blocking Turner's ability to work on other child-crime cases, making false and derogatory statements about Turner, threatening Turner with a "fitness for duty" evaluation and finally removing Turner from her position in Minot and forcing her to move hundreds of miles from her home into an environment which was even more hostile then Minot. Specifically, in Minneapolis Ms. Tuner lost her entire support network, lost her excellent law enforcement contacts and was made the target of jokes and was referred to as the "porn twin." Agents were warned not to work with her and other agents warned that Turner had filed "civil and administrative complaints."

The cumulative impact of these events directly resulted in Turner developing post traumatic stress disorder (PTSD). Ex. 51. Dr. Carter Letter. An independent psychological expert carefully evaluated Turner medical record and concluded that Turner developed PTSD as direct result of the FBI's retaliatory and discriminatory actions:

> The data clearly indicates that Turner has become disillusioned by her experiences with the FBI. Turner has a strong sense of right and wrong. It is hard for her to reconcile the way she has been treated by colleagues and supervisors with her image

> of the FBI as an agency committed to the highest morals and ethical standards. Her very fundamental belief in the integrity of law enforcement has been permanently shattered by her work related experiences. She fell her trust and commitment have been betrayed. This forms the basis of Post Traumatic Stress Disorder.

*Id*. at p. 4.[11]

In short, in 1998-99, the FBI created such an extremely hostile environment that Turner developed Post Traumatic Stress Disorder and sever physical illnesses, Ex. 1 ¶ 37, directly caused from her abusive treatment.

## III. TURNER WAS RETALIATED AGAINST AFTER FILING EEO COMPLAINTS

Title VII prohibits an employer from retaliating against an employee because he or she has opposed any practice made an unlawful employment practice by this subchapter," or "has made a charge" of harassment, or has "participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Turner must prove the following elements: 1) she engaged in statutorily protected conduct; 2) she suffered an adverse employment action; 3) the adverse action was causally linked to the protected activity. *Cross v. Cleaver II*, 142 F.3d 1059, 1071 (8th Cir. 1998); *see also, Kipp v. Mo. Highway & Transp, Comm'n,* 280 F.3d 893, 896 (8th Cir.2002); *Kiel v. Select Artifacts, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999). In *Ellis Fished State Cancer Hospital v. Marshall*, 629 F.2d 563 (8th Cir. 1980), the Eighth Circuit held that "The presence or absence of retaliatory motive is a legal conclusion and is provable by circumstantial evidence even if there is testimony to the contrary by witnesses who perceived lack of such improper motive." *Id*. at

[11] The doctor who examined Turner just after she learned of the decision to transfer her reached similar conclusions. This doctor determined that Turner condition was consistent with PTSD. The doctor also on-the-job "harassment" and Turner's concerns over being "betrayed and unsupported by her fellow agents" as causes for her condition. Ex. 49, pp. 2, 4.

566. Moreover, there are several factors that successfully establish circumstantial evidence of discriminatory motive for retaliation. *See id.* at 566 (high work performance rating prior to engaging in protected activity, and low rating or "problems" thereafter). *Viracon, Inc. V. NLRB*, 736 F.2d 1188 (7th Cir. 1984) (differences in the way the complainant and other employees were treated).

In regard to the first prong of the *Cross* analysis, it is not disputed that Turner engaged in protected activity. Ms. Turner filed EEO complaints with appropriate administrative authorities and engaged in protected conduct in "opposition" to sex discrimination within the FBI.

As set forth in the Argument section, Turner clearly set forth sufficient facts to meet her burden under the second prong of her retaliation claim (adverse action).

In regard to the third prong (causation), the arguments set forth in the facts are equally applicable to the retaliation claims. These arguments set forth facts which establish causation between Turner's EEO/sex discrimination complaints and the adverse action. However, there are additional facts which provide even more support for a finding of retaliation.

First, the timing of the adverse actions support a finding of retaliation. The FBI admits that after Turner filed her EEO complaint she: 1) received unsatisfactory performance evaluations in certain critical areas; and 2) made a protected reconsideration request of her April 1999 PAR; 3) was re-rated at a drastically lower level her PAR subsequent evaluations; and 4) was involuntarily transferred from Minot to Minneapolis based on the recommendation of the independent inspection report. The FBI further admits that "all of these events occur[ed] during the same time period;" therefore creating a relation between her EEO complaints, her reconsideration requests, and her involuntary transfer. To be sure, Turner has shown "more than

a temporal connection between [her] protected conduct and the adverse employment action." *Scroggins v. University of Minnesota*, 221 F.3d 1045 (8th Cir. 2000) citing *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir. 1999). The events here show a chain of retaliatory events that were pretexual in nature.

Second, there is direct evidence of retaliation. FBI agents in the Minneapolis Division specifically referred to the fact that Turner had filed "civil and administrative" claims as a reasons she should be avoided. Ex.41, p. 3. The only civil and administrative claims Turner had filed at the time those statements were made were EEO claims. Ex. 1, ¶ 9

Third, the specific timing of Turner's first downgraded evaluation clearly supports a finding of retaliation. Prior to June, 1999 Turner had never been rated as "does not meet expectations. On June 18, 1999 Turner informed James Burrus, the Acting SAC of the Minneapolis Division, that SSRA Welken had engaged "discriminatory practices" against Turner and that these discriminatory practices had "increased" since Turner had filed an "EEO complaint." Ex, 19, p. 2. Turner requested the June 18th EC be placed in her personnel file.

In direct response to this EC, the Acting SAC referred to Turner's memo as "not appropriate material" for a personnel file, refused to place the document in her file and forwarded the memo directly to Welken, the very individual accused to engaging in the "discriminatory practices." Ex.20. Burrus violated FBI procedure by not forwarding Turner's allegations of increased discriminatory practice to FBI OPR. Three days later Welken downgraded Turner's performance standing, and for the first time in her career rated Turner as "minimally acceptable/ unacceptable" in two critical elements. Ex. 23. After downgrading Turner's performance on June 23rd, Welken *never* upgraded her performance to the acceptable

range. Thus, from June 23, 1999 until her first review in Minneapolis (May, 2000), Turner's rating was continuously in the unacceptable range. The timing of this incident is strong evidence of retaliation. And, the Eighth Circuit's "cases hold that this temporal proximity is sufficient as a matter of law to establish the final requirement in a prima facie case . . . ." *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989).

Finally, Turner was directly pressured by the SAC to drop her EEO complaints. She was informed that should she drop the complaints and put these allegations of discrimination behind her, the SAC would transfer her to Rochester; a RA consistent with her career goals. Ex. 1 ¶ 32. The SAC's conduct constitutes direct evidence of retaliation.

## CONCLUSION

For the forgoing reasons, Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted

Stephen M. Kohn
Kohn, Kohn & Colapinto, LLP
3233 P Street, N.W.
Washington, D.C. 20007
(202) 342-6980
(202) 342-6984
Attorney for Jane A.T. Turner

ON BRIEF: C. Jason Perkey

May 21, 2004