**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jane A.T. Turner,

Plaintiff,

v.

John Ashcroft, United States Attorney General, Federal Bureau of Investigation, United States Department of Justice, and Robert S. Mueller, Director, Federal Bureau of Investigation,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Case No. 01-1407 ADM/AJB

---

Stephen M. Kohn, Esq., Kohn, Kohn & Colapinto, LLP, Washington, D.C., appeared for and on behalf of Plaintiff.

Martha A. Fagg, Esq., Assistant United States Attorney, Sioux City, IA, appeared for and on behalf of Defendants.

---

## I. INTRODUCTION

On July 23, 2004, oral argument before the undersigned United States District Judge was heard on the Motion for Summary Judgment or in the Alternative, Partial Summary Judgment [Docket No. 45] of Defendants John Ashcroft, the Federal Bureau of Investigation, the United States Department of Justice, and Robert S. Mueller (collectively, "Defendants"). In her First Amended Complaint [Docket No. 41], Plaintiff Jane Turner ("Turner" or "Plaintiff") alleges one count of sexual discrimination (Count I), three counts of retaliation or reprisal (Counts II, III, and IV), one count of hostile work environment (Count VI), and one count of "permanent

medical damage" (Count V). For the reasons set forth below, Defendants' Motion is granted.

## II. BACKGROUND[1]

Jane Turner began her career as a Special Agent with the Federal Bureau of Investigation ("FBI") in October, 1978. Turner Aff. ¶ 1 (Pl's Opp'n to Defs' Mot. for Summ. J. ("Pl's Opp'n") Ex. 1). In February, 1987, Turner sought and received a Senior Resident Agent ("SRA") position in the Minot, North Dakota Resident Agency ("RA") of the Minneapolis Division. Id. ¶ 2. In North Dakota, Turner specialized in investigating difficult child abuse crimes. Id. ¶ 3. Turner was recognized for her successful work in this area. Letter from Attorney General Smith to Turner of Sept. 4, 1981 (Pl's Opp'n Ex. 4). Turner has also received praise for various aspects of her performance with the FBI, including her dedication and determination. Memo from Mpls. Supervisory Agent in Charge ("SAC") to FBI Director of Oct. 28, 1992 at 3-4 (Pl's Opp'n Ex. 6). From the time Turner commenced her employment with the FBI through April, 1999, she consistently earned marks of "superior" or "exceptional" on her Performance Assessment Ratings ("PARs"). Pl's Opp'n Ex. 5. Turner also participated in the FBI's career development program in an effort to become an FBI manager. Memo from Mpls. SAC to FBI Director of Oct. 28, 1992.

In 1996, Turner applied to be the Supervisory Special Resident Agent ("SSRA") in Fargo, North Dakota. Turner Aff. ¶ 4. Another female agent, Wendy Loucks ("Loucks"), applied for the same position, as well as four other agents. Loucks Statement at 7 (Pl's Opp'n Ex. 10); SAC Recommendation (Defs' Mem. in Supp. of Am. Motion for Summ. J., or in the

[1] For purposes of the instant Motion, the facts are viewed in the light most favorable to Plaintiff, the nonmovant. See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Alternative, Partial Summ. J. ("Defs' Mem.") Ex. 2). However, both Turner and Loucks were passed up for the position in favor of Craig Welken ("Welken"). Loucks Statement at 8-10. Loucks claims that Welken had been "tapped" for the position by then SAC Larry Collins. Id. at 8.

Turner became concerned that she and other female agents in North Dakota were not being properly credited for their work. Following a review of her PARs, she asked Welken in 1998 why she was not receiving Quality Step Increase Awards for her performance. Turner Aff. ¶ 8. She apparently did not receive a satisfactory answer from Welken to this question. Id. Turner also claims her mileage reimbursements were low. Loucks also asserted that Turner was given unfairly low mileage reimbursements. Loucks Statement at 4.

