01 CV 1407 ADM/AJB

RECEIVED
BY MAIL
NOV 30 2005
CLERK US DIST COURT
MINNEAPOLIS MN

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 04-3426

---

Jane A. T. Turner, *
*
Appellant, *
*
v. *
* Appeal from the United States
Alberto Gonzales,[1] United States * District Court for the
Attorney General; Federal Bureau * District of Minnesota.
of Investigation; United States *
Department of Justice; Robert S. *
Mueller, Director, Federal Bureau *
of Investigation, *
*
Appellees. *

---

Submitted: June 24, 2005
Filed: August 30, 2005

---

Before MELLOY, HEANEY, and GRUENDER, Circuit Judges.

---

SCANNED
DEC 01 2005
U.S. DISTRICT COURT MPLS

GRUENDER, Circuit Judge.

Jane Turner appeals an adverse grant of summary judgment on her claims of gender discrimination, hostile work environment and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. We affirm the grant of summary judgment with respect to Turner's gender discrimination and hostile work environment claims. However, we reverse the grant of summary judgment on the retaliation claim and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Turner was a long-time FBI Special Agent with commendations for her work on high-profile cases. From 1978 until 1998, she consistently earned performance ratings of "Superior" or "Exceptional." She was stationed at the Minot, North Dakota Resident Agency of the Minneapolis Division of the FBI during the events that led to this discrimination suit. She became the Senior Resident Agent (SRA) at Minot in 1987. The SRA is the top-ranking agent at a station that has no official supervisor. The parties dispute the degree of supervisory authority an SRA has over the other agents at the station.

In 1996, Turner was denied a supervisory position in Fargo, North Dakota. The position went to a male, Craig Welken, who became Turner's supervisor. Turner believed that gender discrimination played a role in the denial. However, Turner did not file an Equal Employment Opportunity (EEO) complaint about this incident.

In 1998, Turner began to complain that Welken was not properly crediting her with "statistics" for the cases she worked. "Statistics" are used by the FBI to evaluate

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Alberto Gonzales is substituted automatically for his predecessor, John Ashcroft, as respondent.

worthiness for promotions and performance-based salary increases, known as "quality step increases." Turner also complained that she received lower mileage reimbursements than the male agents. Turner alleged that the other agents in Minot, who were all males, did not respect her and refused to follow her orders. When these other agents questioned Welken about Turner's authority as an SRA to control their activities, however, Welken informed them that he was their official supervisor and the sole assigner of work. One veteran male agent told a newer agent that an SRA's duties were to "order supplies." Turner believed the other agents felt that she, as a woman, was only fit to do secretarial work. Turner filed an EEO complaint about this perceived gender discrimination in June 1998.

One month later, in July 1998, Welken assigned an agent with much less experience than Turner to the Froistad case, a high-profile case involving the sexual exploitation and murder of a five-year-old. The United States Attorney for the District of North Dakota, John Schneider, asked Welken to assign Turner instead because of her expertise in child crimes. Welken complied with the request. Turner obtained a confession from Froistad, and in October 1998 Schneider sent an e-mail giving Turner primary credit for the successful resolution of the case.

In her next performance review, in April 1999, Turner again received a "Superior" rating. However, Turner objected to the review because she felt it did not properly credit her work on the Froistad case or on other cases. Turner met with Welken on June 11, 1999 to discuss the performance review. According to Turner, Welken informed her that he would not give her credit because she "poached" the case and "sandbagged" him with Schneider.

On June 18, Turner wrote a memorandum to Welken's supervisor, Minneapolis Division Special-Agent-in-Charge James Burrus, stating her complaints about the performance review and Welken's response. She also stated that Welken's discriminatory treatment of her had increased since her initial EEO complaint. She

asked that the memorandum be made part of her personnel file. Burrus responded on June 22 that her complaints would be forwarded to Welken.

