Page 48

significance.
Q. And do you know what happened with that source after she left?
A. No, I don't.
Q. How did you observe Agent Turner's interactions with John Schneider?
A. I observed them because I was often there when they were interacting. If it was at a trial, for example, Grand Jury session, meetings, strategy sessions, pretrial preparation, witness preparation, those type of activities. I was often there.
Q. And did you observe that she had a good relationship with him professionally in terms of interacting?
A. Yes.
Q. And?
A. Very good. I'll tell you a story. Since John is gone he can't be embarrassed by this. But I think it was in connection with the Froistad case, but it may have been something else where somebody from Time Magazine was interviewing John. And Jane came into the room and gave him a hug or some such embrace, or he gave her a hug. Anyway a real cordial hello and the reporter says, This is a

Page 49

U.S. Attorney and an FBI agent and he wanted to... And John said, "Please don't write anything about that." It was kind of an embarrassing moment for him. So they had a good relationship.
Q. Did you ever discuss or did Mr. Schneider ever share with you his opinions about Jane Turner's performance?
A. Yes.
MS. FAGG: Object, hearsay. But you can answer the question.
BY MR. KOHN, CONTINUING:
Q. And in terms of those discussions, were they part of work? Did they occur at work as part of your professional duties?
A. Yes.
Q. And in terms of those discussions you've -- and I hope just to move the deposition along a little. But you've testified generally about your perceptions of Agent Turner. Were those consistent with the types of perceptions Mr. Schneider had?
A. Yes.
Q. Is there anything about, that stands out that you remember that Schneider said about Turner and her performance?

Page 50

A. Well, there's the exhibit that you showed me earlier, which I think aptly recites his opinion about Jane.
Q. Okay. Did you --
A. Here's an observation. He once said, "We should try all of the cases in this district."
Q. And do you know why he said that?
A. Because he enjoyed it so much, and he said he thought we made a great trial team. He was kidding, I think. But I mean it was just an expression of how much he thought about the work that we were doing.
Q. Do you remember when Mr. Schneider learned that Jane was being transferred out of North Dakota?
A. I don't remember when I learned that.
Q. Did you ever discuss that with him, her transfer out of North Dakota?
A. I think that we did discuss it.
Q. Do you know how he reacted, or whether he was happy or unhappy or he wanted her transferred or didn't want her transferred?
A. I think we both reacted that, well, if this was what was going to happen to her we hoped that it would be good for her. That she'd be in a

Page 51

situation that she'd be comfortable in and do well in and thrive in. But obviously we were going to miss her here.
Q. And do you know why you would miss her? Did he express to you that he thought she'd be missed in North Dakota?
A. I don't recall such an exact expression.
Q. Did you feel that way?
A. Sure.
Q. That she would be missed?
A. Sure.
Q. Why would she be missed in North Dakota?
A. Because, well, I would miss her. Because I enjoyed working cases with her on the reservation and elsewhere, and she's my friend.
Q. Did anyone from the FBI seek your input when they were discussing the decision to transfer her and like call you up?
A. I'm glad you asked that question. No they didn't, which I found amazing.
Q. Why?
A. Because I was the prosecutor who worked with her more than anyone else for all those


Nelson Reporting Service
309 South Mill Street, Fergus Falls 218.739.3484

years. And nobody consulted me.
Q. And had they consulted with you, what would you have said?
A. What would their question have been?
Q. If they said, "We are thinking of transferring Turner. She doesn't want to go. We want her to go. And what do you think?"
A. I'd have said, "Why the hell do you want to do that? Why would you take an agent with her experience and skill level away from her home base where she's comfortable and does a great job? Why would you want to remove her against her will?"
Q. Did her transfer have any type of impact on case development at Fort Berthold --
A. Berthold.
Q. -- Berthold Reservation?
A. Now I missed the critical part of that question.
Q. Did it impact case development in the Fort Berthold Reservation?
MS. FAGG: Steve, are you talking sort of globally or what Clare was specifically his case assignments and case load? Because he wouldn't know globally.
Q. Strike that. Did you discuss her



