UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
01-CV-1407 (JMR/FLN)

| | | |
|---|---|---|
| JANE A. T. TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | **JOINT AGREED** |
| | ) | **STATEMENT OF** |
| | ) | **TESTIMONY** |
| | ) | |
| ALBERTO GANZALES, *et al.*, | ) | **JAMES CASEY** |
| | ) | |
| Defendant. | ) | |
| | ) | |

In accordance with this Court's Final Pretrial Order dated November 11, 2006, as modified on December 20, 2006, the parties to this proceeding hereby set forth the following joint agreed statement of deposition testimony concerning the witness Mr. James Casey:

Mr. James Casey commenced working for the Federal Bureau of Investigation in 1987. He became a supervisor with the FBI in 1997, and an Assistant Special Agent in Charge of the Cincinnati Division in 2002.

In October 1999, Mr. Casey was assigned as an "Assistant Inspector in Place" and tasked (along with other FBI employees) with conducting an inspection of the Minneapolis Division of the FBI. During the inspection of the Minneapolis Division, Mr. Casey and Steven Hancock were tasked with inspecting all of the resident agencies located in North Dakota. Mr. Casey inspected the Minot Resident Agency, the Fargo Resident Agency, and the Bismarck Resident

Agency. Other than Jane Turner, Mr. Casey did not find any of the other agents assigned to those resident agencies to have performance problems.

Mr. Casey wrote the Electronic Communication introduced into evidence as Exhibit *4*.

In drafting the Electronic Communication and making recommendations, Mr. Casey discussed his findings with two Inspectors in Charge and the Chief Inspector. Prior to making any final recommendations in the inspection, the recommendations were discussed and vetted by Mr. Casey, the Inspectors in Charge and the Chief Inspector.

When he wrote up the report, Mr. Casey did not bring in Ms. Turner and discuss with her each allegation contained in the report. Mr. Casey testified that it is not part of the inspection protocol to do this. According to Mr. Casey, the inspection is an independent auditing procedure; it is not a confrontational or court-like procedure, or a disciplinary procedure. Mr. Casey's role was to do the audit and make the recommendations. It is up to the supervisors to make whatever performance-related actions they will make based on the report.

Mr. Casey knows that the working relationship between a case agent and the Assistant U.S. Attorney prosecuting the case is important. Mr. Casey did not interview any of the Assistant U.S. Attorneys who had worked with Ms. Turner. Mr. Casey testified that the U.S. Attorney's Office is a separate group of interviews and that interviews with the U.S. Attorney's Office are usually handled

by the Chief Inspector or the Inspectors in Charge. Usually, the U.S. Attorney, the First Assistant U.S. Attorney, and the Chief of the Criminal Division are interviewed. Not all of the Assistant U.S. Attorneys are interviewed. These interviews are done to "get a read" on the overall working relationship between the U.S. Attorney's Office and the FBI office, not individual working relationships between case agents and line Assistant U. S. Attorneys.

When Mr. Casey and Mr. Hancock started the inspection in North Dakota, they interviewed Craig Welken at the Fargo Resident Agency. The issue of Jane Turner's performance came up during that interview. When he conducts an inspection, Mr. Casey interviews the supervisor first and one of the first questions asked is "Are there any problems here?" . Mr. Welken told Mr. Casey that there were performance problems with Ms. Turner and they discussed those.

Mr. Casey knew that Mr. Welken's office was many miles away from the Minot Resident Agency. Mr. Casey did not interview any FBI employee who had observed Ms. Turner doing interrogations, testifying in court, interviewing witnesses, or making arrests.

If a supervisor told Mr. Casey something during an inspection, he was "inclined to believe it." To the best of his knowledge, Mr. Casey has never been lied to by a supervisor during an inspection. Had he been given or developed information during an inspection that indicated a supervisor had lied during an inspection, that action could be an offense potentially referable to the Office of

Professional Responsibility. For Mr. Casey, there was nothing that Mr. Welken said or did that led him to believe that anything he told Mr. Casey during the inspection was not true.

When Mr. Casey conducts an inspection he operates under the assumption that the supervisors would be fully candid.

During the inspection, Mr. Casey did not interview either Mr. Erk or Mr. Mattson about interactions between them and Ms. Turner. .\ Mr. Casey did not interview U.S. Customs Agent Onstead.

Mr. Casey could not recall any specifics about the Ty Hall case.

Mr. Casey testified that no one made him aware at any time before or during the inspection that Jane Turner had filed an EEO complaint. When asked if Jane Turner hold him that she had filed an EEO complaint, Mr. Casey recalled that Jane Turner told her about her EEO complaint during their interview.

Mr. Casey did not ask anybody whether information provided to him concerning Jane Turner may have been provided in retaliation against Ms. Turner, because she had filed an EEO complaint. Mr. Casey undertook no “quality assurance features” to ensure that animus that may result from Ms. Turner having filed an EEO sex discrimination complaint did not taint in any way the information he was obtaining about her. Mr. Casey was not aware of any procedures or mechanism during the inspection process that would assist in guarding against a supervisor who may want to retaliate against a person who had filed allegations of

sex discrimination, to prevent that from impacting the quality of his job as an assistant inspector. The inspection process was not an inspection of Jane Turner; it was an inspection of the Minneapolis Division.

In this inspection, once he learned from Agent Turner that she had filed a discrimination complaint, Mr. Casey did not do anything any differently in the way he conducted his inspection. He did not evaluate the information being obtained from Ms. Turner's supervisor in a different manner. Mr. Casey did inform the Chief Inspector and Mr. Hancock that he had obtained information from Ms. Turner that she had filed a discrimination complaint. The Chief Inspector did not make any recommendations or direct Mr. Casey about action to take to address Ms. Turner's discrimination issue. Mr. Casey did not contact anyone at the FBI's EEO office about Jane Turner or seek guidance from an EEO counselor about how to proceed with respect to Jane Turner. In Mr. Casey's view, there was not need for him to contact the FBI's EEO office or seek guidance from an EEO counselor because he regarded the EEO complaint as a separate matter from the inspection process of the Minneapolis Division.

Respectfully submitted,

CHARLES W. LARSON, SR.
United States Attorney

By: s/Martha A. Fagg

MARTHA A. FAGG
Assistant United States Attorney
600 4th Street, Suite 670
Sioux City, IA 51101
712-255-6011
712-252-2034 (fax)
martha.fagg@usdoj.gov

By: s/Stephen Kohn

Stephen Kohn
Attorney at Law
3233 P Street, NW
Washington, D.C. 20007
202-342-6980
Attorney for Plaintiff