UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
01-CV-1407 (JMR/FLN)

| | | |
|---|---|---|
| JANE A. T. TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | **JOINT AGREED STATEMENT OF TESTIMONY** |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | **RICHARD WALDIE** |
| | ) | |
| Defendant. | ) | |

In accordance with this Court's Final Pretrial Order dated November 11, 2006, as modified on December 20, 2006, the parties to this proceeding hereby set forth the following joint agreed statement of deposition testimony concerning the witness Mr. Richard Waldie:

Mr. Richard Waldie began working for the Federal Bureau of Investigation in 1971 and became a Special Agent in 1973. As a Special Agent he worked violent crime, fugitive, car theft, and white collar crime cases in both the New York and Minneapolis Divisions.

In early 2000, Mr. Waldie was assigned to the St. Paul Resident Agency in the Minneapolis Division. The Special Agent in Charge of the Minneapolis Division, Doug Domin, called Mr. Waldie. Mr. Domin told Mr. Waldie, "Rich, Jane Turner is being transferred from Minot to headquarters. Jane is going to investigate Crimes Against Children cases with you. She has a national reputation, a good reputation, and expertise in these matters. She's going to be

working with you. You're still the coordinator. She'll be able to help our program and the program will move forward." Mr. Domin asked Mr. Waldie to call Jane Turner.

Mr. Waldie then had a telephone conversation with Ms. Turner. Mr. Waldie told Ms. Turner, "The SAC called me and said that you're being transferred down here." Mr. Waldie then explained to Ms. Turner what SAC Domin said. Mr. Waldie said to Ms. Turner, "You know, I specialize in child pornography cases." Mr. Waldie knew that Ms. Turner's area of expertise was crimes involving abuse of children, things that she had been in contact with at the reservation, crimes that he had investigated, but he recognized that he did not have nearly as much experience with those cases as Ms. Turner. He told Ms. Turner, "They're moving both of us to Minneapolis and we're going to be on this new squad." Mr. Waldie understood that he and Jane Turner would be investigating Crimes Against Children and that the two of them would be the nucleus of the squad investigating those crimes.

According to Mr. Waldie, in that phone call, he didn't know if Ms. Turner knew about "the transfer part." Mr. Waldie testified that Ms. Turner did not know that she was going to be working crimes against children cases, and that Mr. Waldie was being transferred to Minneapolis. According to Mr. Waldie, Ms. Turner appeared to say "wow" in response to what he told her. Mr. Waldie

testified that Ms. Turner didn't know anything about it and that he was the one who notified her.

After his assignment to the Minneapolis FBI office, other FBI employees made comments to Mr. Waldie about him and Jane Turner working together. These comments included, "Oh, the porn twins;" "Ha, ha, ha, you're going to work with Jane Turner now;" and "Ha, ha, ha, you guys are going to do child pornography together." Mr. Waldie interpreted these comments as alluding to him being placed in a position he did not want to be in by having to work with Ms. Turner, that she was somebody you didn't want to work with, and that he was going to have to work with her on a subject matter that was very sensitive. Mr. Waldie described these comments as being made to him in a derogatory, comical way that he did not appreciate. When people made these comments to Mr. Waldie, he told them it was inappropriate.

All of Ms. Turner's interactions on cases with Mr. Waldie were professional.

Once he started working with Ms. Turner, he felt that being partnered with her worked out fine. Mr. Waldie continued to carry a caseload of child pornography cases, which he described as "more than enough for one person." He and Ms. Turner discussed his child pornography caseload in their first conversation. Based on that discussion, Mr. Waldie understood that Ms. Turner didn't have much of an interest in child pornography cases and that she would

rather concentrate on other Crimes Against Children cases. This division of cases between Mr. Waldie and Ms. Turner worked out very well for them, in Mr. Waldie's opinion. He and Ms. Turner interacted concerning investigative resources available in the division and, on one occasion, they did a victim interview together. Otherwise, Mr. Waldie observed that their squad supervisor, John Kaul, had tasked her with some projects drawing on her expertise that she worked on independent. These projects involved resources that needed to be pulled together with local hospitals and other professionals; looking into child abduction and other programs that the FBI could develop; and looking at the historical information in the Minneapolis office to see what had been done before.

