**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**01-CV-1407 (JMR/FLN)**

| | | |
|---|---|---|
| **JANE A. T. TURNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **DEFENDANT'S MEMORANDUM** |
| **v.** | ) | **IN SUPPORT OF DEFENDANT'S** |
| | ) | **MOTION FOR JUDGMENT** |
| **ALBERTO GONZALES,** | ) | **AS A MATTER OF LAW** |
| **ATTORNEY GENERAL, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ________________________________ | ) | |

## Introduction

This case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Following remand from the U.S. Court of Appeals for the Eighth Circuit, plaintiff, a former Special Agent with the Federal Bureau of Investigation (FBI) proceeded to a jury trial on one remaining count of her Amended Complaint – retaliation. Two issues were presented to the jury: (1) whether plaintiff's June 1999 file review/Performance Summary Assessment (PSA) of "Minimally Acceptable/Unacceptable" constituted retaliation by Turner's first-line supervisor for her complaints of discriminatory treatment and (2) whether plaintiff's transfer by the FBI from Minot, North Dakota, to Minneapolis constituted retaliation. The jury rejected plaintiff's claim on the transfer issue but found that the June 1999 "Minimally Acceptable" PSA constituted prohibited retaliation. Judgment, including an award of lost wages, was entered for plaintiff on February 9, 2007. Defendant brings this timely motion under Federal Rule of Civil Procedure 50(b).

Plaintiff has failed to present sufficient evidence such that a reasonable jury could find in her favor on the issue of the June 1999 PSA. The parties stipulated that plaintiff had engaged in

"protected activities" under Title VII. The parties also stipulated about the practical difference between a Performance Appraisal Report (PAR), which is the annual rating of record under civil service law, and the 90-day file review/PSA, the mechanism by which the FBI provides its employees with on-going, informal supervisor's feedback. The parties' stipulation explicitly stated that a PSA cannot serve as the basis for granting or denying a Within Grade Increase (WIGI) in salary. Plaintiff's claim of retaliation therefore fails because she suffered no adverse action as a matter of law. Moreover, plaintiff has not offered evidence to prove a causal nexus between her discrimination complaints and the "Minimally Acceptable" June 1999 PSA.

**Evidence Presented At Trial**

Plaintiff Jane Turner joined the FBI as a Special Agent on October 22, 1978. In 1987, she transferred to Minot, North Dakota, as the Senior Resident Agent (SRA). North Dakota is part of the FBI's Minneapolis Division. Agd. Ex. 9.

In 1987, Craig Welken transferred to the Minneapolis Division as SRA of the Bismarck, North Dakota, office. Agd. Ex. 1 at 2. In 1995, Welken receive a competitive promotion to Senior Supervisory Resident Agent (SSRA) in the Fargo office to supervise all FBI agents in North Dakota. Agd. Ex. 1 at 3-4; Transcript (Tr.) 516-518. As SSRA, Welken became Turner's first-line supervisor. Turner had also applied for the SSRA position and was unhappy that she did not get it. After 1995, Welken found his relationship with Turner to be challenging: while she could be very pleasant to deal with, she also spoke negatively about him to outside agencies and complained about his supervision of the North Dakota squad whenever a new Special Agent in Charge or Assistant Special Agent in Charge arrived in the Minnesota Division. Tr. 357-358, 473-74, 476-77, 518-19.

Assistant Special Agent in Charge (ASAC) James “Chip” Burrus became plaintiff’s second-line supervisor in March 1998. Id at 4.

On June 22, 1998, plaintiff filed an Equal Employment Opportunity complaint alleging sex discrimination and gender-based hostile work environment by Welken. Tr. 128. Thereafter, Welken heard rumors that Turner had filed an EEO complaint about him and affirmatively learned of her EEO complaint in late April 1999 from an EEO investigator. Tr. 535. Burrus knew that Turner had filed an EEO complaint because he had arranged contact between Turner and an EEO counselor after she e.mailed Burrus, requesting an EEO investigation. Tr. 474-76.

