**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**
**01-CV-1407 (JMR/FLN)**

| | | |
|---|---|---|
| **JANE A. T. TURNER,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **ALBERTO GONZALES, ATTORNEY GENERAL, U. S. DEPARTMENT OF JUSTICE,** <br><br> **Defendant.** | ) | **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR A NEW TRIAL** |

## Introduction

This case arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Following remand from the U.S. Court of Appeals for the Eighth Circuit, plaintiff, a former Special Agent with the Federal Bureau of Investigation (FBI) proceeded to a jury trial on one remaining count of her Amended Complaint – retaliation. Two issues were presented to the jury: (1) whether plaintiff's June 1999 file review/Performance Summary Assessment (PSA) of "Minimally Acceptable/Unacceptable" constituted retaliation by Turner's first-line supervisor for her complaints of discriminatory treatment and (2) whether plaintiff's transfer by the FBI from Minot, North Dakota, to Minneapolis constituted retaliation. The jury rejected plaintiff's claim on the transfer issue but found that the June 1999 "Minimally Acceptable" PSA constituted prohibited retaliation. Judgment, including an award of lost wages, was entered for plaintiff on February 9, 2007. Defendant brings this timely motion for a new trial under Federal Rule of Civil Procedure 59.

Consideration of all testimony and documentary evidence presented at trial leads to the conclusion that the jury's verdict was not supported by the weight of the evidence. Furthermore,

various procedural and evidentiary rulings from the bench unduly prejudiced defendant and impeded his efforts to present a full defense to plaintiff's allegation that the June 1999 "Minimally Acceptable" file review/PSA was retaliation for her raising discrimination complaints against her supervisor, Craig Welken. While taken individually, any one of these rulings likely would likely not justify a new trial. However, their cumulative effect resulted in substantial prejudice to defendant and a verdict based on emotion rather than the evidence. Defendant incorporates by reference his Motion for Judgment as a Matter of Law, filed on February 23, 2007. If the Court denies defendant's Rule 50(b) Motion, in the alternative, defendant requests that the Court enter an order directing a new trial.

**Statement of Facts**

The Court scheduled trial on this case for the full day Wednesday, January 24; the morning of Thursday, January 25; and the full day Friday, January 26. Plaintiff presented her case on Wednesday, Thursday, and the first part of the morning Friday. Defendant then began presenting his case; however, the Court recessed the trial earlier than scheduled on Friday afternoon due to illness. The trial remained in recess until Thursday, February 1, at which point defendant concluded his case, closing arguments occurred and the case was submitted to the jury.

The evidence presented at trial showed that Turner joined the FBI as a Special Agent on October 22, 1978. In 1987, she transferred to Minot, North Dakota, as the Senior Resident Agent (SRA). North Dakota is part of the FBI's Minneapolis Division. Agd. Ex. 9.

In 1987, Craig Welken transferred to the Minneapolis Division as SRA of the Bismarck, North Dakota, office. Agd. Ex. 1 at 2. In 1995, Welken receive a competitive promotion to Senior Supervisory Resident Agent (SSRA) in the Fargo office to supervise all FBI agents in

North Dakota. Agd. Ex. 1 at 3-4; Transcript (Tr.) 516-518. As SSRA, Welken became Turner's first-line supervisor. Turner had also applied for the SSRA position and was unhappy that she did not get it. After 1995, Welken found his relationship with Turner to be challenging: while she could be very pleasant to deal with, she also spoke negatively about him to outside agencies and complained about his supervision of the North Dakota squad whenever a new Special Agent in Charge or Assistant Special Agent in Charge arrived in the Minnesota Division. Tr. 357-358, 473-74, 476-77, 518-19.

Assistant Special Agent in Charge (ASAC) James "Chip" Burrus became plaintiff's second-line supervisor in March 1998. Id at 4.

On June 22, 1998, plaintiff filed an Equal Employment Opportunity complaint alleging sex discrimination and gender-based hostile work environment by Welken. Tr. 128. Thereafter, Welken heard rumors that Turner had filed an EEO complaint about him and affirmatively learned of her EEO complaint in late April 1999 from an EEO investigator. Tr. 535. Burrus knew that Turner had filed an EEO complaint because he had arranged contact between Turner and an EEO counselor after she e.mailed Burrus, requesting an EEO investigation. Tr. 474-76.

Between April 1989 and April 1999, Turner consistently received annual Performance Appraisal Reports (PAR) of "Superior" with the exception of 1993 when she received an "Exceptional" PAR. Plaintiff's Exhibit (Pl. Ex. ) 51. Under civil service regulations, the PAR is an FBI agent's rating of record and is used to determine if an agent receives a within-grade salary increase (WIGI). Agd. Ex. 1 at 7, 11.

On April 22, 1999, Turner received her annual PAR for the April 1, 1998 - March 31, 1999, appraisal year. Agd. Ex. 2. That PAR rating gave Turner an overall rating of "Superior"

but Turner felt it should have been "Exceptional" due to her work on the Froistad case. Agd. Ex. 1 at 4-5.

