UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
01-CV-1407 (JMR/FLN)

| | |
|---|---|
| JANE A. T. TURNER,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO GONZALES, *et al*.,<br>Defendant. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL** |

Plaintiff Jane Tuner, by and through counsel, hereby submits her Opposition to Defendants' Motions for Judgment as a Matter of Law and New Trial and a proposed order to the Court.

**SUMMARY OF THE ARGUMENT**

As set forth below, the defendants have waived their right to file either a Motion for Judgment as a Matter of Law ("JMOL") or a Motion for a New Trial. However, even if the Court finds that defendants have not waived this right, it should still deny these motions because their substantive arguments are meritless.

In each of its motions, the FBI contends that Ms. Turner's "downward performance grade" claim, and thus the Jury's verdict on that claim, is limited to the June 1999 Performance Summary Assessment ("PSA"). This is a disingenuous reading of Ms. Turner's claim that deliberately ignores Ms. Turner's arguments and the bulk of the evidence that she introduced at trial. The fact that the FBI did not even attempt to

address the merits of Ms. Turner's full claim only underscores the weakness of its argument. The FBI's motion for JMOL is especially egregious in this respect, as it completely ignores the deference due to the Jury's findings. Thus, as all of the FBI's arguments are predicated upon this insincere presentation of the trial record, the FBI's motions are baseless and each must be denied on its face.

Furthermore, in both motions, the FBI contends that Ms. Turner failed to present sufficient evidence to support a finding that she had suffered an adverse employment action or that any such action was causally connected to her EEO complaint. However, in both cases the FBI failed to properly consider the record of this proceeding and controlling legal authority. .

Finally, the FBI claims in its Motion for a New Trial that the "cumulative effect" of "various evidentiary rulings" unduly prejudiced the proceedings. These arguments are completely without merit.

## PROCEDURAL HISTORY

Commencing on January 25, 2007 this case was tried before a jury in U.S. District Court. The plaintiff rested her case on January 26, 2007. In accordance with Fed. R. Civ. P. 50(a), the defendants moved for judgment as a matter of law. Trial Tr. 351:9-10 (Jan. 26, 2007). The FBI did not make any oral arguments specifying the legal or factual grounds on which their motion was based. *Id.* Instead, the Court took the motion under advisement, and invited the FBI to submit a written memorandum supporting this motion.

*Id.* at 351:15-16 (THE COURT: The matter's under advisement. You wish to submit something you may feel free to do that.).

At the close of evidence, the FBI renewed their motion Rule 50(a) motion for a judgment as a matter of law. Trial Tr. 604. The Court denied this motion. Trial Tr. 604-605.

Defendants never submitted the written memorandum supporting their Rule 50(a) motion, as permitted by the Court on January 26, 2007.

After the close of evidence, this case was submitted to the jury on February 1, 2007. The jury returned a verdict for plaintiff Jane Turner on February 5, 2007. On February 5, 2007, after learning of the jury's verdict, the defendants filed a motion for a renewed Judgment as a Matter of Law ("renewed JMOL"). That motion was denied.

On February 20, 2007, well after the jury returned its verdict, the FBI requested the Court to "reconsider its denial of defendant's oral Rule 50 motion and enter a schedule allowing the parties to fully brief the issues." Dkt. 152 p. 3. The FBI based this request on their belief that they, "never had the opportunity to submit detailed argument supporting its motion for judgment as a matter of law." Dkt. 152 p. 2. The FBI failed to mention in this letter the fact that the Court had permitted the submission of written briefs on the Rule 50(a) matter, and also failed to mention that the FBI had never filed any such brief. This letter-request was denied on March 5, 2007. Dkt. 158.

The FBI filed a new motion for Rule 50(b) JMOL on Feb. 23, 2007. Dkt. 147. On Feb. 26, 2007, the FBI filed a motion for a new trial. Dkt. 148.

Plaintiff hereby files her opposition to both the February 23rd and 26th motions.

**ARGUMENT**

The defendants motion is without merit. As a threshold matter, defendants waived their right to file, post trial, either a motion for judgment as a matter of law or a motion for a new trial based on insufficiency of evidence.

Furthermore, defendants premise all of their arguments wholly upon a disingenuous and unreasonably narrow reading of Ms. Turner's "downward performance grade" claim and the Jury's verdict and, as such, are meritless on their face.

Finally, the Court should only grant a motion for a new trial when doing so is necessary "to avoid a miscarriage of justice." *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002); *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). As the defendants' contention that the verdict is against the weight of the evidence ignores most of the evidence presented at trial, and the reasonable inferences therefrom, and each of their allegations of evidentiary error are untimely, defendants have failed to demonstrate that any such injustice has occurred to warrant a new trial.

## I. DEFENDANTS WAIVED THEIR RIGHT TO CHALLENGE THE SUFFICIENCY OF THE EVIDENCE IN ITS MOTION FOR A NEW TRIAL AND WAIVED ITS RIGHT TO A POST-VERDICT JUDGMENT AS A MATTER OF LAW

In accordance with Fed. R. Civ. P. 50, the FBI's motion for renewed JMOL and for a new trial must be denied. The FBI failed to follow the mandatory procedural

requirements set forth Rule 50, and consequently waived its right to file for post-verdict relief under Fed. R. Civ. P. 50(b).

The rule is clear. In order to file a Rule 50(b) motion for renewed JMOL or a motion for a new trial based on insufficient evidence, a party must first demonstrate that they properly filed for a judgment as a matter of law under Rule 50(a). *Walsh v. National Computer Systems*, 332 F.3d 1150, 1158 (8th Cir. 2003); *Pulla v. Amoco Oil Co.* 72 F.3d 648, 655 (8th Cir. 1995); *Jones v. City of St. Clair*, 804 F.2d 478, 479-80 (8th Cir. 1986) (motion for new trial based on insufficiency of evidence cannot be "first raised" in motion for new trial).

A motion for judgment as a matter of law under Rule 50(a) must be filed "before" a "case is submitted to the jury" and the motion "**must specify** the judgment sought and **the law and facts that entitle the movant to the judgment**." Fed. R. Civ. P. 50(a) (emphasis added).

It is undisputed that prior to the submission of this case to the jury, the FBI twice moved for Judgment as a matter of law ("JMOL"). Trial Tr.351:9-17 , 604:20-25, 605:1. It is also undisputed that neither of these motions contained any statement specifying any law or facts that would entitle them to judgment. Not only did the motions fail to specify any law or facts, but the FBI ignored this Court's invitation to file a written memorandum detailing their arguments before the case was submitted to the jury. Trial Tr. 351:9-17.

Over twenty days after the case was submitted to the jury, and well after the verdict in this case was issued, the FBI, finally stated the law and facts that they believed entitled them to a judgment or a new trial. This statement has come too late. The law is clear on the rule that any issue not specified in a JMOL motion under Rule 50(a) may not later be raised in a Rule 50(b) JMOL motion filed after the jury verdict has been returned. *Walsh v. National Computer Systems,* 332 F.3d 1150, 1158 (8th Cir. 2003). Nor can the defense raise an argument about the insufficiency of evidence in any post-trial motion or on appeal. *See Pulla v. Amoco Oil Co.* 72 F.3d 648, 655 (8th Cir. 1995); *Catlett v. Local 7370 of the United Paper Workers Int'l Union,* 852 F.2d 254 (8th Cir. 1995). Accordingly, because the FBI failed to specify any legal or factual issues in their JMOL motions under Rule 50(a), they cannot now move for a JMOL under Rule 50(b) or for a new trial based on insufficient evidence.