Additionally, Turner alleges that FBI management effectively downgraded her SRA status to a secretarial function. In November of 1997, Peter Klokstad ("Klokstad") was transferred to the Minot office. Klokstad Dep. at 11 (Pl's Opp'n Ex. 12). Although Klokstad did not join the FBI until 1995, and was less experienced than Turner, he simply ignored tasks assigned to him by Turner. Id. at 6; Turner Aff. ¶ 7. When Klokstad asked SA Carl Florez ("Florez") what an SRA did, Florez stated that an SRA was "basically somebody that was supposed to order supplies." Klokstad Dep. at 36.

Eventually, Turner submitted an Electronic Communication on March 19, 1998, resigning her role as SRA "[d]ue to . . . no respect, nor support for [her.]" Memo Relinquishing SRA Status of March 19, 1998 (Pl's Opp'n Ex. 13). On April 6, 1998, Turner contacted the FBI EEO and alleged sex discrimination in the Minot office. June, 1998 EEO Complaint (Pl's Opp'n

Ex. 15). On June 10, 1998, Turner filed a formal EEO complaint alleging discrimination on the basis of sex and reprisal for involvement in a protected EEO activity. Id.

In July, 1998, at the repeated requests of U.S. Attorney John Schneider ("Schneider"), Turner was assigned to a high profile murder case over the objection of Welken. Turner Aff. ¶ 12. Ultimately, Turner was able to obtain a confession from the defendant, and was complimented by Schneider for her work. Id. ¶ 14; Email from Schneider to Turner of Oct. 13, 1998 (Pl's Opp'n Ex. 17). Following the conclusion of this case, Turner received a PAR rating of "superior." April, 1999 PAR (Pl's Opp'n Ex. 18). However, Turner felt that Welken did not fully recognize her for her work on this project because no positive reference to the murder case was included within the PAR. Turner Aff. ¶ 15. Turner confronted Welken regarding the failure to include mention of her work, but Welken refused to change the PAR. Additional Information for PAR Review Request at 1 (Pl's Opp'n Ex. 19). Turner responded by reporting the situation to Acting SAC Chip Burrus ("Burrus"). Id. Burrus denied Turner's request to include her version of events in her file, and instead, passed her complaints on to Welken. Letter from Burrus to Turner of June 22, 1999 (Pl's Opp'n Ex. 20).

Soon after, Turner received a "minimally acceptable/unacceptable" rating on her June, 1999 PAR. June, 1999 Performance Summary Assessment ("PSA") (Pl's Opp'n Ex. 22). Turner received similarly low ratings on her subsequent PARs. August, 1999 PSA (Pl's Opp'n Ex. 23); November, 1999 PAR (Pl's Opp'n Ex. 24). Additionally, Welken received complaints regarding Turner's performance from outside law enforcement officials and agents and staff within the FBI. Welken Decl. ¶¶ 3-5 (Defs' Mem. Ex. 4). These complaints included reports of

missed deadlines, failures to report investigative information in a timely manner, and complaints of derogatory comments. Welken Dep. at 49-53, 70-76, 95-101 (Defs' Mem. Ex. 5); see also June, 1999 PAR; August, 1999 PAR. In September, 1999, the new SAC, Doug Domin ("Domin"), met with Turner and observed her demeanor to be "troubling." Domin Memo of Sept. 14, 1999 at 2 (Defs' Mem. Ex. 8). Turner disclosed to Domin that she was taking anti-depressants. Domin Dep. II at 19-20 (Defs' Mem. Ex. 10). Domin ordered that following the meeting, he would personally review Turner's work for a period of sixty days. Domin Memo of Sept. 14, 1999 at 2. Domin's review determined that Turner was not working at the agent level assigned to her. Domin Dep. I at 44-48, 73-79 (Defs' Mem. Ex. 9); Domin Dep. II at 21, 24-26.