On June 23, Welken downgraded Turner's performance rating from "Superior" to "Minimally Acceptable/Unacceptable." The new, unscheduled interim performance review purported to cover Turner's work from late March through mid-June 1999 and cited the following reasons for the downgraded performance rating: failure to conduct investigative work in a timely manner, failure to properly notify other law enforcement officials about weekend unavailability, delayed report and time sheet filing, poorly written reports and minimal contacts with sources.

Welken began to document problems with Turner's work over the following months. In September and October 1999, Welken noted that one of Turner's reports showed she made inappropriate comments to a state's attorney on one case and that three Native American reservation police officials complained about Turner being difficult to work with on another case. However, the state's attorney immediately wrote a letter to the FBI saying Turner's behavior was not unprofessional, and the reservation police chief later stated in deposition testimony that Turner always worked well with the reservation police and the incident was a minor one that would normally be worked out among the participants without complaint. Nevertheless, Turner continued to receive poor performance ratings.

New Minneapolis Division Special-Agent-in-Charge Doug Domin met with Turner in September 1999 and found her to be a "very troubled agent." According to Domin, Turner admitted that she was taking antidepressants but was not under a doctor's care. She displayed a range of extreme emotions and showed Domin photographs of abused child victims from her cases. Domin informed her that he would personally review her work over the following 60 days.

The FBI Inspection Division conducted a routine investigation of the Minneapolis Division, including the Minot office, in October 1999. The report recited the problems previously mentioned with Turner and also cited procedural errors that Turner allegedly had made during the Froistad and Vigestad investigations. The report concluded that Turner should be transferred to a work site that allowed more direct supervision and also recommended a Fitness for Duty Evaluation. Although the FBI claims that the report was based on independent interviews with FBI agents and outside law enforcement officials who worked with Turner, Turner argues that the investigator merely restated inaccurate information about her gleaned from Welken and Domin. Turner presented statements from local law enforcement and prosecutorial personnel that her work was generally outstanding and showed no decline during the 1998-99 time period.

Turner received another poor performance rating in December 1999, making her eligible under FBI regulations for an involuntary transfer. Domin immediately transferred her to Minneapolis. She filed a second EEO complaint in March 2000. After the FBI allowed her to exceed the standard 90-day relocation deadline, she began work in Minneapolis in May 2000. One of Turner's new co-workers in Minnesota recalled being warned before her arrival that she was "someone to avoid, or at least be wary of," because she was "prone to initiate administrative or civil action with little provocation." Turner was assured that the FBI continued to value her expertise in investigating crimes against children, but she did not receive work assignments in that area commensurate to those she had received in Minot. During her time in Minneapolis, Turner's supervisors documented performance problems and instances of disruptive behavior. Eventually, the FBI instituted termination proceedings. Turner resigned in October 2003, before the termination proceedings could be completed.

Turner filed suit against the FBI, its director, the Department of Justice and the Attorney General (collectively "the FBI") under Title VII for sexual discrimination,

retaliation and hostile work environment based on the events leading up to her transfer to Minneapolis. The district court granted the FBI's motion for summary judgment on all claims. The district court concluded that Turner presented no evidence of causation to sustain her discrimination and hostile work environment claims. As for the retaliation claims, the district court concluded that any adverse actions taken by the FBI were justified by evidence of Turner's poor performance and erratic behavior. Turner appeals the grant of summary judgment.

## II. DISCUSSION

We review a grant of summary judgment de novo. *Hesse v. Avis Rent A Car Sys.*, 394 F.3d 624, 629 (8th Cir. 2005). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* If a reasonable jury could return a verdict for the non-moving party based on the evidence presented, summary judgment is inappropriate. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996). We must affirm the grant of summary judgment on a claim if any essential element of Turner's prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial. *Hesse*, 394 F.3d at 629.

### A. Discrimination

An employee's claim will survive a motion for summary judgment if the employee can produce "direct evidence of discrimination, that is, 'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Russell v. City of Kansas City, Missouri*, 414 F.3d 863, 866 (8th Cir. 2005) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Alternatively, the claim may survive

a motion for summary judgment by creating an inference of unlawful discrimination through the familiar *McDonnell Douglas* three-step burden-shifting analysis. *Russell*, 414 F.3d at 866.