transfer with Morley, ASAC Morley?
A. Yes.
Q. Did she have an opinion with you? Did she express any opinion to you about the transfer?
A. You know, I can't remember exact expressions about the transfer itself.
MS. FAGG: Objection, hearsay. But go ahead and answer the question.
A. I mean Jan, I think, liked working with Jane as well and recognized her skills and abilities as well as I. That's my impression from my discussions with Jan Morley, and particularly like the Charette case, for example. I think Jan and I both worked on that one and Jane was involved in that.
Q. You know Craig Welken?
A. Yes.
Q. And he used to work with you as an agent?
A. Yes. We had not many cases. I didn't work Standing Rock cases very long. But, yes, I had cases with Craig and Jeff Hosking.
Q. And you were away for a time and he was a supervisor of Agent Turner?
A. Yes.



Q. Did he ever call you up and ask for your input into her performance during performance review time, to the best of your recollection?
A. I don't recall any such call.
Q. In, and what about, do you know a Douglas Domin?
A. No. That name is familiar. I think it's probably an ASAC or something or was.
Q. What about Chip Burris? Do you know him?
A. That again sounds like a management level type FBI type person out of Minneapolis.
Q. You don't remember him ever calling or talking with you about Jane?
A. I remember meeting Roger Wheeler, but since then they don't come by as often as they used to.
Q. In terms of Agent Turner's transfer in leaving the work in North Dakota, have you ever discussed that with others, say Carroll Erickson, Chief of Police? Did that conversation ever come up?
A. I know Carroll Erickson. I don't recall a discussion with him about it. It wouldn't surprise me if he said we talked about it, but I just don't recall.



Q. Now I'd like to go on to in terms of the Fort Berthold Indian Reservation.
A. That was good.
Q. Thank you. Is child abuse, such as molestation, sexual abuse, is that a problem on the reservation? Is that something that happens?
A. Yes.
Q. And can you just describe that for the record in terms of, is it the type of thing that's extremely rare and the occurrence is out of the ordinary or the type of criminal activity which is more commonplace within that community?
A. It certainly is not rare. It certainly occurs. And the frequency is much more than any of us would ever hope it to be. You know, it's an area where there is poverty, alcohol abuse, many of the elements that go together and that sort of thing. I'm not saying it doesn't happen off the reservation, but the reservation seems to have more than its share of child sexual abuse and physical abuse.
Q. And you've previously testified that child related criminal activity was an area of particular expertise with Agent Turner?
A. Yes.

with Jane. Clare had worked with Jane on numerous cases in Fort Berthold, because that was the reservation that Jane had been assigned to for investigations.
Q. Did Clare ever give, discuss with you his opinion about how Agent Turner had handled the Charette case?
A. Charette?
Q. Charette.
A. Did Clare ever ask my opinion; is that what you're saying?
Q. No, strike that. In terms of the turf war issue that you had testified to earlier, do you know how the U.S. Attorney's Office or offices may have become aware that there was some type of issue about who had the turf over the Charette case?
A. No, I don't know how.
Q. And who informed you that that might have been a concern from somebody?
A. John.
Q. And John is John who?
A. U.S. Attorney John Schneider.
Q. What did he say in telling you that?
A. Oh, just that there might be a turf issue here or something.



Q. Do you know how it came up, in what context?
THE WITNESS: Can I consult with her for a minute?
MR. KOHN: Yes.
MS. FAGG: Could you ask the question again?
MR. KOHN: If you would read it back this time.
(The requested portion of the record was read by the Reporter.)
MS. FAGG: For clarification, what do you mean, what "came up" or what's the subject of your question?
MR. KOHN: How the issue that there might be a turf issue on the Charette case.
BY MR. KOHN, CONTINUING:
Q. In what context did that, did John make you aware that this, that there was a turf issue related to the Charette case?
A. Just in that there was a dispute over who should be conducting the investigation.
Q. And did John tell you how he was informed that there was a dispute over that?
A. No, he didn't.