Mr. Waldie served as relief supervisor in Mr. Kaul's absence and assigned Ms. Turner Crimes Against Children cases to work. Mr. Waldie was never told by Mr. Kaul or anyone else not to assign cases to Ms. Turner.

In November, 2000 Mr. Waldie learned that the Crimes Against Children program was going to be moved out of the squad that he and Ms. Turner worked in. Mr. Waldie was informed that he was being moved, along with all of the Crimes Against Children violations to the violent crime squad, where the Crimes Against Children cases originally had been, and that Craig Welken was the supervisor of that squad. Mr. Waldie later learned from Jane Turner that that she was not transferred to the Violent Crimes squad. Mr. Waldie testified that he didn't think she knew what she was going to be doing because the squad was left

with computer crimes and applicants. Mr. Waldie didn't think being left on the squad and doing either computer crimes or applicants was Ms. Turner's preference.

Mr. Waldie heard from Jerry Dewees, another agent on the Crimes Against Children squad, that Ms. Turner had slapped him on the rear end. When Waldie was asked, "and was he totally offended by that?" Mr. Waldie testified, "I think he was." Mr. Dewees did not tell Mr. Waldie the context in which Ms. Turner's slapping him occurred.

Mr. Waldie heard other complaints about Jane Turner in the Minneapolis office but did not hear them directly from the employees involved. Mr. Waldie regarded these complaints as only hearsay.

Other then Jerry Dewees, no one else told Mr. Waldie that they were grabbed or pinched by Ms. Turner. One other rumor he heard about such touching were hearsay.

Ms. Turner never touched or pinched Mr. Waldie, and he never saw Ms. Turner engaging in this conduct with anyone. Mr. Waldie never discussed these matters with Ms. Turner.

In late summer 2000, Mr. Waldie attended a meeting with Ms. Turner at the U.S. Attorney's Office. Also attending the meeting were Mr. Kaul; Jeanne Graham, a supervisory Assistant U. S. Attorney; and Clifford Wardlaw, a line Assistant U. S. Attorney. Ms. Graham supervised the Crimes Against Children

cases in the U.S. Attorney's Office and was the person the FBI agents have to contact on all Crimes Against Children cases. Mr. Wardlaw was the Assistant U.S. Attorney who prosecuted most of the cases on the Red Lake Indian Reservation. The purpose of the meeting was to discuss the new squad and the Crimes Against Children program.

Ms. Turner brought a number of case files that she wanted to discuss to the meeting. During the meeting, Ms. Turner sat next to Ms. Graham and went through each of the cases she had, discussing them with Ms. Graham and passing her the case files. Mr. Waldie occasionally commented on the cases, but almost 100 percent of the interaction during the meeting was between Ms. Turner and Ms. Graham. Ms. Turner wanted Ms. Graham to approve a new investigation based on information developed by the other FBI field offices.

The meeting lasted between 30 and 45 minutes. When that meeting ended, Mr. Waldie and Ms. Turner left; Mr. Kaul stayed behind. Mr.Waldie did not see any reaction or non-reaction from Ms. Graham about the meeting.

Mr. Waldie testified that, about one week later, he was called into the office of his supervisor, Mr. Kaul. Mr. Waldie further testified about the conversation he had with Mr. Kaul: Kaul asked, "do you remember what happened at the meeting?" Waldie responded, yes. Kaul asked Waldie if he remembered a comment about Native Americans that was made by Ms. Turner and something

about homosexuals in the film industry. Waldie replied, “YES, I do, you know, what’s the problem here?”

Kaul responded by saying, “Well, they know about it upstairs,” meaning upper management.

Waldie asked, ‘Is anyone going to take a statement from me? What’s the story here?”