Between April 1989 and April 1999, Turner consistently received annual Performance Appraisal Reports (PAR) of “Superior” with the exception of 1993 when she received an “Exceptional” PAR. Plaintiff’s Exhibit (Pl. Ex. ) 51. Under civil service regulations, the PAR is an FBI agent’s rating of record and is used to determine if an agent receives a within-grade salary increase (WIGI). Agd. Ex. 1 at 7, 11.

On April 22, 1999, Turner received her annual PAR for the April 1, 1998 - March 31, 1999, appraisal year. Agd. Ex. 2. That PAR rating gave Turner an overall rating of “Superior” but Turner felt it should have been “Exceptional” due to her work on the Froistad case. Agd. Ex. 1 at 4-5.

Under the FBI’s grievance process for PARs, an employee must start the process within ten business days. Agd. Ex. 1 at 9-10. First, the employee must file a written request for reconsideration with her first- and second-line supervisor, setting out her specific challenge(s) to the PAR rating and examples of work performance to justify a higher rating. The employee also must meet with the first-line supervisor to discuss the employee’s dissatisfaction and identify the

specific points where the supervisor and employee disagree. Next, the first-line supervisor writes a specific response to the employee's written grievance and forwards both memos to the second-line supervisor. The second-line supervisor then provides the employee with a written response in ten business days, stating whether the rating will be changed. If the employee is still dissatisfied, she can appeal the decision to the FBI's Personnel Officer.

In an April 25, 1999 memo, Turner requested reconsideration of the April 1999 PAR and stated that the rating reflected Welken's gender bias and appeared to be retaliation for her filing a hostile work environment complaint. Agd. Ex. 6 at 2-3. Three days later, Turner told Welken that the April 25 memo was a rough draft which should not be filed and she was still working on the memo she did want filed. Agd. Ex. 1 at 5; Def. Ex. 79. Welken forwarded the April 25 memo to Burrus and asked how to proceed. Agd. Ex. 6 at 1. Turner had not met with Welken first to discuss the PAR rating or why she was unhappy with it. Id. Burrus determined that Turner had missed the ten-day deadline but went ahead to consider Turner's PAR grievance. Tr. 483-85. Burrus advised Turner about how to proceed in grieving her PAR and suggested that she contact the EEO office for guidance if she wanted to amend her original EEO complaint. Agd. Ex. 7. Turner later submitted a memo dated May 23, 1999 which detailed her arguments for the "Exceptional " PAR she sought. Agd. Ex. 5.

On June 11, 1999, Welken conducted a face-to-face file review/PSA with Turner. Tr. 146, 537; Agd. Ex. 8 at 1; Def. Ex. 81c at 1-2. FBI supervisors are required to review an agent's files every 90 days. Agd. Ex. 1 at 8; Tr. 520. The file review consists of two parts: (1) a review of the agent's open files to determine what investigative work has been done over the last 90 days and what will be done in the next 90 days (Def. Ex. 81c at 20-41) and (2) an interim

Performance Summary Assessment (PSA), which the FBI uses to give agents on-going feedback about their work. Tr. 146, 520. The PSA is done so that if the supervisor sees performance issues developing during the file review period, the agent is warned of the need to improve and has the chance before the annual PAR is issued to correct any problems. Tr. 488-89, 520; Agd. Ex.1 at 8. Under civil service regulations, the PSA is not a rating of record and cannot serve as the basis for granting or denying a WIGI. Agd. Ex. 1 at 11. The PSA covers only the 90-day file review period and has no permanency. Tr. 520. The file review sheets and PSA are not filed in the agent's official personnel file (OPF) but are kept for all agents by the supervisor in a drop folder as a record for file reviews done throughout the PAR rating period. Tr. 489-90, 528.

Before meeting with Turner on June 11, Welken reviewed her assigned case files. Def. Ex. 81c at 20-41. He found that on two color-of-law police brutality cases and a public corruption case Turner had not met significant deadlines and reporting requirements mandated by FBI policy and, on several of Turner's other cases, she had done no investigation or victim interviews during the file review period. Id.; Tr. 537-39, 542. Under internal FBI policy, as all agents are aware, color-of-law and public corruption cases uniquely have very strict reporting requirements under very tight deadlines. Tr. 537-38. Welken based his "Minimally Acceptable" PSA on the missed deadlines in the color of law and public corruption cases and Turner's failure to comply with the FBI's internal reporting requirements on a third color-of-law case. Tr. 538-39. Welken felt there had been some slipping in Turner's work during the review period and was also concerned about the upcoming inspection and getting Turner on track and focused about the delinquent cases. Tr. 539.