Under the FBI's grievance process for PARs, an employee must start the process within ten business days. Agd. Ex. 1 at 9-10. First, the employee must file a written request for reconsideration with her first- and second-line supervisor, setting out her specific challenge(s) to the PAR rating and examples of work performance to justify a higher rating. The employee also must meet with the first-line supervisor to discuss the employee's dissatisfaction and identify the specific points where the supervisor and employee disagree. Next, the first-line supervisor writes a specific response to the employee's written grievance and forwards both memos to the second-line supervisor. The second-line supervisor then provides the employee with a written response in ten business days, stating whether the rating will be changed. If the employee is still dissatisfied, she can appeal the decision to the FBI's Personnel Officer.

In an April 25, 1999 memo, Turner requested reconsideration of the April 1999 PAR and stated that the rating reflected Welken's gender bias and appeared to be retaliation for her filing a hostile work environment complaint. Agd. Ex. 6 at 2-3. Three days later, Turner told Welken that the April 25 memo was a rough draft which should not be filed and she was still working on the memo she did want filed. Agd. Ex. 1 at 5; Def. Ex. 79. Welken forwarded the April 25 memo to Burrus and asked how to proceed. Agd. Ex. 6 at 1. Turner had not met with Welken first to discuss the PAR rating or why she was unhappy with it. Id. Burrus determined that Turner had missed the ten-day deadline but went ahead to consider Turner's PAR grievance. Tr. 483-85. Burrus advised Turner about how to proceed in grieving her PAR and suggested that she contact the EEO office for guidance if she wanted to amend her original EEO complaint. Agd. Ex. 7.

Turner later submitted a memo dated May 23, 1999 which detailed her arguments for the "Exceptional " PAR she sought. Agd. Ex. 5.

On June 11, 1999, Welken conducted a face-to-face file review/PSA with Turner. Tr. 146, 537; Agd. Ex. 8 at 1; Def. Ex. 81c at 1-2. FBI supervisors are required to review an agent's files every 90 days. Agd. Ex. 1 at 8; Tr. 520. The file review consists of two parts: (1) a review of the agent's open files to determine what investigative work has been done over the last 90 days and what will be done in the next 90 days (Def. Ex. 81c at 20-41) and (2) an interim Performance Summary Assessment (PSA), which the FBI uses to give agents on-going feedback about their work. Tr. 146, 520. The PSA is done so that if the supervisor sees performance issues developing during the file review period, the agent is warned of the need to improve and has the chance before the annual PAR is issued to correct any problems. Tr. 488-89, 520; Agd. Ex.1 at 8. Under civil service regulations, the PSA is not a rating of record and cannot serve as the basis for granting or denying a WIGI. Agd. Ex. 1 at 11. The PSA covers only the 90-day file review period and has no permanency. Tr. 520. The file review sheets and PSA are not filed in the agent's official personnel file (OPF) but are kept for all agents by the supervisor in a drop folder as a record for file reviews done throughout the PAR rating period. Tr. 489-90, 528.

Before meeting with Turner on June 11, Welken reviewed her assigned case files. Def. Ex. 81c at 20-41. He found that on two color-of-law police brutality cases and a public corruption case Turner had not met significant deadlines and reporting requirements mandated by FBI policy and, on several of Turner's other cases, she had done no investigation or victim interviews during the file review period. Id.; Tr. 537-39, 542. Under internal FBI policy, as all agents are aware, color-of-law and public corruption cases uniquely have very strict reporting requirements under

very tight deadlines. Tr. 537-38. Welken based his "Minimally Acceptable" PSA on the missed deadlines in the color of law and public corruption cases and Turner's failure to comply with the FBI's internal reporting requirements on a third color-of-law case. Tr. 538-39. Welken felt there had been some slipping in Turner's work during the review period and was also concerned about the upcoming inspection and getting Turner on track and focused about the delinquent cases. Tr. 539.

During the file review/PSA meeting, Welken told Turner that she being rated as "Minimally Acceptable" for the file review period and explained to her his basis for this: under the critical elements of her performance plan, timeliness and completeness of an investigation were required and that her assigned civil rights case reports were overdue and not properly investigated and that Welken had to complete required forms and re-work in substantial detail her report on another civil rights case assigned to her. Def. Ex. 81c at 1-2. Turner and Welken discussed the Froistad case and, according to Turner, "a couple other things." Tr. 146, 539-541, 565-66; Def. Ex. 81c at 1-2. Turner initiated the discussion of the Froistad case, which was not one of her assigned matters during this file review period. Id. Welken acknowledged her good work on the case (as he had during her work on the case: Tr. 135, Pl. Ex. 56) but pointed out that he did not like being "blind-sided" by the U.S. Attorney's request for her participation in the case without prior notice from her, "poaching" in the Bismarck Resident Agency territory, and her continuing custodial interviews of Froistad. Def. Ex. 81c. Welken advised Turner that they would not have a situation like what occurred with Froistad again. Id.

Turner was shocked and stunned by Welken's comments on the Froistad case, took them as a personal attack and "manufactured lies." Tr. 147-48, 150.