Likewise, the FBI cannot now put forth any arguments about the sufficiency of evidence in their motion for a new trial, unless there is such overwhelming evidence contrary to the verdict that a denial of the motion would result in a **manifest miscarriage of justice.** *Pulla 72 F. 3d at 656.* ("emphasis added"). The FBI has does not contend in its motion that there such a manifest miscarriage of justice, and cites to no authority which would allow them to now challenge the sufficiency of evidence in a motion for a new trial.

In the Eighth Circuit, "[a]dherence" to these procedural requirements are "mandatory." *Id.; Conseco v. North American Mortgage Co.* 381 F.3d 811, 821 (8th Cir.

2004). Such strict adherence conforms to the motivation behind a 1991 amendment to Rule 50 emphasizing the requirement for an articulation of grounds in a JMOL motion: "The Notes explicitly state that the 'revision thus alters the result in cases in which courts have used various techniques to avoid the requirement that a motion for a directed verdict be made as a predicate to a motion [JNOV].'" *Lambert v. Genesee Hospital*, 10 F.3d 46, 54 (2nd Cir. 1993) (quoting Rule 50 1991 Advisory Committee notes.)

The case law has also firmly established the rule that if a party fails to adhere to the mandatory requirements of Rule 50(a) by omitting the legal and factual grounds for a JMOL motion, and there is no manifest injustice, then the JMOL motion must be denied. *Walsh* 332 F. 3d at 1158; *Conseco* 381 F.3d at 821; *Clark v. Central States Dredging Co.* 430 F. 2d 63 at 65 (8th Cir. 1970); *Lambert*, 10 F.3d at 54; *Piesco v. Koch*, 12 F.3d 332 (2nd Cir. 1993); *Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9, 11 (3rd Cir. 1976). Likewise, all arguments based on the insufficiency of evidence put forth in a motion for a new trial must also be denied. *Pulla* 72 F.3d at 655.

While strict adherence to the rule is required, there is some flexibility in how the specific statement of law and facts can be made. JMOL motions "**may be in writing, which is the better practice**, or made orally during the course of a hearing or trial." *U.S. Indus., Inc. v. Semco Mfg., Inc.*, 562 F.2d 1061, 1065, (8th Cir.), cert. denied, 434 U.S. 986 (citing C. Wright & A. Miller, Federal Practice and Procedure § 2533, at 581 (1971) (emphasis added). An oral motion can be sufficient if "colloquy between counsel and the trial court fleshes out the motion" so that the opposing part is provided with "the requisite

notice." *Walsh*, 332 F.3d at 1158. However, the mere act of making an oral motion for JMOL without stating any of the legal or factual grounds, and without submitting a written motion is insufficient. *See Clark*, 430 F.2d 63 at 65; *Piesco* 12 F.3d at 341.

In *Clark*, the defendant moved for directed verdict by stating, "Your Honor, at this time defendant makes an oral motion for a directed verdict at the conclusion of all the evidence and asks leave of the court to file a written motion setting forth its grounds tomorrow morning; since court is adjourning now." 430 F. 2d at 65. Consequently, because the court was not informed of any specific grounds for the motion before the verdict was delivered, the motion was properly denied. In *Piesco*, the relevant colloquy consisted of counsel stating, "Defendants move for a directed verdict" and of the judge replying, "Denied." 12 F.3d at 341. The Court held that this colloquy was not sufficient to preserve the defendant's right to move for JMOL after trial. *Id.*

There is no discernible difference between the present case and either *Clark* or *Piesco*. In the present case, the FBI's first motion for JMOL was made after the plaintiff rested and consisted of the following exchange:

> "The Court: Defense moves for JMOL?
>
> Ms. Fagg: Right.
>
> * * *
>
> The Court: The matter's under advisement. You wish to submit something you may feel free to do that." Trial Tr. 351:9-17

As in *Clark*, the FBI neglected to submit any written statement of the legal and factual grounds on which they based their motion. They did, however, renew their motion for JMOL after the close of evidence. The FBI's renewed motion for JMOL consisted of the following exchange:

Ms. Fagg: Your Honor, may I renew the motion for judgment?

The Court: Certainly.

Ms. Fagg: Do you want to hear argument on it?

The Court: No.

Ms. Fagg: Okay, thank you.

The Court: The Motion is denied. Trial Tr. 604:20-24, 605:1.

As in *Piesco* and *Clark*, there is nothing in this transcript which would provide plaintiff's counsel notice of even one issue where the defendant felt insufficient evidence had been presented. Moreover, because the FBI did not file the written memorandum invited by the Court, they cannot now be heard to complain that they did not have an adequate opportunity to fully and properly comply with their obligation to "specify" the "law and facts that entitle(d)" them of judgment under Rule 50(a)..

The FBI, by ignoring this Court's suggestion that they file a memorandum setting forth grounds for their Rule 50(a) motion, violated both the purpose[1] and

[1] An issue arising after a jury verdict "comes too late for the possibility of a cure", and circumvents the "spirit of the rules" by allowing "tactical victories at the expense of substantive interests." *Lowenstein v. Pepsi-Cola Bottling Co.* 536 F.2d 9, 11 (3rd Cir. 1976) (quoting 5A Moore's Federal Practice § 50.08, at 2358-59).

requirements of Rule 50. Not only did the FBI fail to sufficiently specify their legal and factual basis for their motion for JMOL prior to verdict, they failed to specify anything at all. Although they were granted leave to submit a written motion, which would have preserved any specified issue for a 50(b) motion, they chose not to. They have either willfully or negligently ignored Rule 50(a), and therefore they have waived their right to file a 50(b) motion.

The FBI would counter by stating that this court's refusal to hear oral argument excuses their neglect in declining to submit a written statement of the factual and legal basis for their JMOL motion. Dkt. 152 p. 2. However, neither the text of Rule 50, nor the relevant case law requires the Court to hear oral arguments on a motion for a directed verdict. In fact, as stated before, Court's have correctly noted that filing written Rule 50(a) motions, as the Court in this case suggested, constituted the "better practice."

Defendants also contend that they never had the opportunity to submit detailed argument supporting its JMOL motion. *Id.* The record clearly shows that this Court gave leave to counsel to submit a written memo in support of its initial motion after the close of the plaintiff's case. There is no indication in the record that this offer was off the table when the FBI moved to renew the motion at the close of its case. Furthermore, it was not this court's responsibility to guide the FBI's legal strategy. If the FBI felt that a particular issue merited JMO or a new trial, then it was their responsibility to specify that issue in a motion for directed verdict. *See McCarty v. Pheasant Run, Inc.* 826 F.2d 1554, 1556 (7th Cir. 1987). They did not do this.

The application of Rule 50(a) to the procedural history of this case does not present a complicated legal issue. Rule 50(a) requires that a party specify the legal and factual grounds for a JMOL motion prior to the submission of the case to the jury. Although the FBI had the opportunity to submit a written statement of the legal and factual grounds, they declined to do so. Therefore, defendants waived their right to consideration of their Rule 50(b) motion for JMOL filed after the jury verdict and waived their right to file a motion for new trial based on insufficient evidence. .

## II. THE FBI'S MOTION FOR A NEW TRIAL SHOULD BE DENIED ON ITS FACE BECAUSE IT IS PREDICATED ON A MISREPRESENTATION OF THE TRIAL RECORD

Defendants base their entire argument on a disingenuous and unreasonably narrow reading of Ms. Turner's claim and the Jury's verdict. The FBI attempts to radically limit the scope of her performance related claims. The Bureau attempted to define the scope fo the claim by stating that "Ms. Turner alleged that the performance downgrade from her April 1999 'Superior' annual PAR to her June 1999 'Minimally Acceptable' file review/PSA constituted retaliation by Welken for Turner's filing a sex discrimination complaint against him." Def. Mtn. New Trial at 11.