In October, 1999, an independent inspection of the Minneapolis Division, which included Minot, was conducted. Casey Memo of Oct. 19, 1999 (Defs' Mem. Ex. 11); Inspection Report (Defs' Mem. Ex. 12). During the inspection, Bureau of Indian Affairs officers told the inspector that Turner was difficult to work with, was unavailable after business hours, and failed to respond to crime scenes on weekends. Casey Memo of Oct. 19, 1999 at 4-5. Ultimately, the inspection concluded that Turner was not performing up to standards. Id. at 8; Inspection Report at 56-57. The inspection recommended that Turner be transferred to an office where she could be closely supervised. Casey Memo of Oct. 19, 1999 at 8; Inspection Report at 56-57. The report also recommended that Turner be referred to the Employee Assistance Program and given a Fitness for Duty evaluation. Inspection Report at 56-57. Following the inspection, Domin ordered that Turner be transferred to the Minneapolis office and referred her for a Fitness for Duty evaluation. Domin Memo of Nov. 5, 1999 (Defs' Mem. Ex. 13); Welken Memo of Oct.

30, 1999 (Defs' Mem. Ex. 14). After the inspection, Turner received a warning PAR at the "unacceptable" level in December, 1999. December, 1999 PAR (Defs' Mem. Ex. 17). Turner rejected the PAR, writing "do not agree" on the face of the PAR. Id. The FBI's Health Care Programs Unit ("HCPU"), however, denied the referral for the Fitness of Duty evaluation as premature. HCPU Memo of Nov. 22, 1999 (Defs' Mem. Ex. 15). Turner did seek a psychological evaluation from Dr. John Garafalo ("Garafalo"), who found that Turner suffered from post-traumatic stress related symptoms and generalized anxiety. Garafalo Dep. at 20-23 (Defs' Mem. Ex. 16). Garafalo attributed these symptoms to memories of the child abuse cases on which Turner had worked. Id.

In May, 2000, Turner began work in the Minneapolis field office.[2] Following the first ninety days in Minneapolis, Turner received a "fully successful" evaluation by her second-line supervisor Ray Morrow ("Morrow") as recommended by Domin. Morrow Dep. at 43-44 (Defs' Mem. Ex. 19); April, 2000 PAR (Defs' Mem. Ex. 20). Despite the positive evaluation of her work, Turner refused to sign the April, 2000 PAR. After this positive evaluation, however, complaints began to build against Turner, including allegations of disparaging comments towards managers and male agents, unwelcome touching, circulation of a sexually-offensive cartoon, and rude behavior towards a security guard. Domin Dep. I at 168-173, 177-183, 186-187; Domin Dep. II at 37-40; Kaul Decl. (Defs' Mem. Ex. 21); Kaul Memo (Defs' Mem. Ex. 22); "The Ideal Woman" cartoon (Defs' Mem. Ex. 23); Kaul Summary (Defs' Mem. Ex. 24).

---

[2] Plaintiff argues that this lawsuit pertains only to actions prior to her transfer to Minneapolis. However, events that occurred after her transfer are intertwined with this action. Moreover, both Defendants and Plaintiff refer to events that occur following Plaintiff's transfer. As a result, post-transfer events will be considered in this Motion.

Additionally, Turner's first-line supervisor, John Kaul ("Kaul"), witnessed a briefing Turner gave at the United States Attorney's Office in which Turner made disparaging remarks towards Native Americans and homosexuals. Kaul Summary. Turner also suffered from performance related complaints, including disregarding instructions during a prostitution sting and failing to properly handle documents. Domin Memo of Sept. 25, 2000 at 13-14 (Defs' Mem. Ex. 25); Memo re: Improper Handling of FBI Documents of Aug. 24, 2000 (Defs' Mem. Ex. 25A). Kaul and Domin both met with and counseled Turner regarding these issues. Domin Dep. II at 40-41, 48-52; Kaul Summary at 4-6; Domin Memo of Sept. 25, 2000 at 11. Around this time, Turner told Domin she wanted to be taken off child abuse cases, stating that she was working through post-traumatic stress. Email from Domin to Turner of Sept. 7, 2000 (Defs' Mem. Ex. 27).