In this case, Turner's only alleged direct evidence of discrimination is one fellow agent's remark to another that an SRA's duties were to "order supplies." We view this evidence in the light most favorable to Turner and assume that the remark evidences discriminatory animus. However, Turner produced no evidence to link this remark from a co-worker to the challenged employment decisions. Therefore, we proceed to the *McDonnell Douglas* burden-shifting analysis.

Under the *McDonnell Douglas* analysis, the elements of a prima facie discrimination claim are: 1) the employee belonged to a protected class; 2) she was qualified to perform her job; 3) she suffered an adverse employment action; and 4) she was treated differently from similarly situated males. *Hesse*, 394 F.3d at 631. The fourth element of a prima facie discrimination case also can be met if the employee provides "some other evidence that would give rise to an inference of unlawful discrimination." *Putnam Search Term End v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003). Once an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the employee to show that the employer's reason was pretextual. *Hesse*, 394 F.3d at 631.

Turner cannot establish a prima facie case of discrimination because she has not presented evidence that would give rise to an inference of unlawful discrimination. She attempts to meet this fourth element of the prima facie burden by showing that she was treated differently from similarly situated males. This requires evidence that Turner and her male co-workers "were 'involved in or accused of the same or similar conduct and [were] disciplined in different ways.'" *Rodgers v.*

*U. S. Bank, N.A.*, No. 04-3000, slip op. at 10-11 (8th Cir. Aug. 11, 2005) (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004)).

Turner presented evidence that male agents at her resident office made mistakes but did not receive downgraded performance reviews like the one Turner received in June 1999. However, the alleged mistakes were not similar to the conduct alleged in Turner's downgraded performance review. According to Turner's evidence, one male agent failed to recognize a child's injuries as an incident of sexual abuse and another male agent mishandled evidence in a child pornography case. These isolated investigative mistakes by each male agent are not similar to the pattern of ignoring internal workplace responsibilities and deadlines cited in Turner's downgraded performance review. We conclude that Turner has not established a prima facie case of discrimination. Accordingly, we affirm the district court's grant of summary judgment to the FBI on the discrimination claim.

**B. Hostile Work Environment**

The elements of a prima facie hostile-work-environment claim are: 1) the employee is a member of a protected group; 2) she was subject to unwelcome harassment; 3) there was a causal nexus between the harassment and her membership in the protected group; 4) the harassment affected a term, condition, or privilege of employment; and, in a case alleging harassment by non-supervisory employees, 5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999). The harassment must be both subjectively offensive to the employee and objectively offensive such that a reasonable person would consider it to be hostile or abusive. *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 975 (8th Cir. 2005).

To support her hostile work environment claim, Turner again relies on the statement by a co-worker that an SRA's duties were to "order supplies." Turner does

not argue that she was present when this remark was made. She also contends that junior male co-workers' reluctance to take orders from her as an SRA and the initial assignment of the Froistad case to a less experienced male agent demonstrate a general lack of respect for her abilities because of her gender. However, Turner has presented no evidence of specific instances of workplace conduct that a reasonable person would consider to be hostile or abusive. Therefore, we affirm the district court's grant of summary judgment to the FBI on the hostile work environment claim. *See Burkett v. Glickman*, 327 F.3d 658, 661 (8th Cir. 2003) (affirming a grant of summary judgment to an employer on a hostile work environment claim where the employee's "only substantial supporting evidence" was the deposition testimony of a co-worker that a supervisor had occasionally used a disparaging word in front of other employees and the employee offered no evidence that she was present when such remarks were made).

### C. Retaliation

We apply the *McDonnell Douglas* analysis to claims of retaliation. *Hesse*, 394 F.3d at 632. The elements of a prima facie case of retaliatory discrimination are: 1) the employee engaged in activity protected under Title VII; 2) an adverse employment action was taken against her; and 3) there was a causal connection between the two. *Id.* Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.* at 631.