Q. Did he tell you how that dispute had been resolved?
A. Jane got transferred.
Q. And first of all, what did he say to the best of your recollection?
A. (No response).
Q. Did he think there was a relationship between Jane's transfer and the Charette case?
A. John expressed disappointment that Jane was being transferred because she was a good agent, and it was during the time that we were working the Charette case.
Q. What else did he say about it?
A. I can't remember verbatim. I mean, we discussed it.
Q. Did John have an opinion that there might have been a relationship between the two?
A. He may have.
Q. And did, when you say John thought that Jane was a good agent, did he ever explain to you why he thought she was a good agent?
A. Yes.
Q. What were some of the reasons why he thought she was a good agent?
A. John thought that she was a good agent



because she got confessions, because she was hard working, she was available, and that she didn't quit, not until she was satisfied.
Q. How did John feel about her being transferred out?
A. He was disappointed.
Q. Do you know if he ever expressed that disappointment in writing to anybody?
A. No, I do not.
Q. Do you know in terms of his computer or, after he died, if there was any attempt to maintain the integrity of what was had on his hard drive --
A. No, I don't.
Q. -- or his documents? Do you know what happened with the computer he was using?
A. Drew has it.
Q. And that's Drew?
A. Our new U.S. Attorney.
Q. In terms... And you also mentioned, I think that Clare was involved in a discussion on this?
A. Yes, he was.
Q. And do you remember what Clare said?
A. At what point?

Q. Was there one discussion or was there a discussion where John mentioned his disappointment about the transfer. Maybe Clare was there and you all talked about it. Was that specific or just coming up?

A. No. We've never had any group discussion on Jane's transfer. There were comments and concerns that were expressed between the attorneys at differing points.

Q. Who else raised a concern about the transfer?

A. I couldn't say all the attorneys that raised a concern because I don't know. I know the attorneys I talked to.

Q. I know. And who would they be?

A. They would be Mike. Well Mike is not an attorney. I'm sorry. John, Clare, Dave and, I believe, Lynn J.

Q. Who is Mike?

A. Mike is the FBI agent that I work with.

Q. Is that Mike Wilson?

A. That's Mike Wilson.

Q. And he expressed the concern about it?

A. No, I did.



Q. To him?

A. Yes.

Q. What was the concern you expressed?

A. That I was sorry to see Jane leave. And that I was concerned about who was going to be able to cover, because it was down to one agent in Minot, and that would be Pete.

Q. And was that a concern that you would be down to Pete?

A. Yes.

Q. Why?

MS. FAGG: I'm going to object to that question. Pete Klokstad's performance has absolutely nothing to do with it.

MR. KOHN: It has everything to do in terms of disparate treatment is absolutely relevant.

MS. FAGG: No relationship with this lawsuit or your client's claim for discrimination or harassment or retaliation.

MR. KOHN: It deals with disparate treatment, which is how you prove all of those things.

MS. FAGG: I think you're going to have a hard time convincing the Judge of that one.

MR. KOHN: If you're going to instruct



her not to answer?

MS. FAGG: I'm not her attorney and not going to instruct her not to answer that question.

MR. KOHN: Instructing her not to answer the question?

MS. FAGG: I am not instructing her to not answer the question.

BY MR. KOHN, CONTINUING:

Q. In terms of Pete Klokstad, was there any concern he would be the only agent left there?

A. Obviously you're concerned when there's a large area of investigations and only one agent to do it; yes.

Q. Wouldn't it be logical, if they were transferring one person out, that they would bring another person in?

A. So are you asking me if it was logical to go down to one agent in that area? Is that what you're asking me?

Q. Was it logical to go down to one agent in that area?

A. Not logical to go down to one agent in that area.

Q. Were there any issues about whether



Pete would be able to do, to do as good of a job as Jane had done?

A. Yes.

Q. And what were those concerns?

A. Large area. Turtle Mountains is an area that demands a lot of time and attention. Fort Berthold had been a very active reservation and didn't seem feasible or possible that one agent could handle both reservations.

Q. In terms of Mike Wilson, are you aware that he's called Jane Turner and sought some assistance from her, advice from her in terms of --

A. Absolutely.

Q. And how do you know that?

A. It's my case that he was seeking assistance from her on.

Q. Whose idea was it that he should seek assistance from her?

A. Mike's.

Q. Do you know, did he ask whether he could?

A. He doesn't need to ask me who he talks to on his investigations.

Q. Do you know why he called and asked her for assistance?