Kaul Answered, “No, you talked to me about it and that’s it.” Mr. Kaul then asked, “do you recall that some kind of comments like that was made?” Mr. Waldie told Mr. Kaul, “YES.”

Mr. Waldie testified that he did not specifically remember the comments made by Ms. Turner. Mr. Waldie remembered “Jane saying something about something that happened in relationship to Indian reservation cases, like it’s commonplace where they do that.”

Waldie also remembered comments about a gentleman who was in the film industry who Waldie had investigated for luring children to his residence and possibly sexually assaulting them. Mr. Waldie testified, “and to the best of my recollection, I think there might have been a comment made by Jane saying that it is commonplace in the film industry or that homosexuals control the film industry or something like that.” Mr. Waldie could not recall whether Jane Turner was reading off an interview sheet when she made the comments. Mr. Waldie testified that, to the best of his knowledge, there were not any interview sheets where that

issue came up. Mr. Waldie testified that he did not recall seeing that on anything he had read.

When asked, "you didn't think the comments were out of the ordinary, did you?" Mr. Waldie testified that the comments did not offend him personally.

Mr. Waldie spoke with Jean Graham at least a few times a week in most cases. After the meeting, Ms. Graham spoke with Mr. Waldie and told him that she had a group of folders that were provided to her by Jane Turner and she wanted to return them. Ms. Graham also told Mr. Waldie that Jane Turner had called her about this same time and had asked her whether "there was anything wrong with the meeting." Ms. Graham did not understand why Turner had made that call.

Mr. Waldie heard just about everyone who worked at the FBI office use the "F" word, although he was not sure if Ms. Turner ever used that word.

In the office, the Crimes Against Children squad was laid out in two cubicles next to each other, with four desks in each cubicle. Mr. Waldie sat in one group of four and Ms. Turner sat in the other group of four. In the group of four desks where Ms. Turner sat, there were two other agents and one empty desk. Special Agent Dan Miller was assigned to the squad and sat across from Ms. Turner. When Ms. Turner arrived in Minneapolis, Mr. Miller was serving as a class counselor at the FBI Academy. Mr. Waldie estimates that Mr. Miller returned to the Minneapolis office about a month after Ms. Turner arrived. John

Payne, the other agent who sat in the same cubicle as Ms. Turner, transferred to the squad after she arrived in Minneapolis. Mr. Waldie did not remember whether Mr. Payne joined the squad before or after Mr. Miller returned from the FBI Academy. Mr. Waldie estimates that "it could possibly be a month" that Ms. Turner was the only agent sitting in her assigned cubicle.

Mr. Waldie believes that he treated Ms. Turner fairly when he worked with her. Mr. Waldie and Ms. Turner had had coffee together. Mr. Waldie was usually the first person in the office and normally had his coffee before everyone else arrived. Mr. Waldie did not go for coffee with other agents on their squad. He explained this as follows: "I have a very good friend – I get their early. There's a supervisory computer specialist who I've been friendly with for a long time, and we go get coffee together."

When asked if he thought Ms. Turner was treated fairly by headquarters (meaning managers/supervisors in Minneapolis), Mr. Waldie stated, "I think she was by me. I don't know how I can judge it one way or another without knowing all the facts. I mean, I don't know what her interaction with John Kaul specifically. You know, I didn't discuss her work product with John Kaul. I really can't say anything more than that. He did not perceive any difference in the way she was being treated by other agents in the office. In Mr. Waldie's view, some people interacted more with Ms. Turner and some people less, "like any core section of society." Mr. Payne and Ms. Turner would go for coffee and tea

together. Other then Payne, he never saw Turner having coffee with any other agent. No one on the squad said that they wouldn't talk with her for any reason.

Respectfully submitted,

__/s/ Stephen M. Kohn____
Stephen M. Kohn,
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007
Attorney for Plaintiff

___/s/ Martha Fagg_______
Martha Fagg
Assistant United States Attorney
320 Sixth Street, Suite 203
Sioux City, Iowa 51101
Attorney for Defendant