During the file review/PSA meeting, Turner and Welken discussed the Froistad case and,

according to Turner, "a couple other things." Tr. 146, 539-541, 565-66; Def. Ex. 81c at 1-2. Turner was shocked and stunned by Welken's comments on the Froistad case, took them as a personal attack and "manufactured lies." Tr. 147-48, 150.

On June 18, 1999, Turner sent a memo captioned "Additional information for PAR review request" to Burrus. Agd. Ex.8; Tr. 145-146, 166, 483-486. The memo referenced Turner's June 11th file review and stated that, "At the end of the file review," Welken told Turner she did not receive credit for the Froistad case "because SA Turner 'sandbagged' SSRA Welken with United States Attorney (USA) John Schneider . . . and SSRA Welken will not allow any 'poaching' of cases, and this was a 'poached' case." Tr. 146; Agd. Ex. 8 at 1. Turner's memo complained of Welken's discrimination and retaliation. Id. at 2. On June 22, Burrus received Turner's memo and took it to be PAR review material for plaintiff's on-going grievance of the April 1999 PAR. Tr. at 485-86. Burrus returned the memo to Turner with a routing slip telling her that since Welken was not on the copy count and she labeled the memo as additional information for her PAR review request, he would forward a copy to Welken for his consideration. Tr. at 484-86, 498-99; Pl. Ex. 60. Burrus sent it to Welken via Federal Express on June 22. Tr. at 486.

Welken prepared a written PSA which found her "Minimally Acceptable/Unacceptable" in two critical elements and "Fully Successful/Minimally Acceptable" in one critical element. Def. Ex. 81a. Attached to the PSA form were an explanation for the PSA rating and a Performance Improvement Plan (PIP) which provided specific suggestions for improvement to the "Fully Successful" level. Id.; Def. Ex. 81b. The PSA and PIP were dated June 23, 1999. Id.

Welken made further attempts to discuss the PSA and PIP with Turner. Tr. 542-43; Def.

Ex. 81c at 3-8. In a July 6, 1999 telephone conversation, Welken told Turner that the written PSA with the PIP would be Federal Express'd to her in Minot; with a rating below "Fully Successful," a PIP was required and prepared; another file review and PSA would occur in roughly 30 days. Def. Ex. 81c at 5; Tr. 168. Welken also told Turner that there was no reason that she should view the PSA and PIP "in a manner suggesting the end of the world;" the work she was currently doing in one of her cases was "exactly what we want;" and to read and review the PSA and PIP and call him the next day. Id. In a routing slip, Welken said, "Please review and call me to discuss the rating and plan. I see no reason why this can't be fully resolved within 30 days with a favorable PSA at that time." Def. Ex. 81b at 5-12 (emphasis in original); Tr. 541. At this point, Welken was hopeful that Turner would respond in a very positive way and that a file review of her work in another thirty days would result in a favorable PSA at a higher level. Tr. 541-43.

Turner received the PSA and PIP on July 7 but did not read them until July 16 because she believed it was something retaliatory and she wasn't up to looking at it. Tr. 167; Def. Ex. 81c at 7. Turner was devastated when she read the PSA and did not think her performance had declined to justify the PSA. Tr. 168, 170, 222. Turner did not call Welken as instructed until July 16. Def. Ex. 81c at 8. After the July 16 call, Welken told Burrus, "I am concerned that there is little apparent interest in working this performance issue out."

Welken issued a Turner a second PSA on August 28 at the "Minimally Acceptable" level. Tr. 170; Def. Ex. 83a. Welken based this PSA on a review of Turner's pending case files. Def. Ex. 83b.

Turner received a Warning PAR of "Unacceptable" and a PIP in December 1999. Tr.

213; Def. Ex. 90a and 90b. In April 2000, Turner received a "Fully Successful" PAR. Tr. 213; Agd. Ex. 3. Turner was not fired by the FBI; however, had she not received the "Fully Successful" PAR in April 2000, she could have been fired. Tr. 213.