On June 18, 1999, Turner sent a memo captioned "Additional information for PAR review request" to Burrus. Agd. Ex.8; Tr. 145-146, 166, 483-486. The memo referenced Turner's June 11th file review and stated that, "At the end of the file review," Welken told Turner she did not receive credit for the Froistad case "because SA Turner 'sandbagged' SSRA Welken with United States Attorney (USA) John Schneider . . . and SSRA Welken will not allow any 'poaching' of cases, and this was a 'poached' case." Tr. 146; Agd. Ex. 8 at 1. Turner's memo complained of Welken's discrimination and retaliation. Id. at 2. On June 22, Burrus received Turner's memo and took it to be PAR review material for plaintiff's on-going grievance of the April 1999 PAR. Tr. at 485-86. Burrus returned the memo to Turner with a routing slip telling her that since Welken was not on the copy count and she labeled the memo as additional information for her PAR review request, he would forward a copy to Welken for his consideration. Tr. at 484-86, 498-99; Pl. Ex. 60. Burrus sent it to Welken via Federal Express on June 22. Tr. at 486.

Welken prepared a written PSA which found her "Minimally Acceptable/Unacceptable" in two critical elements and "Fully Successful/Minimally Acceptable" in one critical element. Def. Ex. 81a. His notes for developing the PSA showed that he again was reviewing Turner's files and work on June 22 and 23. Def. Ex. 81c at 9-19. Attached to the PSA form were an explanation for the PSA rating and a Performance Improvement Plan (PIP) which provided specific suggestions for improvement to the "Fully Successful" level. Id.; Def. Ex. 81b. The PSA and PIP were dated June 23, 1999. Id.

Welken made further attempts to discuss the PSA and PIP with Turner. Tr. 542-43; Def. Ex. 81c at 3-8. In a July 6, 1999 telephone conversation, Welken told Turner that the written PSA with the PIP would be Federal Express'd to her in Minot; with a rating below "Fully Successful,"

a PIP was required and prepared; another file review and PSA would occur in roughly 30 days. Def. Ex. 81c at 5; Tr. 168. Welken also told Turner that there was no reason that she should view the PSA and PIP "in a manner suggesting the end of the world;" the work she was currently doing in one of her cases was "exactly what we want;" and to read and review the PSA and PIP and call him the next day. Id. In a routing slip, Welken said, "Please review and call me to discuss the rating and plan. I see no reason why this can't be fully resolved within 30 days with a favorable PSA at that time." Def. Ex. 81b at 5-12 (emphasis in original); Tr. 541. At this point, Welken was hopeful that Turner would respond in a very positive way and that a file review of her work in another thirty days would result in a favorable PSA at a higher level. Tr. 541-43.

Turner received the PSA and PIP on July 7 but did not read them until July 16 because she believed it was something retaliatory and she wasn't up to looking at it. Tr. 167; Def. Ex. 81c at 7. Turner was devastated when she read the PSA and did not think her performance had declined to justify the PSA. Tr. 168, 170, 222. Turner did not call Welken as instructed until July 16. Def. Ex. 81c at 8. After the July 16 call, Welken told Burrus, "I am concerned that there is little apparent interest in working this performance issue out."

Welken issued a Turner a second PSA on August 28 at the "Minimally Acceptable" level. Tr. 170; Def. Ex. 83a. Welken based this PSA on a review of Turner's pending case files. Def. Ex. 83b.

Turner received a Warning PAR of "Unacceptable" and a PIP in December 1999. Tr. 213; Def. Ex. 90a and 90b. In April 2000, Turner received a "Fully Successful" PAR. Tr. 213; Agd. Ex. 3. Turner was not fired by the FBI; however, had she not received the "Fully Successful" PAR in April 2000, she could have been fired. Tr. 213.

The highest grade and step that a Special Agent can reach is GS-13, step 10. At every grade, these step increases result in additional salary, overtime pay, and retirement benefits for Special Agents. Agd. Ex. 1 at 11.

A step increase or WIGI is not automatic under civil service regulations; it has three requirements. Agd. Ex. 1 at 11-12. First, the employee must serve the minimum required time in each step before advancing to the next step. Second, the employee must have received at least a "Fully Successful" or "Meets Expectations" overall rating on most current PAR. Third, the employee must not have received another salary increase, such as an award or merit bonus, during the required service period between steps. In order to get a WIGI, an employee's supervisor must certify that he or she has served the required minimum time in grade and the current Performance Appraisal Report is at the "Fully Successful" or "Meets Expectations" level. Id. Turner received her WIGI to GS-13, step 9 on November 9, 1998. Tr. 200; Agd. Ex. 1 at 12. The earliest that Turner could next be eligible for a WIGI to GS-13, step 10 was November 2001, based on the minimum required service time of three years to qualify for her next step increase. Id. As of June 1999 when she received the "Minimally Unacceptable/Unacceptable" PSA, Turner had served only seven months of the minimum three year time in grade required for the WIGI to GS-13, step 10.