In fact, Ms. Turner alleged that her "downward performance grade" constituted retaliation, which encompasses much more than just the June 1999 Performance Summary Assessment ("PSA"). *See* Verdict Form, Docket No. 133; Jury Instruction #12; Trial Tr. 661; Pl. First Amended Complaint at paragraph 92 ("By… giving her disparately negative performance feedback and evaluations… defendants have

continuously retaliated against Ms. Turner because she filed complaints and otherwise opposed sex discrimination"). While it is true that the June 1999 PSA marked the *beginning* of the retaliation, the moment at which her performance was first "downgraded," Ms. Turner at no point stated that her retaliation claim was limited to this incident.

Instead, the Jury heard Ms. Turner and other witnesses describe at great length how, having downgraded her, the FBI continued to retaliate by perpetuating this downgraded rating through a series of additional adverse actions related to her performance:

Following the June 1999 PSA, Mr. Welken generated a second PSA dated August 28, 1999 in which he rated Ms. Turner "Minimally Acceptable" in all three Critical Elements. Mr. Welken noted in this report that he was "concerned that [Ms. Turner] is not yet exhibiting the full range of performance required of a senior GS-13 Agent… it is hoped that all critical elements will reflect a much higher level of performance by late September." Trial Ex. 83a at 2. If the findings of the June 1999 PSA were retaliatory, then it is reasonable to infer that Ms. Turner's performance had not actually declined. From this, it is reasonable to infer that, because this PSA references no decline in Ms. Turner's performance and references the findings of the June 1999 PSA, that her performance in August of 1999 was the same as it was in June and thus the findings of the August 1999 PSA were also retaliatory.

On September 14, 1999 Special Agent in Charge (SAC) Douglas Domin prepared a memorandum in which he noted that:

> "SAC Domin was aware of certain performance issues relative to SA Turner in the course of reviewing a recent file review report conducted by SSRA Craig R. Welken [the June/August PSAs]. In the course of this review, it was noted that SA Turner was considered Marginally Acceptable in certain Critical Elements… SAC Domin briefly discussed the performance matters with ASAC Burrus and instructed him to determine if SA Turner would consider a transfer to Headquarters City… in an effort to restore this agent's productivity … to a Fully Successful or higher level." Trial Ex. 84[2] at 1-2.

It is clear from this memorandum that Mr. Domin based his belief that Ms. Turner had performance problems and should be transferred to Minneapolis at least in part on the retaliatory PSA reports drafted by Mr. Welken. Trial Tr. 330:9 – 331:4; Trial Tr. 332:4-9; Trial Tr. 354:18-19.

Following Mr. Domin's assessment, the FBI conducted an inspection of Ms. Turner's performance. This inspection was based in part on the "drop files" kept by Mr. Welken, which the inspector accepted as truthful. Trial Tr. 453:18 – 455:6. The report of this inspection, dated October 10, 1999, found that:

> "[Ms. Turner] was not performing her duties and responsibilities commensurate with her grade level and experience. This determination was based on reviews of cases assigned [and] performance documentation by the supervisor… Craig R. Welken." Trial Ex. 87[3] at 4.

The October 1999 Inspection Report then went on to make three recommendations based on its findings, which were themselves based on the June and August 1999 PSAs:

---

[2] Exhibit attached.
[3] Exhibit attached.

> "That SAC, Minneapolis, seek the immediate transfer of SA Turner to an entity which would allow for closer supervision… refer SA Turner to EAP and seek… a fitness for duty evaluation… [and] afford SA Turner with a new PAR incorporating findings reported during this inspection." Trial Ex. 87 at 10.

The findings and recommendations of the October 1999 Inspection Report were reiterated by Mr. Welken's "Response to Inspection Finding" that he prepared on November 19, 1999. Trial Ex. 88[4]. Mr. Domin approved this document on November 22, 1999. Trial Ex. 88. This document demonstrates, beyond any doubt, that the downgraded performance reviews created the factual predicate necessary involuntarily transfer Ms. Turner based on a loss of effectiveness.

On October 30, 1999, Mr. Welken drafted a lengthy memorandum to Mr. Domin titled "SA Jane A.T. Turner – Personnel Issues." In this memorandum Mr. Welken recommends that:

> "SA Turner be afforded a mandatory psychological fitness for duty (FFD) evaluation; that she be transferred to Minneapolis headquarters; and that her IC responsibilities at the Ft. Berthold Indian Reservation be temporarily re-assigned."
>
> Details: SA Turner has experienced continuing performance deficiencies. An Improvement Plan was prepared 6/23/99, in conjunction with a PSA. A subsequent PSA on 8/28/99, reflected performance below the [Fully Successful] level in all three critical elements… SA Turner's performance is [currently] at the [Unacceptable] level." Trial Ex. 87 at 13.

The memorandum went on to state that:

> "In view of a number of factors which indicate that SA Turner's ability to perform effectively in her current assignment is permanently impaired, it is recommended that she be immediately transferred to Minneapolis… be

[4] Exhibit attached.

> given closer supervision… in an environment which does not include [Violent Crimes and Major Offenders in Indian Country] cases." Trial Ex. 87 at 13-14.

And finally that:

> "irrespective of any FFD findings, SA Turner be transferred from the Minot Resident Agency. This action is necessary in order to permit an immediate effort to resolve the problems listed above…" Trial Ex. 87 at 25.

Welken then confirmed at trial that he based these recommendations, in part, on the original PSAs. Trial Tr. 563:3-4, 15-18.

This pattern of retaliatory conduct continued with the issuance of the November 27, 1999 PAR, which rated Ms. Turner as "Unacceptable" in all three Critical Elements. Trial Ex. 90a[5] at 3-5. In the explanation of each of these ratings, the PAR notes that the "Unacceptable" rating "follows PSAs dated 6/23/99 and 8/28/99, which found SA Turner's performance to be in the "Minimally/Unacceptable" range (6/23), Minimally Acceptable (8/28), and a 11/27/99, [Unacceptable] Performance Review." Trial Ex. 90a at 3-5.

These documents, which were submitted into evidence and discussed at great length during the trial proceedings clearly show that Ms. Turner's "downward performance grade" claim of retaliation was not limited to, but merely began with, the June 1999 PSA. Much of the evidence that Ms. Turner introduced at trial went to demonstrating how the conduct that started with the June 1999 PSA continued through the August 1999 PSA, October 1999 Inspection Report, October 1999 Memorandum,

[5] Exhibit attached.

November 1999 PAR, and finally culminated with the November 1999 Response to Inspection Findings. These findings set forth the fact that Ms. Turner's involuntary transfer to Minneapolis was based on the retaliatory performance review.

The defendants' decision to improperly construe the Jury's findings and omit the other incidents of retaliation from its analysis only highlights the weakness of its argument. As discussed in greater detail below, virtually all of the FBI's arguments immediately fail if Ms. Turner's claim and the Jury's verdict are read properly. As such, because its entire motion is based on what can only be called an insincere presentation of the trial record, the FBI's motion for a new trial must be denied on its face.