Shortly following this email exchange, Domin proposed that Turner either be demoted, referred for a Fitness of Duty evaluation, or be terminated. Domin Memo of Sept. 25, 2000 at 17-18. The request for a Fitness of Duty evaluation was again denied by HCPU. Bartnik Memo of Nov. 15, 2000 (Defs' Mem. Ex. 28). Following more complaints about Turner's performance, a third referral for a Fitness for Duty examination was made by Domin in January, 2001, and was granted. Trudeau Dep. at 30-35 (Defs' Mem. Ex. 29); Reda Statement (Sealed Ex. 1); Reda Notes (Sealed Ex. 2); Yoder Memo of Jan. 30, 2001 (Defs' Mem. Ex. 31). Turner was evaluated by two forensic specialists, both of whom found her unfit for duty. Gruenberg Eval. at 13-14 (Sealed Ex. 3); Ostrov Eval. at 16 (Sealed Ex. 4). In response to these evaluations, Turner was placed on paid leave for a period of one year to allow Turner to retain a psychiatrist and obtain counseling. Bartnik Letter at 2-3 (Sealed Ex. 5). Turner told the FBI that she would receive

counseling from Dr. Garafalo and Dr. Ginger Kirk, but ultimately did not receive treatment. Garafalo Dep. at 24, 27.

Turner returned to the FBI in January, 2002. However, her performance soon began to suffer, and the FBI again received complaints regarding personality and professional issues. Regan Memo of Oct. 17, 2002 at 3-16 (Defs' Mem. Ex. 36). Eventually, the FBI began termination proceedings for Turner. October, 2002 PAR (Defs' Mem. Ex. 37); Proposed Termination Letter of April 11, 2003 (Defs' Mem. Ex. 38). Before termination proceedings concluded, Turner voluntarily retired on October 31, 2003.

During her tenure at the FBI, Turner filed five EEO complaints. The first complaint was filed on June 22, 1998, and contained general allegations of sex discrimination, hostile work environment, and retaliation. June, 1998 EEO Complaint. Turner challenged her non-selection as North Dakota supervisor in 1995, as well as her failure to be transferred in 1996-97. Taoka Memo of Aug. 18, 2000 (Defs' Mem. Ex. 41). Turner filed a second EEO Complaint on March 16, 2000, again alleging sex discrimination, sexual harassment, and retaliation. March, 2000 EEO Complaint (Defs' Mem. Ex. 40). Specifically, Turner disputed her performance evaluations and the results of the independent investigation, as well as the resulting transfer to Minneapolis. Taoka Memo of Aug. 18, 2000. A third EEO complaint was filed by Turner in December, 2000, in which Turner contested incidents following her arrival in Minneapolis. December, 2000 EEO Complaint (Defs' Mem. Ex. 42). Turner filed a fourth EEO complaint in April, 2002, alleging that a negative PAR rating and the subsequent affirmation of that rating were discriminatory and constituted reprisal. April, 2002 EEO Complaint (Defs' Mem. Ex. 43).

Finally, Turner filed a complaint in January, 2003, claiming sex discrimination and retaliation by various FBI supervisors who gave Turner a negative rating on a PAR. January, 2003 EEO Complaint (Defs' Mem. Ex. 44).

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B. Title VII Framework

Defendants argue that they are entitled to summary judgment because Plaintiff cannot establish a prima facie claim for Title VII gender discrimination, retaliation, or hostile work environment. In the alternative, Defendants argue that the actions they took which constitute a prima facie case were all performed for legitimate purposes. Title VII provides that "[i]t shall be

an unlawful employment practice for an employer to discriminate against any of his employees . . . because he [the employee] has opposed any practice made unlawful by this subchapter . . . ." 42 U.S.C. § 2000e-3a. The burden shifting framework described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), applies to Plaintiff's Title VII claims.[3] See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134-36 (8th Cir. 1999) (applying framework to Title VII claim). Under this framework, the plaintiff employee must initially establish a prima facie case of discrimination. This showing creates a presumption that the employer acted unlawfully. See Kiel, 169 F.3d at 1134-35. The burden of production then shifts to the employer who must provide legitimate, non-discriminatory reasons for the adverse employment action. Id. If the defendant meets this requirement, the burden returns to the plaintiff to show that the employer's explanation is pretextual. Id.