There is no dispute that Turner engaged in protected activity by filing complaints about sexual discrimination. Turner argues that her performance rating downgrade, the denial of step increases in salary, and her transfer to Minneapolis all qualify as adverse employment actions. We examine each of these actions in turn.

**1. Performance Rating Downgrade and Denial of Step Increases**

"A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000). "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Id.*

Turner contends that the performance rating downgrade detrimentally altered the terms of her employment by making her ineligible for promotions, for transfers to positions with greater promotion potential, and for within-grade salary step increases—both the discretionary "quality step increases" and automatic time-in-grade step increases. Performance ratings that have a negative impact on promotion potential do not constitute an adverse employment action unless the rating actually led to the denial of the promotion. *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003). Turner made no showing that she would have gotten a promotion absent the performance rating downgrade. Therefore, the negative impact on her promotion potential does not render the performance rating downgrade an adverse employment action. Similarly, a "decision not to raise . . . salary [is] not an adverse employment action [where] . . . salary [is] not decreased or otherwise diminished in any way." *Id.* Therefore, Turner's resulting ineligibility for a *discretionary* quality step salary increase does not render the performance rating downgrade an adverse employment action.

Turner's resulting ineligibility for an *automatic* step salary increase based on time in grade, on the other hand, qualifies the performance rating downgrade as an adverse employment action because it delayed an otherwise automatic salary increase. No exercise of discretion would have been necessary for Turner's salary to increase; it would have happened automatically as long as her performance rating remained at

"Fully Successful" or higher. In other words, in this case the performance rating downgrade directly forfeited a non-discretionary salary increase, detrimentally altering the terms and conditions of Turner's employment. *See Spears*, 210 F.3d at 854. Therefore, we find that the performance rating downgrade qualifies as an adverse employment action.

We also find evidence sufficient to raise a genuine issue of material fact as to whether Turner's complaints caused the performance rating downgrade. "A plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events. Generally, however, a temporal connection alone is not sufficient to establish a causal connection." *Eliserio v. USW, Local 310*, 398 F.3d 1071, 1079 (8th Cir. 2005) (citation omitted).

In this case, the timing of Turner's performance rating downgrade strongly supports an inference of causation. Turner wrote a memorandum to her second-line supervisor, Burrus, referring to her previous EEO complaint and alleging increased discriminatory treatment by her supervisor, Welken. Burrus informed Turner that he would forward the memorandum to Welken, and five days later Welken generated an "interim" performance review that downgraded Turner in all rated areas. The fact that it was not a regularly scheduled performance review and occurred less than two months after the regular annual review in April (in which Turner received a "Superior" rating) is further circumstantial evidence that the performance rating downgrade was motivated by Turner's complaints. Therefore, Turner provided sufficient evidence to establish a prima facie case for her retaliation claim based on her performance rating downgrade.

**2. Transfer to Minneapolis**

"A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred

employee's title, salary, or benefits." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000). Turner's title, salary and benefits were not affected by the transfer to Minnesota. Turner first contends that the necessity to develop new informants and local law enforcement contacts in Minneapolis was tantamount to starting her career over again, constituting a significant change in working conditions. We are not persuaded that the normal inconveniences associated with any transfer, such as establishing one's professional connections in a new community, are sufficient, without more, to demonstrate a significant change in working conditions. *See, e.g., Montandon v. Farmland Indus.*, 116 F.3d 355, 359 (8th Cir. 1997) ("However unpalatable the prospect may have been to him, the requirement that [the employee] move to [a different city] did not rise to the level of an adverse employment action."). In contrast, a significant change in working conditions does occur where there is "a considerable downward shift in skill level required to perform [the employee's] new job responsibilities." *Meyers v. Neb. Health & Human Serv.*, 324 F.3d 655, 660 (8th Cir. 2003). Turner has presented evidence sufficient to raise a genuine issue of material fact as to whether the work she was assigned after her transfer to Minneapolis was a considerable downward shift from her responsibilities in investigating crimes against children while she was stationed in Minot. Therefore, we find a genuine issue of material fact as to whether the transfer qualifies as an adverse employment action.