The highest grade and step that a Special Agent can reach is GS-13, step 10. At every grade, these step increases result in additional salary, overtime pay, and retirement benefits for Special Agents. Agd. Ex. 1 at 11.

A step increase or WIGI is not automatic under civil service regulations; it has three requirements. Agd. Ex. 1 at 11-12. First, the employee must serve the minimum required time in each step before advancing to the next step. Second, the employee must have received at least a "Fully Successful" or "Meets Expectations" overall rating on most current PAR. Third, the employee must not have received another salary increase, such as an award or merit bonus, during the required service period between steps. In order to get a WIGI, an employee's supervisor must certify that he or she has served the required minimum time in grade and the current Performance Appraisal Report is at the "Fully Successful" or "Meets Expectations" level. Id. Turner received her WIGI to GS-13, step 9 on November 9, 1998. Tr. 200; Agd. Ex. 1 at 12. The earliest that Turner could next be eligible for a WIGI to GS-13, step 10 was November 2001, based on the minimum required service time of three years to qualify for her next step increase. Id. As of June 1999 when she received the "Minimally Unacceptable/Unacceptable" PSA, Turner had served only seven months of the minimum three year time in grade required for the WIGI to GS-13, step 10.

Assistant U.S. Attorney (AUSA) Clare Hochhalter worked extensively with SA Turner for twelve years. Tr. 76-80, 84. During the 1998-99 time frame, Hochalter did not see any

decline Turner's interviewing skills, ability to get evidence to support convictions, skills in interacting with Native Americans, availability to handle cases, and working with other law enforcement agencies and the United States Attorney's Office. Tr. 79-93. AUSA Jan Morley is the tribal liaison to the Turtle Mountain Chippewa Indians in the United States Attorney's Office in Fargo, North Dakota. Tr. 252-53. During the 1999 time period, Morley felt that Turner had a superior reputation for child abuse cases on the reservation with a remarkable reputation for getting confessions and presenting the cases for prosecution. Tr. 257-58.

**Standards for Entry of Judgment as a Matter of Law**

Plaintiff has failed to present sufficient evidence for a reasonable jury to find that the June 1999 "Minimally Acceptable" PSA constituted retaliation. "Judgment as a matter of law is proper only when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Wedow v. City of Kansas City, Mo., 442 F.3d 661, 669 (8th Cir. 2006) (citing Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004)(quotations omitted); see also Fed. R. Civ. P. 50. In considering a Rule 50 motion, this Court must: (1) resolve direct factual conflicts in favor of the non-movant; (2) assume as true all facts supporting the non-movant which the evidence tended to prove; (3) give the non-movant the benefit of all reasonable inferences; and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn. Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 770 (8th Cir. 2004) (quoting Larson v. Miller, 76 F.3d 1446, 1452(8th Cir. 1996)(en banc). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001) (citation omitted).

## Argument

**Plaintiff Has Failed to Present Sufficient Evidence for a Reasonable Jury to Find Retaliation in Violation of 42 U.S.C. § 2000e-3 with Respect to the June 1999 PSA**

Plaintiff has failed to present sufficient evidence for a reasonable jury to find retaliation, which requires that she show that (1) she was engaged in a protected activity (opposition or participation); (2) she suffered an adverse employment action; and (3) the adverse action occurred because she engaged in the protected activity. Hunt v. Nebraska Public Power Dist., 282 F.3d 1021, 1028 (8th Cir. 2002)(citations omitted). The three-step sequence of proof outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) still holds as a "sensible, orderly way to evaluate the evidence . . . as it bears on the critical question of discrimination." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1100 (1988), quoting Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978). The parties are thus required to develop the record on all stages of the McDonnell Douglas analysis, including defendant showing a legitimate, non-discriminatory reason for the challenged employment action and plaintiff, that defendant's proffered reason is pretext and discrimination the real reason for the action. Estes, 856 F.2d at 1100. Once the parties have developed the record, the governing questing is whether plaintiff's evidence permits a reasonable inference of discrimination. Id.

The parties stipulated that plaintiff had engaged in protected activities. However, plaintiff's retaliation claim fails thereafter, as the evidence did not show that she suffered an adverse employment action. Furthermore, aside from the circumstantial evidence of timing, plaintiff provided no evidence to show a causal connection between her discrimination complaint and the "Minimally Acceptable" PSA. Plaintiff's evidence also did not demonstrate that Welken's stated reasons for the PSA were pretext.

**A. The June 1999 file review/PSA does not constitute an adverse action.**

Plaintiff has failed to to offer sufficient evidence that the June 1999 PSA constituted an adverse action. As the Eighth Circuit recognized in Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005), a poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment and is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms and conditions of the employee's employment (citations omitted). The parties stipulated that the PSA, under civil service law, is not an agent's rating of record and cannot serve as the basis for salary changes, promotions, or other performance-based actions. Agd. Ex. 1 at 11. Testimony established that a PSA covers only the 90-day file review period, has no permanency as part of an agent's official personnel file, and is the means by which a supervisor provides an agent with on-going feedback about the strengths and weakness of her work displayed in the file review period. Tr. 488-90, 520. The PSA produces no material change in an FBI employee's terms or conditions of employment. Spears v. Missouri Dep't of Corrections, 201 F.3d 850, 853 (8th Cir. 2000). On the trial evidence, a jury could not reasonably find that the June 1999 PSA constituted an adverse action. Without an adverse action against plaintiff, defendant is entitled to judgment as a matter of law on this retaliation claim.

**B. Plaintiff has failed to show the required causal connection between the June 1999 PSA and her discrimination complaints against her supervisor.**

Plaintiff has failed to offer sufficient evidence that the June 1999 PSA stemmed from her complaints about sex discrimination against Welken. "A plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events. Generally, however, a temporal connection alone is not sufficient to establish a causal connection." Turner, 421 at 696-97, citing Eliserios v. USW, Local 310, 398 F.3d 1071, 1079 (8th Cir. 2005). The year between plaintiff's filing her EEO complaint in June 1998 and the June 1999 PSA (during which Welken heard rumors of Turner's complaint) weakens the inference of a retaliatory motive with respect to that original EEO complaint. Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999)(four month gap weakened inference of retaliation). The evidence showed that the timing of the June 1999 file review/PSA at issue coincided with Turner's challenging her April 1999 "Superior" PAR. Plaintiff attributed that PAR rating to Welken's discriminatory and retaliatory animus. This temporal connection supports an initial inference of causation, Eliserio, 398 F.2d at 1079, but the remaining evidence – unrebutted by plaintiff – fails to show that Welken issued Turner the "Minimally Acceptable" PSA because of her sex discrimination complaints against him.

Welken testified that the June 1999 PSA was based on his review of her case files and the work she performed and did not perform during the April 1 - June 23, 1999 file review period. He found that, during this period, Turner had neglected two color-of-law police brutality cases and a public corruption case, all of which had stringent reporting requirements and deadlines under FBI policy. Additionally, Welken had had to edit substantially Turner's report on a third color-of-law case which was substandard. Finally, in his review of her files, he found several

cases in which she had done no investigation. All of these performance issues formed the basis of the June 1999 file review/PSA. Tr. 537-542.

Plaintiff presented no evidence to rebut Welken's findings: nothing showing that (1) the deadlines and reporting requirements Welken was concerned about were, in fact, not significant and mandated by FBI policy; (2) that Welken allowed "a pass" on these deadlines and requirements to other agents who had not charged him with discrimination; (3) that she had completed the color-of-law and public corruption cases in a timely manner consistent with FBI requirements; and (4) that she had conducted investigation on the several cases she had not addressed during the file review period. See Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 633 (8th Cir.2005).

Plaintiff proffered the testimony of AUSAs Hochhalter and Morley which generally established that during the 1998-99 time frame, Hochhalter had not seen any decline in Turner's interviewing skills, retrieval of evidence, interactions with Native Americans and other law enforcement personnel, availability, and confession/conviction rate. Tr. 79-93; 257-58. However, none of those formed the basis for the June 1999 PSA. Moreover, as the Eighth Circuit observed, "[T]hese individuals would not necessarily be aware of a decline in her ability to meet internal FBI deadlines and the quality of her internal FBI reporting." Turner, 421 F.3d at 698. Plaintiff called Welken's criticism of her work a personal attack, manufactured lies, and "death by a thousand paper cuts" but proffered no specific documentary or anecdotal evidence to support these allegations that Welken was "petty" in his criticism of her paperwork and denial of statistics. Throughout her testimony, plaintiff simply labeled every supervisory action as "retaliatory." Such conclusory and unsupported allegations of being treated unfairly do not

support plaintiff's retaliation claim. Dhyne, 184 F.3d at 989, citing Feltmann v. Sieben, 108 F.3d 970, 976 (8th Cir. 1997), cert. denied, 522 U.S. 1075 (1998).

Plaintiff also did not rebut the extensive evidence and testimony presented by defendant that showed Welken in July 1999 attempting to work with her to address the June 1999 PSA, telling her that he saw no reason that the PSA/PIP could not be fully resolved in 30 days and she shouldn't view it as the end of the world, and pointing out that her current work in one case was exactly what was expected of her. Plaintiff likewise did not rebut Welken's testimony about his "moving on" past his disagreement with U.S. Attorney Schneider on Turner's assignment to the Froistad case, the difficulties of their supervisor/employee relationship, Turner's own unhappiness at being passed over in 1995 for the supervisor's position Welken held, and her consistent complaints about his supervision to every new SAC and ASAC. Throughout all this, Welken continued to give her "Superior" PARs. The totality of the evidence which plaintiff left unrebutted leads to the reasonable conclusion that Welken did not harbor retaliatory animus toward Turner. His assessment of her work during the file review period was legitimate, and the June 1999 PSA was not retaliation for Turner's discrimination complaints.

**C. The jury's award of lost wages should be vacated as a matter of law.**

Turner did not lose any salary nor was she fired as a result of the June 1999 PSA. The parties' stipulated evidence showed that, under civil service law, only an annual PAR is the rating of record used to determine if an agent receives a WIGI. Stipulated evidence also showed that the PSA cannot serve as the basis for any salary increase or decrease. Consequently, the evidence showed as a matter of law that the June 1999 PSA did not – and could not -- lead to any loss of wages for plaintiff.

Moreover, the stipulated evidence and plaintiff's testimony showed that Turner received a WIGI to GS-13, step 9 in November 1998 and therefore was not eligible due to time in service requirements until November 2001. When she got the June 1999 PSA, she still had two years and five months to serve as a GS-13, step 9 before she could go to GS-13, step 10. Following the June 1999 PSA, she received a December 1999 "Unacceptable" Warning PAR and an April 2000 "Fully Successful" PAR. Based on the evidence presented at trial, which specifically excluded plaintiff's PARs after April 2000 and before her November 2001 WIGI eligibility date, no jury could reasonably conclude that plaintiff lost wages as a result of her April 2000 PAR. See Turner, 421 F.3d at 696 (as long as her performance remained at "Fully Successful" or higher, Turner's WIGI would have happened automatically).

**Conclusion**

For the foregoing reasons, the February 9, 2007 judgment for plaintiff on the issue of a performance downgrade should be vacated and, pursuant to Fed. R. Civ. P 50(b), judgment as a matter of law should be entered for defendant.

Dated: February 26, 2007

Respectfully Submitted,
MATT M. DUMMERMUTH
United States Attorney

S/Martha A. Fagg

MARTHA A. FAGG
LAWRENCE D. KUDEJ
Assistant United States Attorneys
600 4th Street, Suite 670
Sioux City, Iowa 51101
Telephone: (712) 255-6011
Fax: (712) 252-2034
martha.fagg@usdoj.gov
Larry.kudej@usdoj.gov

COLLEEN B. GRZEŚKOWIAK
Special Assistant United States Attorney
935 Pennsylvania Avenue, N.W.
Room PA-400 North
Washington, DC 20535
Telephone: (202) 220-9311
Fax: (202) 220-9355
Colleen.Grzeskowiak@IC.fbi.gov

CERTIFICATE OF SERVICE

I certify that I mailed/electronically mailed/hand/ delivered a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on

UNITED STATES ATTORNEY

BY: s/Michelle Schwebach

COPIES TO:

Stephen Kohn
Attorney at Law
3233 P Street, NW
Washington, D.C. 20007