Assistant U.S. Attorney (AUSA) Clare Hochhalter worked extensively with SA Turner for twelve years. Tr. 76-80, 84. During the 1998-99 time frame, Hochalter did not see any decline Turner's interviewing skills, ability to get evidence to support convictions, skills in interacting with Native Americans, availability to handle cases, and working with other law enforcement agencies and the United States Attorney's Office. Tr. 79-93. AUSA Jan Morley is the tribal

liaison to the Turtle Mountain Chippewa Indians in the United States Attorney's Office in Fargo, North Dakota. Tr. 252-53. During the 1999 time period, Morley felt that Turner had a superior reputation for child abuse cases on the reservation with a remarkable reputation for getting confessions and presenting the cases for prosecution. Tr. 257-58.

**Standards for Granting a New Trial**

A district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if failing to do so would result in a miscarriage of justice. Schaffer v. Wilkes, 65 F.3d 115, 117 (8th Cir. 1995) (quoting White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992)). "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence – it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict'." White, 961 F.2d at 780 (quoting Ryan v. McDonough Power Equip., 734 F.2d 385, 387 (8th Cir. 1984)). The district court may not, however, "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. Id. (quotations omitted). In ruling on a motion for a new trial, the district court must articulate its reasons for finding the verdict is against the weight of the evidence. Schaffer, 65 F.3d at 118.

## Argument

### I. The Jury's Verdict that the June 1999 File Review/PSA Constituted Retaliation was against the Weight of the Evidence Presented at Trial

Viewing all of the testimony and documentary evidence presented at trial, the Court can conclude that the jury's verdict was against the weight of the evidence. As a result, a miscarriage of justice would result if the jury's verdict and damages award of $60,000 lost wages and $300,000 compensatory damages (remitted) were allowed to stand and a new trial not granted.

Turner alleged that the performance downgrade from her April 1999 "Superior" annual PAR to her June 1999 "Minimally Acceptable" file review/PSA constituted retaliation by Welken for Turner's filing of a sex discrimination complaint against him. In evaluating the weight of the evidence, the Court must determine if Turner made the required showing to establish retaliation: (1) she engaged in protected activities; (2) the June 1999 "Minimally Acceptable" file review/PSA constituted an adverse action; and (3) the adverse action was causally related to the discrimination complaint she filed against Welken. Harris v. Secretary, U.S. Department of the Army, 119 F.3d 1313, 1318 (8th Cir. 1997). The three-step sequence of proof outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) still holds as a "sensible, orderly way to evaluate the evidence . . . as it bears on the critical question of discrimination." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1100 (1988), quoting Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978). Accordingly, the FBI then bears a burden of production to articulate a legitimate, nondiscriminatory reason for the "Minimally Acceptable" file review/PSA. Once this burden is met, the fact finder then is left to determine if Turner presented evidence capable of proving that the FBI's proffered reason for the June 1999 PSA was a pretext for prohibited retaliation. Harris, 119 F.3d 1313 at 1318.

**A. The weight of the evidence did not show that Turner suffered an adverse employment action.**

The parties stipulated that plaintiff engaged in protected activities. The parties also stipulated about the personnel impact of a PSA for an FBI agent: the PSA, under civil service law, is not an agent's rating of record and cannot serve as the basis for salary changes, promotions, or other performance- or merit-based actions. Agd. Ex. 1 at 11. Thus, a PSA, whatever the rating, has no financial (either salary or bonus award) or career advancement impact on an FBI employee. Testimony established that a PSA covers only the 90-day file review period, has no permanency as part of an agent's official personnel file, and is simply the mechanism by which an FBI supervisor provides an agent with on-going feedback about the strengths and weakness of her work as displayed during the file review period. Tr. 488-90, 520. A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment and is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms and conditions of the employee's employment. Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005). The weight of the evidence showed the PSA produces no material change in an FBI employee's terms or conditions of employment. Spears v. Missouri Dep't of Corrections, 201 F.3d 850, 853 (8th Cir. 2000).

Turner testified that she retired with less than full retirement benefits, Tr. 603, but did not link this alleged loss to the June 1999 PSA. During closing argument, plaintiff's counsel argued to the jury based on Defendant's Ex. 94 – incorrectly and contrary to agreed stipulation – that the PSA performance downgrade Turner received in 1999 led to loss of wages. As the Court pointed out to the jury, statements made in closing argument do not constitute evidence. Tr. 654. Given the evidence presented at trial, the jury either (1) did not understand the different nature and

operative effect between a PAR (the annual rating of record, basis for salary increase) and a PSA (means for informal feedback on performance during file review period, no financial/promotion impact) or (2) did understand the difference but decided to award plaintiff lost wages in spite of the stipulated evidence and the law.[1]

Moreover, the evidence showed that Turner received a "Fully Successful" PAR in April 2000, which would be her rating of record as of that date under civil service regulations. Plaintiff still had eighteen months to serve time-in-grade as a GS-13, step 9 before even being eligible for her next Within Grade Salary Increase (WIGI) in November 2001. Agd. Ex. 1 at 11-12. Specifically excluded from trial was evidence of plaintiff's PARs between April 2000 and November 2001, the last of which would have established the basis under civil service regulations for the November 2001 WIGI denial. While a jury may draw inferences from the presented evidence, "an inference is reasonable if it 'may be drawn from the evidence without resort to speculation'." Okruhlik v. University of Arkansas, 395 F.3d 872, 878 (8th Cir. 2005), quoting McGreevy v. Daktronics, Inc., 156 F.3d 837, 840-41 (8th Cir. 1998).

Based on the weight of the evidence, the Court can properly conclude that Turner did not suffer an adverse personnel action with respect to the June 1999 PSA. Without evidence supporting an adverse personnel action, plaintiff's claim of retaliation with respect to the June 1999 PSA founders.

**B. The weight of the evidence did not show that Turner received the June 1999 "Minimally Acceptable" PSA because she complained of Welken's allegedly discriminatory treatment.**

---

[1] Plaintiff's testimony indicates she herself possibly didn't understand these differences. See Tr. 212.

The weight of the evidence does not show that Turner's complaints of discrimination were the cause for Welken giving her the June 1999 "Minimally Acceptable" PSA. Turner's initial discrimination complaint was filed in June 1998. In late April 1999, she also began a challenge to the "Superior" PAR rating Welken gave her for the April 1, 1998 - March 31,1999 evaluation year, alleging in various memos that the evaluation failed to give her full credit for her work on the Larry Froistad case and was motivated by Welken's discriminatory and retaliatory animus. Agd. Exs. 5, 6, and 8. Although the coincident timing of these events supports an initial inference of causation, generally, however, a temporal connection alone is not sufficient to establish a causal connection. Turner, 421 at 696-97, citing Eliserios v. USW, Local 310, 398 F.3d 1071, 1079 (8th Cir. 2005),

Defendant presented testimony that Welken based the June 1999 PSA on his review of plaintiff's files and the work she performed/did not perform during the April 1 - June 23, 1999 file review period. Tr. 537-42; Def. Ex. 81a, 81b, 81c. He found that, during this period, Turner had neglected two color-of-law police brutality cases and a public corruption case, all of which had stringent reporting requirements and deadlines under U.S. Department of Justice (DOJ) and FBI policy. Id. On a third civil rights case, Turner had submitted a substandard preliminary investigation report, which Welken had to revise substantially. Welken also testified that his review of Turner's assigned cases revealed several cases in which she had done no investigation during the file review period. Id.

Plaintiff presented no evidence to contradict or rebut defendant's proffered explanation for the "Minimally Acceptable" PSA or to show that the explanation was pretext for retaliation. Plaintiff did not produce any evidence indicating that (1) the deadlines and reporting requirements

Welken was concerned about were, in fact, not significant and mandated by DOJ/FBI policy; (2) Welken tolerated delinquencies and incomplete reports from other agents on the squad who had not complained of discrimination; (3) she had actually completed the color-of-law and public corruption cases in a timely manner consistent with FBI requirements; and (4) she had conducted investigation on the several cases she left unaddressed during the file review period. See Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 633 (8th Cir.2005). The evidence on the issue of defendant's proffered legitimate, non-discriminatory reason for the performance downgrade does not present "the choice between two stories [and] essentially a credibility determination for a jury rather than a weight of the evidence issue." White v. Pence, 961 F.2d 776, 781 (8th Cir. 1992). Where there is no "second story" from plaintiff about her work on her assigned cases during the PSA's file review period, there is no situation of "diametrically opposed testimony from credible witnesses with plausible versions [where] the function of the jury is to accept one or the other." White, 961 F.2d at 781.

Instead of addressing Welken's rationale for the June 1999 PSA directly, plaintiff proffered evidence from two Assistant U.S. Attorneys (AUSAs) which showed generally that, during the 1998-99 period, neither AUSA had seen a decline in Turner's interviewing skills, retrieval of evidence, interactions with Native Americans and other law enforcement personnel, availability, and confession/conviction rate. Tr. 79-93; 257-58. Testimony of an AUSA and a U.S. Customs Agent showed that Turner worked aggressively on the Larry Froistad case and was credited by the U.S. Attorney with achieving the confession and plea. Pl. Ex. 57. As to the issue at hand, however, this testimony was largely irrelevant as the Froistad case finished up in fall 1998 and did not factor into the June 1999 PSA. Moreover, as the Eighth Circuit observed, "[T]hese

individuals would not necessarily be aware of a decline in her ability to meet internal FBI deadlines and the quality of her internal FBI reporting." Turner, 421 F.3d at 698. While the evidence could lead a jury to infer that Turner displayed a strong work ethic when working the Froistad, Charette, and Baby Moses cases, plaintiff let stand without rebuttal defendant's basis for the June 1999 PSA.

The weight of the evidence does not show that defendant's explanation is pretext for retaliation. The record showed Welken in July 1999 making efforts to work with her to address the June 1999 PSA, telling her there was no reason the PSA/PIP could not be fully resolved in 30 days and she shouldn't view it as the end of the world, and pointing out that her current work in one case was exactly what was expected of her. This evidence belies any assertion on plaintiff's part that Welken harbored a retaliatory animus: common sense and human nature suggests that a supervisor looking to retaliate would have left Turner to twist in the proverbial wind after issuing the "Minimally Acceptable" PSA instead of devoting any time or energy to developing detailed, specific guidance for improvement (Def. Ex. 81a, 81b) and making repeated attempts to discuss the PSA and PIP. Def. Ex. 82. Indeed, evidence from other FBI employees showed that Welken was well-regarded, considered "the salt of the earth" and a good supervisor by both support staff and other managers. Tr. 333, 357-59, 393, 394-95, 396-97.

Plaintiff admitted that she left the written PSA and Performance Improvement Plan unopened and unread on her desk for several days, assuming it was "something retaliatory." Tr. 166-67. Plaintiff likewise did not rebut Welken's testimony about the difficulties of their supervisor/employee relationship, Turner's own unhappiness at being passed over in 1995 for the supervisor's position Welken got, her complaints to the Special Agent in Charge about not being

selected, and her consistent complaints about his supervision thereafter to every new SAC and ASAC. Throughout all this, Welken continued to give her "Superior" PARs. The weight of the evidence shows that Turner was simply not amenable to Welken's supervision.

The weight of the evidence therefore showed that plaintiff suffered no adverse action and failed to establish a causal connection between her discrimination complaints and the "Minimally Acceptable" June 1999 file review/PSA.

## II. The Cumulative Effect of Various Evidentiary Rulings Unduly Prejudiced Defendant and Impeded His Efforts to Present a Full Defense to Plaintiff's Retaliation Allegation.

An allegedly erroneous evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result. Harrison v. Purdy Bros. Trucking Co., 312 F.3d 346, 351 (8th Cir. 2002). Various directions from the bench and evidentiary rulings impeded defendant's ability to present a full defense to plaintiff's retaliation claim. Standing alone, any one ruling would not support an order granting a new trial; however, their cumulative effect resulted in substantial prejudice to defendant.

### A. The testimony of defendant's chief witness, plaintiff's supervisor and the allegedly retaliatory actor, was unfairly abbreviated by the Court.

The Court originally allotted two and a half days for trial of this case. Plaintiff did not finish presenting her case-in-chief until mid-morning the third day, at which point the Court observed that trial would likely continue into Monday, January 29. Defendant's principal witness, Craig Welken, began testimony mid-afternoon on Friday, January 26. Although a trial court's exclusion of evidence is entitled to substantial deference, the Court's exercise of its discretion must not unfairly prevent a party from proving his case. Estes, 856 F.2d at 1102-03. This applies with particular force where evidence demonstrating the employer's state of mind – here, Welken –

is of crucial importance in an employment case. Garner v. Missouri Department of Mental Health, 439 F.3d 958, 960 (8th Cir. 2006), quoting Hardie v. Cotter & Co., 849 F.2d 1097, 1101 (8th Cir. 1988).

For example, Welken testified about his 1995 selection as squad supervisor in North Dakota. Tr. 516-17. In a follow-up question, defendant's counsel asked if there had been an application process for the position and the Court directed counsel that the line of questioning was not relevant. Tr. 517. However, when Welken's next answer revealed that Turner had unsuccessfully applied for Welken's position, the Court sua sponte reversed its ruling. Tr. 517. Clearly, this line of questions was relevant and provided perspective on the Welken/Turner supervisor/employee relationship.

At another point, this exchange occurred:

> THE COURT: How much longer do you anticipate your direct is going to take?
>
> MR. KUDEJ: Fifty minutes. I would hope to be done more like in a half an hour. This is some of the preliminary stuff, the rest of the stuff –
>
> THE COURT: We've really plowed very deep in this stuff.

Tr. 525. The Court later displayed impatience when Welken began testifying about performance statistics and, after dismissing the jury, advised defendant's counsel that he had ten minutes to conclude direct examination of Welken. Tr. 546. This instruction forced defendant's counsel during the recess to truncate the remainder of Welken's testimony to fit the Court's directed ten minutes.

As a result, Welken was precluded from testifying about the source of the conflict between him and Turner on statistics: previous supervisors of the North Dakota agents (who themselves were stationed in Minneapolis rather than in North Dakota) allowed statistical credit regardless of

how significant or de minimus a role an Indian Country FBI agent played in a particular case. Welken would have testified how, under prior supervisors, if a Bureau of Indian Affairs officer actually arrested a suspect and the FBI agent merely provided transport from the border of the Indian Reservation, the agent would be credited with making the arrest. Once Welken became supervisor, however, he interpreted statistical credit more consistently with FBI policy and allowed credit for an arrest only if the FBI agent actually served the arrest warrant and effected the arrest. While Turner testified generally about how Welken "wouldn't allow credit for my work" without providing any concrete example, Welken had ample anecdotal evidence of how he denied Turner's request for statistical credit because she did not effect an arrest or had played only a marginal investigative role in a case, adopting the work of local and state officers as her entitlement for a statistical credit, like an indictment. None of this evidence was put before the jury as a result of the Court's instruction and, consequently, the jury was left with the misleading impression that Welken was arbitrarily denying Turner credit.

Following the ten-minute instruction as the Court recessed Friday afternoon, defendant's counsel was forced to "triage" Welken's expected testimony, picking and choosing what, at a minimum, needed Welken's testimony within the time constraint. As a result, testimony about the June 1999 PSA was limited to the general explanation of Turner's failure to meet deadlines in the color-of-law and public corruption cases. Tr. 538-39. There was no opportunity to properly present the exhibits pertinent to the June 1999 file review and PSA to the jury, Def. Ex. 81c at 9-41, with Welken explaining his approach to file reviews and what he found (and didn't find) among Turner's work product for the file review period. Lacking this testimony, the jury was left with another mistaken and misleading impression: that Welken was "papering" and "keeping

book" on Turner. His testimony would have shown that he used this methodical approach with all agent file reviews and was simply doing his job as a supervisor.

Defendant does not suggest that mathematical parity in testimony transcript pages be a court's goal in allowing both parties to present a full presentation of their cases. Indeed, any given witness can talk much and say little. Here, Turner's complete testimony runs approximately 146 pages; Welken's, approximately 59. After testifying, Welken observed to counsel that only approximately thirty percent of his anticipated testimony on the June 1999 PSA and plaintiff's transfer was given to the jury. Given Welken central role as Turner's supervisor in defendant's case, more latitude in presenting his testimony could have been allowed.

**B. The testimony of Dr. Edwin Carter should not have been admitted.**

Plaintiff proffered the expert testimony and report by Edwin N. Carter, Ph.D., to establish plaintiff's emotional and mental damages. Carter developed his report as a result of an all-day psychological evaluation session with plaintiff on August 27, 2003. By this time, approximately four years had passed since the June 1999 file review/ PSA and plaintiff's transfer to Minneapolis. The evaluation encompassed all events and job-related stressors which Turner had experienced since then, focusing on her having "exposed a pattern of FBI corruption," her transfer from Minot, her whistleblowing activities during 2002, and personnel actions subsequent to her 2000 transfer. The Court properly excluded Carter's expert report.

The Court should have excluded all testimony from Carter. First, plaintiff first identified Carter as her expert witness on December 21, 2006, a full month after the Court's deadline under the pre-trial order. Consequently, defendant did not have the opportunity to depose Carter. Second, Carter's testimony in court departed from his reported expert assessment: instead of

maintaining his original opinion that Turner's mental distress was the cumulative effect of personnel actions and her whistle blowing activities, once his report was excluded, Turner's post-2000 experiences dropped from his calculus of emotional harm. Thereafter, all harm Turner allegedly suffered was due to the June 1999 PSA and her transfer. Under Rule 702, the court has a gatekeeping obligation to ensure that an expert's testimony rests on a reliable foundation and is relevant to the task at hand. Kumho Tire Co. V. Carmichael, 526 U.S. 137, 141 (1999) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). Here, Carter's evaluation of Turner was not contemporaneous with the personnel actions occurring in 1999 and the foundation of his assessment encompassed far more of Turner's workplace experience than was at issue at trial. For this reason, all testimony from Carter should have been excluded. Based as it was on the cumulative scope of Turner's experiences, testimony from Carter was unduly prejudicial to defendant.

Such a exclusionary ruling would not have prejudiced plaintiff. For purposes of establishing emotional harm and damages, plaintiff could have relied on the testimony of friends and relatives. Such testimony has repeatedly been held to be competent evidence of genuine injury. See Foster v. Time Warner Entertainment Company, L.P., 250 F.3d 1189, 1196 (8th Cir. 2001), relying on Morse v. Southern Union Co., 174 F.3d 917, 925 (8th Cir. 1999) and Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997).

**C. The testimony of Peggy Gray of the FBI's Health Care Programs Unit should not have been excluded.**

The Court excluded the testimony of Peggy Gray of the FBI's Health Care Programs Unit (HCPU). Defendant anticipated that Ms. Grey would testify about the medical requirements (both physical and psychological) set for FBI agents, the fitness for duty program, HCPU's response to

Turner's unreported use of anti-depressants, and its assessment of the medical reports Turner submitted from a doctor she consulted in early January 2000 which indicated that Turner was suffering from Post-Traumatic Stress Disorder, experiencing anxiety and visual flashbacks of brutally injured children from her investigations. This testimony would have been a reliable index to the causes of Turner's alleged emotional distress as it was contemporaneous with the personnel actions at issue at trial. Furthermore, Ms. Grey's testimony would have allowed defendant to provide evidence relevant to damages.

**D. The Court erred in denying defendant's motion in limine regarding the testimony of Hochhalter, Morley and Onstead.**

Defendant filed a pre-trial motion in limine to exclude the testimony of AUSAs Clare Hochhalter and Jan Morley as irrelevant to the issues at trial and sought to limit the testimony of U.S Customs Agent Anthony Onstead. None of these individuals ever worked for the FBI; therefore, they had no first-hand knowledge of the decline in Turner's ability to meet internal FBI deadlines and reporting requirements. Turner, 421 F.3d at 698. None of the three were interviewed by Assistant-Inspector-in-Place James Casey about Turner's performance during the October 1999 audit of the Minot Resident Agency nor did they speak with SAC Douglas Domin about their opinion that Turner should not be transferred to Minneapolis. Therefore, none of them knew the issues about Turner that concerned Domin and led to her transfer. Defendant asked that Onstead's testimony be limited to his observations of the September 23, 1999 meeting between himself, Turner, and the Ward County Sheriff's Department on the Vigestad case. Such testimony was relevant to the transfer issue because it provided anecdotal evidence of Turner's inability to work cooperatively with certain local law enforcement entities. Instead, all three witnesses testified generally about Turner's work, Hochhalter especially expansively about cases he and

Turner worked that long predated the time frame at issue. As the Court observed to plaintiff's counsel,

> THE COURT: Counsel, you have painted this case now for two hours, no, for six hours, and you've painted it anyway you want. You've given a background on her that she's obviously one step short of canonization. That's fine with me, I have no problem with that, but at a certain point we ought to try the lawsuit, and you are very close to it, okay? All right. Let's get to work.

Tr. 163. Such unrestricted testimony worked an undue prejudice on defendant, especially in view of supervisor Welken's abbreviated testimony.

**E. The Court allowed inappropriate, extremely prejudicial closing argument by plaintiff's counsel.**

During closing argument, plaintiff's counsel commented extensively on the fact that defendant did not cross-examine AUSAs Hochhalter or Morley and presented no expert witness to rebut Dr. Carter. Tr. 629-30, 648. Counsel's comments about defendant's lack of an expert witness is particularly disingenuous given that he was aware of the anticipated scope of Peggy Grey's testimony, especially with respect to Turner's psychological state during the 1999-2000 time frame. Counsel's argument left the jury with the misleading impression that there was no opposing view to Dr. Carter's assessment of Turner's emotional harm when plaintiff's counsel knew full well there was.

Likewise, counsel's closing argument left the jury with the misleading belief that Hochhalter's effusive praise of Turner had no counterpoint. A cursory reading of the post-trial media reports bears this out: one juror proclaimed Turner "the best FBI agent I've ever met." Hochhalter testified that he and Turner were close personal friends; thus, defendant's counsel relied on the intelligence of the jury to view his testimony through the lens of possible personal bias. Hochhalter's broad testimony about the Froistad (summer/fall 1998), Wilbur Wilkinson

(1993), and other cases predating the time frame at issue were simply irrelevant and defendant's counsel objected as the testimony unfolded.

Equally egregious was plaintiff's counsel's argument based on Def. Ex. 94 (Turner's salary information) that Turner lost salary as a result of the June 1999 PSA and the later transfer. Tr. 643-646. This line of argument misrepresented the very evidence regarding the personnel impact of the PSA which plaintiff's counsel stipulated to on behalf of his client. See Agd. Ex. 1 at 11-12. Turner lost no salary due to the June 1999 PSA because a PSA is not the rating of record and, in 1999, Turner was not eligible for a WIGI due to time-in-grade service requirements. Plaintiff's counsel knew this, as well as the history of Turner's PARs between April 2000 and November 2001. His closing argument, which he illustrated with a knowingly wrongful interpretation of Def. Ex. 94, undoutedly led the jury to its $60,000 award of lost wages.

The trial court has the responsibility to ensure that counsel's closing argument does not misrepresent either the law or the evidence. Higgins v. Hicks Co., 756 F.2d 681 (8th Cir. 1985). The strident, vehement tone with which counsel delivered these inaccurate and inappropriate remarks unquestionably left a misleading impression with the jury and worked severe prejudice to defendant. See Estes, 856 F.3d at 1106.

**Conclusion**

For the foregoing reasons, defendant's Motion for a New Trial should be granted.

Dated: February 26, 2007

Respectfully Submitted,
MATT M. DUMMERMUTH
United States Attorney

S/Martha A. Fagg
MARTHA A. FAGG
LAWRENCE D. KUDEJ
Assistant United States Attorneys
600 4th Street, Suite 670
Sioux City, Iowa 51101
Telephone: (712) 255-6011
Fax: (712) 252-2034
martha.fagg@usdoj.gov
Larry.kudej@usdoj.gov

COLLEEN B. GRZEŚKOWIAK
Special Assistant United States Attorney
935 Pennsylvania Avenue, N.W.
Washington, DC 20535
Telephone: (202) 220-9311
Fax: (202) 220-9355
Colleen.Grzeskowiak@IC.fbi.gov

CERTIFICATE OF SERVICE

I certify that I mailed/electronically mailed/hand/ delivered a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on

UNITED STATES ATTORNEY

BY: s/Michelle Schwebach

COPIES TO:
Stephen Kohn
Attorney at Law
3233 P Street, NW
Washington, D.C. 20007