## III. THE EVIDENCE PRESENTED AT TRIAL FULLY SUPPORTS THE JURY VERDICT

The FBI contends that it should be granted a new trial on the ground that "the jury's verdict was against the weight of the evidence" and thus "a miscarriage of justice would result if the jury's verdict and damages award… were allowed to stand and a new trial not granted." Def. Mtn. New Trial at 11. The FBI bases this argument on its belief that the weight of the evidence presented at trial did not show "that Ms. Turner suffered an adverse employment action" or "that [her] complaints of discrimination were the cause for Welken giving her the June 1999 'Minimally Acceptable' PSA." Def. Mtn. New Trial at 12, 14.

The United States Court of Appeals for the Eighth Circuit has stated that the Court may grant a new trial "on the basis of the weight of the evidence" only "if the first trial result[ed] in a miscarriage of justice." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992).

Furthermore, a new trial on this ground should not be granted "where reasonable men [could] differ in evaluating credible evidence." *Id.* at 780-81; *see also Blake v. J.C. Penney Co.*, 894 F.2d 274, 281 (8th Cir. 1990); *Washburn v. Kansas City Life Ins.*, 831 F.2d 1404, 1410 (8th Cir. 1987). The Eighth Circuit went on to say that:

> "[i]n determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence-- it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id.* at 780 (internal citations omitted).

However,

> "[t]he district court is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable… and the 'trial judge may not usurp the functions of a jury . . . which weighs the evidence and credibility of witnesses.'" *Id.* (internal citations omitted).

In other words, the Court should grant the FBI's motion for a new trial only if, after reviewing the evidence presented at trial, it finds that the Jury reached a verdict so unfair and unreasonable that justice requires the Court to set it aside and grant a new trial. As set forth below, all of the Jury's findings were reasonable and thus the defendants' arguments are meritless.

### A. The Jury Reasonably Found That Ms. Turner Suffered An Adverse Employment Action

The Supreme Court has recently clarified the standard for finding an adverse employment action. *Burlington Northern and Santa Fe Ry. Co. v.White* held that an employment action is adverse (i.e. it alters the terms or conditions of employment in a

manner cognizable under Title VII) if it "might well discourage a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006); *see also*, *Weeks v. Brunswick Corp.*, 2007 U.S. Dist. LEXIS 5561, 20-21 (D. Minn. 2007) (applying *Burlington* and holding that employer's action of issuing three disciplinary reports could likely deter a reasonable employee from making or supporting a charge of discrimination).

In the present case, the jury was asked to determine whether the FBI took any "materially adverse employment action" against Ms. Turner. Jury Instruction #12. In accordance with *Burlington*, this court defined such action as, "one which might well have discouraged a reasonable worker from making or supporting a charge of discrimination." Jury Instruction # 14. No objections were made to these instructions, and the FBI cannot now argue that the *Burlington* instruction read to the jury is not controlling in the case.

Significantly, in their motion, the FBI did not cite to *Burlington*, even once. They did not even attempt to review the evidence in this case under the *Burlington* standard, and on that basis alone their motions for new trial/JMOL on the basis of insufficient evidence of an adverse employment action are frivolous on their face.

Additionally, the Eighth Circuit, in its review of Ms. Turner's appeal, noted that using a performance evaluation to deny a Within Grade Increase ("WIGI") in salary would constitute an adverse action. *Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005). The defendants arguef that, under their unreasonably narrow reading of the

verdict, the evidence cannot show that Ms. Turner suffered an adverse employment action because the June 1999 PSA could not have been used to deny a WIGI, as the parties stipulated that a PAR was the official rating of record used to determine an employee's eligibility to receive a WIGI. *See* Def. Mtn. New Trial at 12; Agd. Trial Ex. 1 at 11; Trial Tr. 419:23 – 420:12.

However, this argument simply ignored the fact that the FBI did provide Ms. Turner with a formal unsatisfactory PAR in November, 1999, and did in fact deny WIGI's to Ms. Turner because Domin formed the opinion that Ms. Turner's performance was unacceptable. Additionally, this argument fails to apply the standard set forth in *Burlington* and ignores the bulk of the evidence that Ms. Turner presented at trial, it is entirely without merit.

Finally, as set forth below, the FBI simply ignored the evidence of other adverse effects caused by the downgraded performance. Based on the unopposed jury instructions concerning the right of the jurors to draw "reasonable inferences" from the testimony [Jury Instruction No. 6], and the standard of review governing post-trial motions for relief, the record unquestionably supports the juries findings of fact.

**1. Under *Burlington* Jane Turner Suffered an Adverse Action**

Noticeably lacking in the FBI's motion is any reference to the holding in *Burlington* when arguing that Ms. Turner did not suffer an adverse employment action. Such omission is particularly striking since they did not object to the inclusion of *Burlington* in the jury instructions. This omission, however, is not inadvertent. Under

*Burlington*, the FBI has no basis for making the argument that Ms. Turner did not suffer an adverse employment action. This jury was specifically instructed, with no objection by the FBI, that they could determine that a performance rating downgrade constituted a materially adverse employment action. Jury Instruction 12. They were also instructed, with no objection by the FBI, that in making such a judgment they should rely on the standard espoused in *Burlington*. Jury Instruction 14. A review of the record unquestionably shows that a reasonable jury member, under these instructions, could and should have found that Jane Turner suffered an adverse employment action. The FBI's refusal to incorporate the controlling law used by the jury in reaching their verdict renders their argument irrelevant and fatally flawed. Such an argument does not merit consideration by this court.

A case recently decided in this district enlightening on this issue. In *Weeks,* this Court held that in light of *Burlington,* the act of issuing three disciplinary reports to an employee constituted an adverse employment action even though the employer did not detrimentally alter the terms or conditions of employment. *Weeks v. Brunswick Corp.*, 2007 U.S. Dist. LEXIS 5561, 20-21 (D. Minn. 2007).

It thus follows, that even without a showing that the FBI's performance downgrades had actual pecuniary consequences (which Turner also proved), even without showing that the performance downgrades directly led to the transfer (which Turner also proved), and even without presenting medical evidence as to the adverse impact the performance ratings had on Ms. Turner's ability to work in law enforcement

(which Turner also provide), a reasonable jury could still infer that the FBI's adverse performance ratings constituted a materially adverse employment action because a reasonable employee might well be dissuaded from making a claim of discrimination if she feared that it would result in negative performance ratings being entered into her personnel file.

While such a finding by the jury would be sufficient, there is more to this case. Ms. Turner's experience of injustice at the hands of the FBI was not limited to just one negative performance rating downgrade. Her experience consisted of a series of escalating events designed to sabotage her job. In this case, the record demonstrates that the adverse employment ratings were not simply used as a coaching devise. The FBI undertook numerous performance-related attacks on Ms. Turner which unquestionably would discourage a reasonable worker form filing a charge of discrimination. These include: the initial PSA's; the placement of negative information into a "drop file" and the consequent utilization of that drop file to justify a poor performance rating in an official inspection; the actual utilization of the negative PSA information by the FBI's Supervisory Agent in Charge to form the opinion that Turner had performance problems and should be transferred; and, the use incorporation of negative performance information into an official FBI inspection report (a report which carried great weight on having the FBI review Ms. Turner's fitness for duty, approve an involuntary transfer of Ms. Turner and issue a formal negative PAR against Ms. Turner).

The record demonstrates that the negative performance reviews formed the basis of a punitive transfer based on the phony allegation that Ms. Turner had lost her "effectiveness." Likewise, on November 27, 1999 Ms. Turner received a formal performance downgrade to "unsatisfactory" which directly impacted her ability to obtain seniority-based salary increases ("WIGIs"). Finally, the adverse performance ratings contained false and highly degrading statements which objectively harmed Ms. Turner's reputation and ability to work effectively as an FBI agent.

The testimony about the negative impact of these downgrades was extensive, and supported by unrebutted medical testimony.

Based on the record as a whole, the jury clearly could have found that the prolonged performance attack on Ms. Turner would have discouraged other employees from filing a discrimination claim.

**2. Ms. Turner suffered an adverse employment action when she received the November 1999 PAR**

Contrary to the FBI's assertion, Ms. Turner *did* in fact receive a negative PAR. In November of 1999, the FBI issued Ms. Turner a "Warning PAR," which constituted her official rating of record for the first nine months of her 1999/2000 annual report and rated her as "Unacceptable" in every "Critical Element" on which she was evaluated. *See* Trial Ex. 90a; Trial Tr. 419:23 – 420:12. As this document, which was presented to the Jury, was part of the FBI's "downward performance grade" retaliation against Ms. Turner and was the rating of record that could be used to grant or deny a WIGI, the Jury could reasonably conclude that Ms. Turner had suffered an adverse employment action.

In fact, defendants' own exhibit, which was admitted into evidence without objection, demonstrates beyond any doubt that Ms. Turner was, in fact, denied a WIGI. Trial Ex. 94[6], p. 5. In accordance with the stipulation reached by the parties, this WIGI could only have been denied if the FBI viewed Ms. Turner's performance as unsatisfactory. Trial Ex. 1 Joint Statement of Agreed Facts, pp. 11-12..

Not only was the jury permitted to draw reasonable inferences from the testimony that Domin – the responsible rating official – formed an opinion of Ms. Turner that she did not meet performance expectations and consequently was not eligible for a WIGI, the undisputed factual evidence demonstrates that she was in fact denied a WIGI. Ex. 94, p. 4.

**3. Ms. Turner suffered an adverse employment action when she received the June 1999 PSA**

Even if the Court accepts the FBI's unreasonably narrow reading of Ms. Turner's claim and the Jury's verdict as applying only to the June 1999 PSA, the Jury could still have reasonably found that it constituted an adverse employment action. While it is true that a PSA cannot serve as the basis for a WIGI *directly*, it can and does do so indirectly. The November 1999 PAR, which the parties have stipulated is a "rating of record" for determining whether an employee receives a WIGI, was based in part on the June 1999 PSA. *See* Trial Tr. 585; Trial Ex. 90(a) at 3 ("This PAR… follows PSAs dated 6/23/99 and 8/28/99, which found SA Turner's performance to be in the Minimally/Unacceptable

[6] Exhibit attached.

range…"). Furthermore, Ms. Turner testified as to the effect of receiving the PSA, saying:

> "… with that kind of PSA where you're, umm, minimally acceptable, umm, you can't get a salary increase, you can't get a transfer, you can't, umm, do much. You're put in limbo, or purgatory, and that's just where you stay. You kind of, ah, you're a bug in amber is how I refer to it." Trial Tr. 168-69

Thus, because the June 1999 PSA served as the basis for something that the FBI has conceded would constitute an adverse employment action, and because a reasonable employee might well be dissuaded from filing an EEO complaint if they knew it would result in them becoming "a bug in amber," and being faced with the prospect that this document could later be used to support an adverse PAR or other adverse action, it is entirely reasonable for the Jury to have inferred that the June 1999 PSA itself was an adverse action under *Burlington*.

**4. Ms. Turner suffered an adverse employment action when she was involuntarily transferred to Minneapolis**

Although the Jury did not find that Ms. Turner's involuntary transfer to Minneapolis constituted retaliation, it nevertheless led to an adverse employment action because it directly resulted in a significant change in her working conditions. *Turner v. Gonzalez*, 421 F.3d 688, 697 (8th Cir. 2005). Specifically, as set forth above, the parties stipulated that Turner's transfer was based on performance issues, i.e. a "loss-of-effectiveness." Ex. 1, Joint Statement of Agreed Facts, p. 6. The record at trial supports this finding, as the decision to transfer Ms. Turner resulted *directly* from the adverse

performance findings. In fact, the formal document approving the transfer states that the transfer was based on the adverse performance findings. Trial Ex. 88.

Thus, just as a downgraded performance ratings resulted in the denial of a WIGI, the downgraded performance ratings also directly resulted in the transfer. Thus, although the officials who approved the transfer in FBI headquarters may have been unaware of the EEO issues, the jury could have found that Domin and Welken both justified the transfer on the basis of the performance decline, especially given the references made to the earlier performance issues in the October 1999 Memorandum and November 1999 PAR. The jury clearly could have determined that the transfer was, in fact, just another adverse action directly resulting from the retaliatory performance findings.

The prevailing law regarding the adverse nature of transfers prior to the Supreme Court's decision in *Burlington* held that "[a] transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action." *Spears*, 210 F.3d at 853. However, "a significant change in working conditions" does occur where there is "a considerable downward shift in skill level required to perform [the employee's] new job responsibilities." *Meyers v. Neb. Health & Human Serv.*, 324 F.3d 655, 660 (8th Cir.2003). Since *Burlington*, the Eighth Circuit has not ruled on what would make an involuntary transfer adverse under the new standard, however, *Burlington* itself notes that a loss of responsibilities or prestige can make a transfer an adverse employment action. *See* 126 S. Ct. at 2416; *see also Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 209-10 (2d Cir. 2006) (holding

that a transfer was materially adverse, despite no change in job title, because it caused the employee to lose most of his managerial assignments and job responsibilities).

Ms. Turner presented considerable evidence that her transfer to Minneapolis resulted in a considerable downward shift from her responsibilities in investigating crimes against children and other crimes that are not generally within the scope of an FBI agent's jurisdiction. Ms. Turner testified extensively on this point:

> "I occupied a very, umm, special place up in Minot. I was highly regarded in the community, I was doing the kind of work I really, really liked…" Trial Tr. 193:2-6.

Whereas,

> "I was never assigned a case by my supervisor, Kaul, during the entire time I was down there in Minneapolis. I never, ah, was able to interview, ah, an individual in my own case, I never was allowed to do any child crimes. I was not allowed to do anything but sit and go through old, ah, most of 'em closed files." Trial Tr. 600:18-23.

*See also* Trial Tr. 112:20 – 120:17; Trial Tr. 195:22 – 196:13.

As such Ms. Turner's involuntary transfer clearly constituted an adverse employment action under *Burlington*, *Meyers*, and *Kessler*. As the record clearly demonstrates, and the transfer was another adverse action springing directly from the negative performance findings. *See*, Trial Tr. 563:5-20.(Welken testimony that performance issues resulted in transfer recommendation; Trial Ex. 88 (approval for transfer based on performance decline).

**5. Ms. Turner suffered an adverse employment action when she received a recommendation for a fitness for duty evaluation following the October 1999 Inspection Report**

The downgraded performance findings contained a recommendation that Ms. Turner undergo a fitness for duty. *See,* Trial Ex. 86, p. 1 and Trial Ex. 87, p. 1. *Also see*, Trial Ex. 84, p. 2, ¶ 3 (Domin confirmed that performance documentation included documentation related to fitness for duty). Ms. Turner testified that, as a result of the recommendation that she undergo a fitness for duty, she had herself tested. Trial Tr. 190:1-18. She then filed a request to be reimbursed for her out of pocket expenses, but was denied. Trial Tr. 191:4-7. Ms. Turner felt obligated to do this because of the severity of the possible consequences for being found unfit for duty:

> "Ah, fitness-for-duty would be the end of your career. They consider you not even able to carry a gun. Of course you do not want somebody who is not fit for duty to carry a gun. You wouldn't be able to really interact much. Certainly not going to get promoted. You're not going to get any raises. Your career is over. I mean, once you're hit with that, ah, it's done. And, ah, no other fellow agents would ever work with you again. That would be for sure. Who would want to?" Trial Tr. 180:16-24.

Furthermore, being found unfit for duty could actually result in termination of an FBI agent's employment. Trial Tr. 217:18 – 218:3.

Faced with the prospect of having to defend herself from unwarranted fitness for duty referrals with her own resources, and being forced to endure the stress and anxiety and stigma that would necessarily accompany any examination whose potential consequences included the loss of one's career, might well dissuade a reasonable employee from filing an EEO complaint. As such, a threatened fitness for duty examination, based on bogus performance allegations, would constitute an adverse employment action under *Burlington*. *See also Murry v. Gonzales*, 2006 U.S. Dist.

LEXIS 60935 (M.D. Fla. 2006) (holding that "material fact exist as to whether a reasonable employee would find that being forced to undergo a physical and psychological fitness for duty examination constitutes a materially adverse action, such that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"); *see also Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (holding investigation of employee was an adverse employment action due to negative stigma it created).

### 6. The cumulative effect of the actions taken by the FBI against Ms. Turner constituted an adverse employment action

Even if none of the employment actions described above constituted an adverse employment action in and of themselves, they most certainly amount to an adverse action when taken as a whole. At trial, Dr. Carter testified about the long effect of Ms. Turner's workplace experiences during the period between April and December of 1999, stating that:

> "In fact it's basically cost her psychologically her career, her professional identity, and has created a very negative self-concept. Which even though she's functional, the negative self-concept has really diminished the quality of her life, the ability to enjoy things. It's affected her concentration on little tasks and detail, and she's still plagued by these obsessional thoughts. And I think that will be permanent." Trial Tr. 287:25 – 288:7.

It is particularly significant that defendants offered *no* rebuttal testimony concerning Dr. Carter's substantive findings as to Ms. Turner's psychological state. This is extremely significant, as Dr. Carter testified that the retaliatory actions of the FBI "cost" Ms. Turner her "career." Obviously, placing an employee in a position where he

or she must defend against a barriage of untruthful performance allegations – allegations that could result in termination, transfer, loss of income or even a fitness for duty process – would be highly stressful. Dr. Carter provide *unrebutted medical testimony* that this conduct by the FBI resulted in a permanent damage to Ms. Turner – both medically and damage to her ability to work for the FBI.

Given the extraordinary toll that the employment actions taken by the defendants against Ms. Turner had on her psychological wellbeing, any employee of the FBI familiar with her case might well be dissuaded from making a similar complaint for fear of having the same thing happen to them. As such, the employment actions that occurred between April and December of 1999, taken as a whole, certainly constitute an adverse action under *Burlington*.

Moreover, Dr. Carter testified, without contradiction, to the numerous medical and psychological problems caused by the FBI's 1999 retaliatory conduct. In fact, Dr. Carter focused his testimony on the cumulative impact of the negative performance ratings, and specifically noted Ms. Turner's negative reaction to the November, 1999 "unsatisfactory" PAR. Trial Tr. 287:7-17. Dr. Carter further testified as to how these numerous performance attacks by the FBI seriously impacted Ms. Turner's ability to psychologically perform her job, and he testified that the impact was permanent. Trial Tr. 287:22-25, 288:1-7

A jury could reasonably infer, from this testimony – especially given its focus on the negative impact of the November, 1999 PAR, could have materially impacted her

ability to perform her job, and thus resulted in her inability to remain as an FBI agent, let alone ever properly qualify for a WIGI, a salary increase or any other monetary benefit associated with employment at the FBI.

### B. The Jury Reasonably Found That Ms. Turner Established A Causal Connection Between Her EEO Complaint And The Negative Performance Ratings

The defendants also contend that Ms. Turner did not establish a causal connection between the negative performance ratings and her EEO complaint because she "presented no evidence to contradict or rebut defendant's proffered explanation for the "Minimally Acceptable" PSA or to show that the explanation was pretext for retaliation." Def. Mtn. New Trial at 14. However, this argument is wholly based on the same disingenuous reading of Ms. Turner's claim and the jury's verdict as their argument about adverse employment actions and, as such, is meritless on its face. Had the June 1999 PSA constituted the entirety of the FBI's retaliatory conduct, then Ms. Turner certainly would have devoted considerable effort to specifically countering the FBI's proffered explanation for the negative ratings. However, as described in detail above, the June 1999 PSA marked only the beginning of the retaliation in this case.

Moreover, the defendants ignore the fact that Ms. Turner did *not* have to rule out all other possible contributing factors for the defendants' conduct, since the Jury was instructed that "plaintiff's protected activity need not have been the only reason for the defendant's decision to take adverse employment actions against the plaintiff." *See* Jury Instr. #12; Trial Tr. 662. Rather, Ms. Turner had the burden to show that her EEO

complaint "played a part in the defendant's decision to take adverse employment action against plaintiff." *See* Jury Instr. #12; Trial Tr. 661.

Furthermore, the Eighth Circuit has held that "evidence that gives rise to an inference of retaliatory motive is sufficient to prove a causal connection." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002). Furthermore, the United States Supreme Court specifically noted that a Jury can infer a causal connection between a protected activity and an adverse employment action if "the evidence that a defendant's explanation for an employment practice is unworthy of credence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). As set forth below, defendants wholly ignore these controlling standards in their analysis of the record and, as such, their arguments are entirely without merit.

Mindful of *Desert Palace*, Ms. Turner constructed her case so as to demonstrate to the Jury that the defendants' descriptions of her performance during the period in question contrasted so strongly with her actual performance that the Jury would be forced to conclude that the defendants' explanation for their adverse employment actions was "unworthy of credence."

Ms. Turner gave compelling and unrebutted testimony that her performance was superior in the June-December, 1999 time frame. Her testimony about her work on the White Owl case made this point. First, she provided unrebutted testimony of her excellent work in obtaining a confession from Mr. White Owl at the precise time Welken was formulating his June, 1999 performance attack. Trial Tr. 154:23-25, 155:1-20.

Second, the FBI attempted to discredit her excellent work in White Owl by alleging that she obtained the confession in violation of the defendant's right to counsel. Trial Tr. 156:5-6. However, in her rebuttal case, Ms. Turner submitted unrebutted testimony and evidence that the alleged *Miranda* issues with White Owl were not truthful, and that she did properly inform White Owl of his right to counsel. Trial Tr. 156:10-25, 157:1-5.

Thus, not only did the FBI ignore Ms. Turner's work on a major case that occurred in June, 1999, a reasonable jury could have concluded that the FBI *lied* about the case and falsely accused Ms. Turner of violating White Owl's constitutional rights. The transcript is replete with other examples of inaccurate and/or false performance allegations raised by the FBI, that a reasonable jury could have found literally scores of instances in which the FBI lied in order to justify downgrading Ms. Turner's performance.

Ms. Turner also presented considerable additional evidence that, throughout the latter half of 1999, she continued to do the excellent work that she had always done and that, rather than giving her proper recognition, the FBI retaliated against her by giving her a series of negative evaluations that downgraded the "Superior" ratings she would otherwise have received to "Unacceptable." This testimony – which was fully corroborated by the testimony of Clare Hochhalter, Janice Morley, and Anthony Onstead, all demonstrated that the performance attacks on Ms. Turner were not truthful and that her superiors claims that they were attempting to help her improve also was not truthful. Thus, as the record contains overwhelming proof that the FBI did not tell the truth about

why it downgraded Ms. Turner's performance, the jury could reasonably find that the defendants' explanation for their adverse employment actions was "unworthy of credence" and thus infer that it was pretext for retaliation under *Desert Palace*.

Other probative evidence that Ms. Turner presented to show a causal connection between the June 1999 PSA and her EEO complaint is the timing of the PSA. The FBI points out that the Eighth Circuit, in its review of Ms. Turner's appeal, stated that "[a] plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events. Generally, however, a temporal connection alone is not sufficient to establish a causal connection" *Turner v. Gonzales*, 421 F.3d 688, 696-97. However, the FBI failed to point out that, in the very next sentence, the Eighth Circuit continued by saying:

> "In this case, the timing of Turner's performance rating downgrade *strongly supports an inference of causation.* Turner wrote a memorandum to her second-line supervisor… alleging increased discriminatory treatment by her supervisor, Welken. Burrus informed Turner that he would forward the memorandum to Welken, and five days later Welken generated an "interim" performance review that downgraded Turner in all rated areas. The fact that it was not a regularly scheduled performance review and occurred less than two months after the regular annual review in April (in which Turner received a "Superior" rating) is further circumstantial evidence that the performance rating downgrade was motivated by Turner's complaints." *Id.* at 697 (emphasis added).

*See also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that a time frame of one day is enough to make a prima facie showing of a causal connection). As such, because the Jury saw the same evidence relating to Ms. Turner's retaliation

claim as did the Eighth Circuit, the FBI's contention that no reasonable Jury could infer causation simply from timing is entirely without merit.

### C. Defendants' Motion For Judgment As A Matter Of Law Must Also Be Denied As Its Higher Evidentiary Burden Is Not Met

Defendants' arguments in their motion for judgment as a matter of law ("JMOL") are virtually identical to their above arguments regarding the "weight of the evidence" in their motion for a new trial. They once again contend that the Court should grant its motion for JMOL because Ms. Turner "failed to present sufficient evidence for a reasonable Jury to find that the June 1999 "Minimally Acceptable" PSA constituted retaliation" because "a PSA cannot serve as the basis for granting or denying a Within Grade Increase (WIGI) in salary." Def. Mtn. JMOL at 2, 9. Thus, "she suffered no adverse action as a matter of law." Def. Mtn. JMOL at 2. Defendants also contend that Ms. Turner failed to present sufficient evidence for the Jury to find a causal connection between the June 1999 PSA and her discrimination complaints against her superior. Def. Mtn. JMOL at 12. As these arguments are virtually identical to their arguments for a new trial, and the standard of review for judgment as a matter of law is vastly higher than it is for a new trial, all of the defendants arguments in their motion for JMOL must fail for the same reasons as set forth above.

Under Fed. R. Civ. P. 50, the Court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable Jury to find for that party on that issue." Fed. R. Civ. P.

50(a)(1). In the recent case *Wilson v. Brinker Int'l, Inc.*, the Eighth Circuit outlined the standards for entry of judgment as a matter of law:

> "[W]e review the district court's decision to grant or deny judgment as a matter of law with great deference to the Jury's verdict. This Court will not set aside a Jury verdict 'unless there is a complete absence of probative facts to support the verdict.'
>
> Accordingly, we must: (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.
>
> 382 F.3d 765, 769-70 (8th Cir. 2004) (internal citations omitted).

A "reasonable inference" is one that "may be drawn from the evidence without resort to speculation." *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996).

In other words, when considering a motion for judgment as a matter of law, the Court must review the evidence in the light most favorable to the nonmovant and ignore evidence supporting the movant except where it is uncontradicted, unimpeached, and provided by disinterested witnesses. The Court must then determine, based on its review of the evidence, whether there exists any reasonable inference capable of sustaining the position of the nonmoving party. *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1337-1338 (8th Cir. 1997); *see also Kennan v. Computer Assocs. Int'l, Inc.*, 13 F.3d 1266, 1269 (8th Cir. 1994).

As argued above, defendants have very clearly not met this very high standard with their arguments.

## V. THE COURT'S EVIDENTIARY RULINGS DID NOT PREJUDICE THE FBI'S ABILITY TO PRESENT A FULL DEFENSE

The FBI contends that a miscarriage of justice will occur if its motion is not granted because "[v]arious directions from the bench and evidentiary rulings impeded [its] ability to present a full defense to plaintiff's retaliation claim." Def. Mtn. New Trial at 17. The FBI then challenged five admissions and exclusions of evidence that it alleged "resulted in substantial prejudice to defendant." Def. Mtn. New Trial at 17. As will be discussed below, each of these arguments are without merit and untimely made.

An allegation that the Court should grant a new trial on the ground of an erroneous admission or exclusion of evidence must be predicated upon a showing that the moving party made a timely objection to the admission of evidence or a timely offer of proof explaining what the party hoped to prove with the excluded evidence. Fed. R. Evid. 103(a). Failure to make such a showing results in the party waiving its right to later claim the admission or exclusion was in error.

An objection to the admission of evidence is timely if it is made as soon as possible after the opposing party should have known it was applicable. *See* Weinstein's Federal Evidence § 103.11; *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1407-1408 (8th Cir. 1994) (upholding admission of testimony because defendant's objection to evidence as speculative was not timely under 103(a)(1) when grounds for objection

became apparent while witness was testifying and defendant failed to object at that time). Similarly, an offer of proof is timely if it is made contemporaneously with the exclusionary ruling. *See United States v. Anderson*, 618 F.2d 487, 491 (8th Cir. 1980) (affirming exclusion of report because defendant's offer of proof was untimely when he had made the offer after the jury had returned its verdict).

Furthermore, a new trial motion based on a timely objection or offer of proof is limited to the grounds asserted when the objection or offer of proof was timely made; any objection or offer of proof made after the fact is untimely. *See United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987) (finding no reversible error because reason for objection to admitted evidence advanced after trial was different from reason raised at trial); *Dupre v. Fru-Con Eng'g, Inc.*, 112 F.3d 329, 336-337 (8th Cir. 1997) (upholding exclusion because no offer of proof appeared in record); *United States v. Chicago B&Q R.R.*, 82 F.2d 131, 139 (8th Cir. 1936) (citing *United States v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 512 (1915)) (holding that grounds for objection or exclusion advanced after trial were irrelevant because "no such objection or exception to them was made on the trial… an objection or exception furnishes no basis for reversal upon any other ground except those specifically called to the attention of the trial court"); *see also United States v. Auerbach*, 682 F.2d 735, 738 (8th Cir. 1982); *Thomas v. Wyrick*, 687 F.2d 235, 239 (8th Cir. 1982).

### A. The FBI's Offer Of Proof In Response To The Court's Direction That Allegedly Limited Its Direct Examination Of Craig Welken Is Untimely

Defendants have chosen to interpret the Court's comment that it had "about ten more minutes" to conclude its direct examination of Craig Welken as an evidentiary ruling excluding any testimony that could not fit within this limit. *See* Trial Tr. 546-47. However, in order to support a motion for a new trial on the ground that this ruling was in error, defendants must show that they responded to it with a contemporaneous offer of proof stating what they hoped to prove with the excluded evidence and the grounds for its admission. Defendants did not do this and, as such, waived any right they might have had to do so in the future. *See Chicago B&Q*, 82 F.2d at 139.

The Eighth Circuit considered an almost identical claim in *Johnson v. Ashby*, 808 F.2d 676 (8th Cir. 1987), and commented extensively on the policy behind its decision to affirm the lower court's ruling:

> "Trial courts have discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence… Here, however, [plaintiff] sacrificed any challenge he might have made to the District Court's time limits by failing to make a timely objection to those limits and an offer of proof as to the evidence he was unable to introduce. Because [plaintiff] lodged no objection to the time limits until after the close of the evidence, and never attempted to introduce the evidence, it is far from clear that the District Court would have refused to grant more time and excluded the evidence… While a party may believe that it would be futile, so far as the trial court is concerned, to make an objection, and that the objection may irritate the Court, it is still incumbent upon the party to make the objection in order to preserve the issue for appeal." *Id.* at 678-79.

As such, any prejudice that the FBI incurred as a result of the Court's ruling was self-inflicted and it cannot now make an offer of proof that it failed to make at trial.[7] Thus the FBI's contention that the Court erred by instructing it to quickly conclude its direct examination of Mr. Welken is untimely and thus must be denied.

**B. The Court Properly Admitted The Testimony Of Dr. Edwin Carter**

The FBI objected at trial to the testimony of Dr. Carter as an expert witness on the ground that his contact with Ms. Turner is "out of the time frame that's pertinent to this particular case. The report shows nothing that gets into that." Trial Tr. 275.

However, in its motion for a new trial, the FBI identifies several additional objections that it did not originally raise, including the alleged lateness of Ms. Turner's identification of him as an expert witness, and that Dr. Carter's testimony differed from what he reported in his expert assessment. The timing of Dr. Carter's expert disclosures was fully addressed in the adjudication of the FBI's pre-trial motion concerning the plaintiff's right to call Dr. Carter as a witness.

---

[7] Furthermore, as FBI itself points out (Def. Mtn. New Trial at 18.), the Court did in fact reverse itself at least once and allow evidence it had excluded upon an offering of proof by the FBI:

> "Q. What was the process -- was there an application process that you had to go through in order to receive that slot?
> A. Yes.
> THE COURT: I think that's not relevant, counsel.
> BY MR. KUDEJ:
> Q. Was -- did Jane Turner apply for that slot?
> A. Yes.
> THE COURT: I change my ruling. You may continue. Briefly, though." Tr. 517.

In order to preserve its right to motion for a new trial based on the erroneous admission of this testimony, the FBI must have made a timely objection to its admission at trial. *See McKnight*, 36 F.3d at 1407-1408. As the FBI failed to make any such objection during the trial proceedings, it has waived its ability to do so and its arguments are untimely and must be denied.

Furthermore, the Court properly overruled the FBI's timely objection that Dr. Carter's 2003 evaluation of Ms. Turner's mental health was irrelevant or based upon insufficient foundation. The fact that Dr. Carter formed his opinions about the causes of Ms. Turner's mental injuries three to four years after they allegedly occurred goes to the weight of his testimony as compared to more contemporaneous evaluations, not its relevance or foundation. If the FBI felt that the relevance of his testimony was outweighed by its prejudicial effect, then it should have objected to it on those grounds. The fact that it did not means that it waived any such objection.

In regard to any alleged conflict between Dr. Carter's report and his testimony, the FBI was in possession of Dr. Carter's report and could have used it to cross examine Dr. Carter. Finally, it was the FBI that decided it did not need to identify or call any expert witness to rebut Dr. Carter's testimony. Inasmuch as Dr. Carter provided unrebutted testimony that the FBI's performance attacks on Ms. Turner in 1999 permanently damaged her career with the FBI, it is understandable that the FBI would now object to Dr. Carter's testimony. However, it was the FBI that decided not to call a rebuttal expert in this matter.

### C. The FBI's Offer Of Proof As To Why The Court Erred In Excluding The Testimony Of Peggy Gray Is Untimely

In its motion for a new trial, the FBI contends that Ms. Gray's testimony "would have been a reliable index to the causes of Turner's alleged emotional distress as it was contemporaneous with the personnel actions at issue at trial… [and] would have allowed defendant to provide evidence relevant to damages." Def. Mtn. New Trial at 22. This is not, however, the offer of proof that the FBI made at the time of the ruling.

At trial, the FBI responded to Ms. Turner's motion to exclude Ms. Gray as a witness by making an offer of proof that "Ms. Gray is basically just going to testify about the process and the efforts that Mr. Domin went through as far as asking that, umm, she be referred for fitness-for-duty." Trial Tr. 322. The Court then responded by saying that "the information that you have told me that will be added to your case I find irrelevant." Trial Tr. 324. Thus, because the offer of proof made by the FBI in its motion differs from the one made by the FBI at trial, the offer it makes in its motion is untimely and must be denied. *See Dupre*, 112 F.3d at 336-337.

### D. The FBI Failed To Object To The Testimonies Of Hochhalter, Morley, and Onstead At Trial And Thus Waived Any Such Right To Do So In The Future

Despite the fact that the FBI filed a motion in limine to exclude the testimonies of AUSAs Clare Hochhalter and Jan Morley and limit the testimony of U.S Customs Agent Anthony Onstead, this does not free it from its obligation to make a timely objection to the admission of their testimony at trial in order to later allege that the

admission was in error. In *United States v. McNeil,* 184 F.3d 770, 776-777 (8th Cir. 1999), the Eighth Circuit held that "[w]hen a motion to exclude evidence is made in limine and is overruled, if the evidence is thereafter admitted at trial without objection, the error, if any, is not preserved." Thus, in order to preserve its right to motion for a new trial based on the erroneous admission of these testimonies, the FBI must have made a timely objection to their admission at trial. *See McKnight*, 36 F.3d at 1407-1408. As the FBI failed to make any such objection at during the trial proceedings, they are waived and its argument that these testimonies were admitted in error is untimely.[8]

### E. The FBI Failed To Object To Ms. Turner's Closing Argument And Thus Waived Any Such Right To Do So In The Future

The FBI did not make a timely objection to Ms. Turner's closing arguments and thus has waived its right to motion for a new trial on those grounds. In order to preserve its right to motion for a new trial based on an objectionable closing argument, the FBI must object to the closing argument in a timely fashion. Such an objection ordinarily must occur during or immediately after the closing argument, but in the case of some intervening events, must still be made "as soon as the district court allow[s]." *See Harrison*, 312 F.3d at 352-53; *see also Curtis Publ'g Co. v. Butts*, 351 F.2d 702, 713-714 (5th Cir. 1965), *aff'd* 388 U.S. 130 (1967) (holding that while Court must permit counsel some leeway regarding objection in case objection magnifies harm, silence during closing and filing motion nine days after recess indicates that counsel did not consider closing

---

[8] Ms. Turner's response on the merits of the objections raised in the FBI's Motion in Limine are fully briefed in her response to that motion (Docket #115, filed 01/17/2007).

objectionable when made). The trial record shows that the FBI made no objections during or immediately after Ms. Turner's closing argument and thus cannot now motion for a new trial on the grounds that the arguments were prejudicial.

## CONCLUSION

For the foregoing reasons, the FBI's Motion for a New Trial and motion JMOL are without merit and must be denied.

Respectfully submitted,

__/s/ Stephen M. Kohn____
Stephen M. Kohn
(Admitted Pro Hoc Vice)

__/s/_ Aaron M. Parness___
Aaron M. Parness
(Admitted Pro Hac Vice)
Kohn, Kohn & Colapinto LLP
3233 P Street N.W.
Washington, DC 20007
Tel: (202) 342-6980
Fax: (202) 342-6984
Attorneys for Plaintiff

Dated: March 14, 2007