However, the plaintiff cannot necessarily avoid summary judgment at this stage by simply establishing a prima facie case and showing that the employer's purported justification is false. Summary judgment may still be warranted if the evidence reveals some other non-discriminatory reason for the employer's action, or if the plaintiff creates only weak factual issues concerning pretext and additional, uncontroverted evidence shows that there was no discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000). Plaintiff retains the ultimate burden of persuasion in showing discrimination throughout this analysis. Id. at 143.

---

[3] Defendants argue that Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) has modified the McDonnell Douglas framework. However, the Eighth Circuit has not explicitly ruled on the applicability of Desert Palace to the McDonnell Douglas framework; therefore, the standard McDonnell Douglas framework will be employed here. As a practical matter, should Desert Palace ultimately be found to modify McDonnell Douglas, the result here will not change.

**C. Discrimination Claim**

To demonstrate a prima facie discrimination claim, Plaintiff must prove the following elements: 1) she belonged to a protected class; 2) she was qualified to perform her job; 3) she suffered an adverse employment action; and 4) non-members of her class were treated differently. See Bredding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1156 (8th Cir. 1999). The fourth element of a discrimination claim has been described as requiring some "evidence that would give rise to an inference of unlawful discrimination." Putnam Search Term End v. Unity Health Sys., 348 F.3d 732, 735-36 (8th Cir. 2003); see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

In the instant case, the first two elements are not disputed. However, Defendants argue that Plaintiff has failed to provide sufficient evidence to survive summary judgment on the third and fourth elements of this claim. Plaintiff lists the following as adverse employment actions taken against her: denial of mileage reimbursements, denial of quality step salary increases, interference with her ability to perform the function of an SRA, unsatisfactory performance ratings, a punitive transfer, and a hostile work environment. An examination of the evidence, however, shows that Plaintiff has scant evidence to prove the alleged adverse actions. Moreover, Plaintiff is unable to rebut Defendants' justifications for the actions.

First, Plaintiff cites denial of mileage reimbursements as an adverse employment action. However, the record shows that Plaintiff was not denied mileage benefits. Loucks Statement at 3. Rather, she was reimbursed at one of the FBI's lower reimbursement rates. Id. The reimbursement rate Plaintiff received was within FBI guidelines. Id. Moreover, no evidence is

presented to suggest that Plaintiff was treated differently in regard to her mileage reimbursements because she was a woman. Finally, Plaintiff cites no authority that receiving low mileage reimbursements is an adverse employment action. In fact, the test the Eighth Circuit employs to determine whether an employment action is sufficiently adverse to sustain a claim sets a high bar. Adverse actions are defined as "tangible changes in duties or working conditions that constituted a material employment disadvantage." Manning v. Metropolitan Life Ins. Co., Inc., 127 F.3d 686, 692 (8th Cir. 1997). Examples include discharge, reduction of duties, actions that disadvantage or interfere with the employee's ability to do her job, and "papering" an employee's file with negative reports and reprimands. See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). Receiving low, but approved, mileage reimbursements does not rise to the level of an adverse employment action.

Second, Plaintiff alleges that denial of quality step salary increases was an adverse employment action taken against her. Plaintiff states that a rating of "below expectations" for a period of 11 months reduced her service computation date. This reduction ultimately kept Plaintiff from a salary increase. Turner Aff. ¶ 36. For Plaintiff to prove the claim that the denial of the quality step salary increase was motivated by discrimination, Plaintiff must also prove that the poor performance reviews were pretextual.

Plaintiff also claims that the unsatisfactory performance reviews alone constitute an adverse employment action. Indeed, poor performance reviews may constitute an adverse employment action when they are used to "detrimentally alter the terms or conditions of the recipient's employment." Spears v. Missouri Dep't of Corrections and Human Resources, 210

F.3d 850, 854 (8th Cir. 2000). However, the mere existence of poor performance reviews alone cannot establish a case for sexual discrimination.

There is no evidence on the record to indicate that the Plaintiff received any of her poor performance evaluations because she is female. Rather, the evidence clearly establishes that Plaintiff's performance steadily declined over her last years in the FBI. See June, 1999 PSA; Welken Dep. at 49-53, 70-76, 95-101; August, 1999 PAR; Domin Dep. I at 44-48, 73-79; Domin Dep. II at 21, 24-26; Casey Memo of Oct. 19, 1999; Inspection Report at 56-57; December, 1999 PAR; Kaul Summary; Regan Memo of Oct. 17, 2002 at 3-16; October, 2002 PAR. As a result, the Defendants had ample justification for Plaintiff's poor performance reviews. By extension, Defendants' denial of Plaintiff's quality step salary increase is not the result of discrimination. Moreover, Plaintiff has not established that non-members of her class were treated differently. Merely alleging that certain men did not receive poor performance reviews does not establish this element. Rather, Plaintiff must show that she was treated differently by performing at an acceptable level, but received unacceptable marks, in contrast to male agents. Plaintiff has failed to proffer evidence to satisfy this element of her claim.

Plaintiff next claims that Defendants interfered with her ability to perform the function of an SRA, claiming that male agents in the Minot resident office were permitted to treat Plaintiff's SRA status as secretarial in nature. However, the only evidence in the record to support this contention is a statement by Agent Klokstad. Agent Klokstad asked Agent Florez what the duties of an SRA were, to which Florez responded "order supplies." Klokstad Dep. at 36. While this statement may tenuously support an inference that Florez was referring to Plaintiff, it does

not establish that male agents in the Minot office were permitted by Defendants to treat Plaintiff's SRA position as secretarial in nature. An offhand comment by Agent Florez on what he perceived to be the duties of an SRA cannot establish a prima facie case of gender discrimination. Moreover, it is not clear from the evidence that Agent Florez was specifically referring to Plaintiff in his remarks.

Plaintiff also alleges that her transfer to Minneapolis was punitive, and therefore constituted an adverse employment action. Transfers can, under certain conditions, constitute adverse employment actions. See Spears, 210 F.3d at 853-54. Plaintiff claims that following her transfer to Minneapolis, she was isolated, ostracized, and ridiculed. Beyond Plaintiff's bare allegations, however, the record does not support this statement. Rather, the record is replete with instances in which Plaintiff engaged in instances of offensive behavior following her transfer to Minneapolis. Examples include distributing an offensive cartoon to support staff and making inappropriate remarks regarding Native Americans and homosexuals during a briefing before an Assistant United States Attorney. Kaul Summary. These instances support Defendants' actions in beginning termination proceedings of Plaintiff prior to her voluntary retirement.

Moreover, Plaintiff fails to demonstrate how the transfer was punitive. Defendants have shown that Plaintiff was transferred in an attempt to re-engage her in productive work and give her a fresh start by assigning her to the Crimes Against Children squad in Minneapolis. Domin Dep. I at 146-158; Domin Dep. II at 30-36, 94-96, 121-122. Plaintiff is unable to provide evidence to rebut this explanation for her transfer. Plaintiff does cite two examples of male

agents who were not transferred despite making investigatory mistakes that harmed victims of crimes. However, the record does not indicate that Plaintiff was transferred as a result of a single error. Rather, it supports the contention that Plaintiff was moved for a variety of reasons that occurred over a number of years.

Plaintiff also cites the negative FBI inspection report as an adverse action. Plaintiff claims the report is filled with inaccuracies and fabrications. However, Plaintiff does little more than allege the errors, rather than substantiate her claims.

Finally, Plaintiff claims a hostile work environment as an adverse employment action. As Plaintiff has made separate allegations of a hostile work environment, that allegation will be dealt with separately.

Ultimately, Plaintiff has failed to set forth a case of gender discrimination. Among her allegations of adverse employment actions, little to no evidence exists to establish a prima facie case regarding Plaintiff's claims. Where some evidence does exist to support Plaintiff's claims of adverse actions, Defendants successfully present evidence to demonstrate proper purposes for their actions which Plaintiff is unable to rebut. As a result, Plaintiff's allegations of gender discrimination must be denied.

**D. Hostile Work Environment Claim**

To demonstrate a prima facie hostile work environment claim, Plaintiff must prove the following elements: 1) she is a member of a protected group; 2) she was subject to unwelcome harassment; 3) the harassment was based on sex; 4) the harassment affected a term, condition, or privilege of employment; and, in cases involving non-supervisory employees, 5) that the

employer knew or should have known of the harassment and failed to take prompt and effective remedial action. See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999). Further, the harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe that her working conditions have been altered. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Defendants argue that Plaintiff has not presented evidence sufficient to survive their Summary Judgment Motion. Plaintiff alleges, without providing sufficient supporting evidence, a number of events that allegedly constitute harassment. For example, Plaintiff cites the allegation by Agent Loucks that there were discriminatory practices perpetrated within the Minneapolis Division as evidence of a hostile environment. Loucks Statement at 2. However, this bare assertion is not sufficient to constitute evidence of a hostile environment. See Winthrop Resources Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 470 n. 10 (8th Cir. 2004) (affidavits unsupported by documentation are not sufficient to create issues of material fact for trial). Plaintiff also claims that Agent Klokstad was told to treat Plaintiff's SRA position as secretarial in nature. As discussed previously, Agent Klokstad's deposition does not support this interpretation of statements made by Agent Florez. Klokstad Dep. at 36. Plaintiff further alleges that the Defendants' failure to immediately assign her to investigate a crime upon the request of the United States Attorney constituted harassment. The FBI ultimately did assign Plaintiff to this case; no evidence is presented to suggest that any delay in assigning Plaintiff to the case was occasioned by her gender.

Plaintiff also cites a litany of other events which she claims constitute harassment.

Again, Plaintiff proffers no evidence to connect any of these allegedly harassing events to the fact that she is a female. Without evidence of a causal connection between the alleged harassment and the fact that Plaintiff is female, Plaintiff's argument are unavailing. As a result, Plaintiff's hostile work environment claim must fail.

**E. Retaliation Claims**

To demonstrate a prima facie retaliation claim as alleged in Counts II, III, and IV of her First Amended Complaint, Plaintiff must prove the following elements: 1) she engaged in statutorily protected conduct; 2) she suffered an adverse employment action; and 3) the adverse action was causally linked to the protected activity. See Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 896 (8th Cir. 2002); Kiel, 169 F.3d at 1136. An adverse employment action "is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 691 (8th Cir. 2001). Thus, "not everything that makes an employee unhappy is an actionable adverse employment action." Id. In proving causation, normally "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Kiel, 169 F.3d at 1136.

Defendants argue that Plaintiff has failed to set forth a prima facie case of retaliation. Defendants further argue that even if Plaintiff can establish a prima facie case, Defendants had legitimate reasons for their actions. Plaintiff claims that the first element of retaliation is satisfied by the filing of five EEO complaints, and is not in dispute. As to the second element, Plaintiff sets forth the same adverse actions alleged in her gender discrimination claim. As a

result, the analysis of the adverse actions under the gender discrimination claim applies to Plaintiff's retaliation claims. In the gender discrimination context, Plaintiff did not present sufficient evidence of adverse actions to establish a prima facie case. Where Plaintiff did present some evidence of adverse actions, Defendants were able to successfully show justification for their actions which Plaintiff was unable to rebut. The same conclusions apply to the first two elements of her retaliation claims.

Even assuming that Plaintiff could muster evidence to satisfy the first two elements of a retaliation claim, she has not proven causation. Plaintiff first argues that the adverse employment actions she suffered, particularly the poor performance reviews, are temporally related to her EEO complaints. While it is true that many of her poor performance reviews and her transfer followed Plaintiff's EEO complaints, a temporal connection alone is not sufficient to establish causation. Kiel, 169 F.3d at 1136. Plaintiff emphasizes Defendants' admission that the poor performance reviews, transfer, and EEO complaints all happened within a relatively close time frame. However, this does not lead to the conclusion that she has demonstrated more than a temporal connection. Moreover, Plaintiff received positive PARs in the relevant time period. April, 2000 PAR (Defs' Opp'n Ex. 20); April, 2001 PAR (Defs' Opp'n Ex. 35). Without further evidence of pretext, Plaintiff's evidence of a temporal connection between the alleged adverse actions and EEO complaints will not save her retaliation claim.

Plaintiff also argues that other FBI agents' discussion of her civil and administrative claims and their resulting desire to avoid her are evidence of pretext. Payne Statement at 3 (Pl's Opp'n Ex. 41). Plaintiff's evidence on this point, however, is unavailing. Although Agent

Payne did attest to hearing discussions among other agents regarding Plaintiff's filing of complaints, he also states that to his knowledge, "no one treated [Plaintiff] different from other agents . . . . I have no knowledge of anyone discriminating against [Plaintiff] based on her sex . . . or as reprisal for being involved in EEO activity." Id. Furthermore, no evidence has been proffered to show that people actually avoided Plaintiff. As a result, this evidence does not support Plaintiff's claims of retaliation.

Plaintiff also alleges that SAC Burrus' refusal to include in Plaintiff's personnel file her written response to a negative PAR rating constitutes evidence of retaliation. Burrus chose to forward the letter to SSRA Welken. According to Burrus' memo to Plaintiff, he did not arbitrarily refuse to include Plaintiff's communication to him in her file, but rather decided not to because it was "based on [Plaintiff's] assessment of the facts and circumstances and is not appropriate material for [Plaintiff's] personnel file." Letter from Burrus to Turner of June 22, 1999. In light of Burrus' proffered explanation for not adding Plaintiff's memo to her file, this action cannot be deemed retaliatory. Moreover, as Plaintiff's response was in relation to her PAR, it was appropriate for Burrus to forward Plaintiff's memo to Welken, who wrote the initial PAR. Consequently, this incident does not support Plaintiff's allegations of retaliation.

Finally, Plaintiff alleges that she was directly pressured by SAC Domin to drop her EEO complaints in exchange for a transfer to Rochester. However, Plaintiff's only evidence of this is her bare allegation contained within her own affidavit. Turner Aff. ¶ 32. Allegations set forth in affidavits are not sufficient to survive summary judgment. Winthrop, 361 F.3d at 470 n. 10. As a result, this evidence of retaliation is not sufficient to make Plaintiff's claim viable.

Because Plaintiff has failed to adequately present evidence of causation between her EEO complaints and any adverse employment actions, judgment must be entered for Defendants on Plaintiff's retaliation claims.

**F. Physical Injury Claim**

In Count V of her First Amended Complaint, Plaintiff alleges a cause of action for "permanent medical damage." Plaintiff does not cite a statute or explain the basis of this claim. It is not clear that this count alleges a cognizable cause of action, as the term "permanent medical damage" is typically a damage rather than a liability concept. Therefore, judgment will also be entered for Defendants on Count V.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment or in the Alternative, Partial Summary Judgment [Docket No. 45] is **GRANTED**, and

2. Plaintiff's First Amended Complaint [Docket No. 41] is hereby **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: September 17, 2004.