We also find evidence sufficient to raise a genuine issue of material fact as to whether Turner's complaints caused the transfer. Turner's performance rating downgrade in June 1999, five days after her letter of complaint, was the first step in the paper trail required to impose an involuntary transfer on an FBI employee. The necessary paper trail was completed with Turner's "Unacceptable" performance rating in December 1999, and Turner was transferred immediately. A reasonable jury could infer that Turner's transfer was a continuation of the same chain of causation

that arguably linked the performance rating downgrade to Turner's complaint letter, as discussed above.

We conclude that Turner presented a prima facie case of retaliation sufficient to survive summary judgment.

### 3. Evidence of Justification and Pretext

Because Turner established a prima facie case, the burden shifts to the FBI to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to Turner to show that the FBI's reason was pretextual. *Hesse*, 394 F.3d at 631. The FBI contends that the performance rating downgrade and transfer to Minneapolis were justified by Turner's documented poor performance and disruptive behavior. We disagree.

The FBI states that Turner's poor performance justified the June 1999 performance rating downgrade. The performance rating document attributed the downgrade to failure to conduct investigative work in a timely manner, failure to properly notify other law enforcement officials about weekend unavailability, delayed report and time sheet filing, poorly written reports and minimal contacts with sources. Turner first attempts to rebut this evidence with statements from Assistant United States Attorneys and law enforcement personnel with whom she had worked closely for several years that her performance did not in fact decline during the 1998-99 time frame. However, these individuals would not necessarily be aware of a decline in her ability to meet internal FBI deadlines and the quality of her internal FBI reporting. Next, Turner argues that her strong record of positive performance reviews before June 1999 creates an inference of pretext for the sudden negative review. "Recent favorable reviews are often used as evidence that the employer's proffered explanation for the adverse action had no basis in fact or was not actually important to the employer." *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002). In

this case, Turner had received a "Superior" rating in her regularly scheduled annual performance review on April 26, 1999, less than two months before the negative, unscheduled interim review. This supports an inference that the FBI's sudden concerns about internal deadlines and report quality were pretextual.

The FBI also alleges that Turner made mistakes on the Froistad and Vigestad cases in 1998 and 1999. However, Turner introduced rebuttal evidence from a U.S. Customs agent who was present with her at the time these mistakes allegedly occurred. The agent avers that Turner engaged in no questionable or unprofessional conduct and behaved as "the epitome of an FBI agent" at all times in question. This raises a genuine issue of material fact as to whether the FBI's allegations of misconduct are mere pretext.

Finally, the FBI cites incidents that occurred in September and October 1999, such as complaints about Turner from local law enforcement and a state's attorney, Turner's emotional behavior in the September meeting with Domin, and the results of the allegedly independent FBI investigation, as justification for the adverse actions. First, we note that incidents from September and October 1999 cannot justify the June 1999 performance rating downgrade.[2] To the extent that these incidents might justify the December 1999 decision to transfer Turner, the "independent" investigator admitted that he interviewed no one who interacted with Turner on a regular basis and merely accepted without question information provided by her supervisors, each of whom worked hundreds of miles away from Turner's location. Federal agents, Native American reservation law enforcement personnel, and Assistant United States Attorneys who worked closely with Turner averred that she did not commit the specific procedural errors alleged in the inspection report, that historically her work

[2]The FBI also attempts to rely on incidents that occurred in Minneapolis after Turner began work there in May 2000. These incidents cannot justify either the June 1999 performance rating downgrade or the December 1999 decision to transfer Turner.

was outstanding, and that her performance showed no decline during the 1998-99 time period.

We conclude that Turner produced rebuttal evidence sufficient to raise a genuine issue of material fact regarding the FBI's proffered justification for the adverse employment actions. Therefore, we reverse the district court's grant of summary judgment to the FBI on Turner's retaliation claim.

## III. CONCLUSION

We affirm the grant of summary judgment with respect to Turner's gender discrimination and hostile work environment claims. We reverse the grant of summary judgment on the retaliation claim and remand for further proceedings consistent with this opinion.

---

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans