(01/26/1998)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE **Date:** 10/30/1999

**To:** Minneapolis **Attn:** SAC Douglas J. Domin

**From:** Minneapolis
Fargo Resident Agency (701)232-7241
**Contact:** SSRA Craig R. Welken

**Approved By:** Welken Craig R.

**Drafted By:** Welken Craig R

**Case ID #:** 67E-HQ-780275 (Pending)

**Title:** SA Jane A.T. Turner -
Personnel Issues

**Synopsis:** Recommendation that SA Turner be afforded a mandatory psychological fitness for duty (FFD) evaluation; that she be transferred to Minneapolis headquarters; and that her IC responsibilities at the Ft. Berthold Indian Reservation be temporarily re-assigned.

**Details:** SA Turner has experienced continuing performance deficiencies. An Improvement Plan was prepared 6/23/99, in conjunction with a PSA. A subsequent PSA on 8/28/99, reflected performance below the FS level in all three critical elements. As of the date of this EC, and taking into consideration the recently developed information set forth below, SA Turner's performance is at the UA level.

There is an apparent inability or unwillingness to make significant efforts toward improvement. In addition I have recently become aware of facts which suggest that key relationships are permanently damaged and the requisite work ethic is non existent.

During the last month I also learned that SA Turner suffers from depression and has taken medication for some time. I am unaware of any direct link between her deteriorating performance and the depression. However, after considering some of the facts contained in this document, particularly those which relate to the issues of trust and the treatment of other law enforcement personnel, it is recommended that SA Turner be afforded a mandatory psychological fitness for duty evaluation.

In view of a number of factors which indicate that SA Turner's ability to perform effectively in her current assignment

To: Minneapolis From: Minneapolis
Re: 67E-HQ-780275, 10/30/1999

is permanently impaired, it is recommended that she be immediately transferred to Minneapolis headquarters where she can be given closer supervision and guidance while getting a fresh start in an environment which does not include IC VCMO cases.

It is also suggested that SA Turner's Ft. Berthold Indian Country caseload be immediately transferred on a temporary basis to a Bismarck Agent and that she be ordered to refrain from contacts and investigation at the reservation. The justification for this approach is apparent after reviewing the recent comments of top ranking law enforcement personnel at Ft. Berthold. Those interviews depict a non-existent professional relationship which is deeply marred by SA Turner's actions.

Background

SA Turner is a 21 year veteran Special Agent who has served as a Resident Agent in Minot, ND since 7/12/87. The majority of her work has involved providing investigative service to the Fort Berthold Indian Reservation.

Effective investigation in North Dakota, and in Indian Country in particular, necessitates strong partnerships with BIA and tribal law enforcement officers. Those relationships require among other things a mutual trust, respect for one another and a sharing of duties. Other requirements include around the clock availability, a strong work ethic, patience in the face of many frustrations. In addition, there must be an effective RA team which works together to respond to and investigate significant matters occurring within the RA territory.

It has recently become clear that SA Turner has failed over a period of time to meet her responsibilities. Her effectiveness at the Ft. Berthold Reservation and at least one other department is minimal. Her actions, as detailed below, have driven a irreparable wedge between her and other law enforcement personnel.

In addition to the long term breakdown of her relationship with key agencies, her ability to deal with fellow Agents is not good. The quality of her investigations has declined significantly. Rather than make efforts to accept responsibility and effect necessary adjustments, she has continued to perform at a level which is unacceptable for a new Agent let alone a 21 year veteran who is paid $90,171 per year.

Within the past month I learned for the first time that SA Turner has been under treatment and is on prescription medication for depression. I am very sympathetic to this

condition. Perhaps some of her actions/inability to perform can be linked to this condition. I have no basis to substantiate that. The psychological fitness for duty (FFD) evaluation can address that. Even if some of her actions were attributable to depression, I am of the opinion that too much damage has been done and the risks to SA Turner, the FBI's ability to function, and other Agents and law enforcement personnel are too high to justify her continued assignment at Minot.

A transfer will be beneficial to all concerned, especially SA Turner. A distant two/three Agent RA specializing Indian Country violent crime investigations with frequent call out does not provide an atmosphere which is conducive to resolving a difficult long term performance and health problem.

I make these observations reluctantly after reflecting back on more than twelve years of serving with SA Turner in North Dakota. Generally speaking she has always been strong willed, unwilling to accept responsibility for any mistakes, yet quick to blame others. She has never enjoyed a solid long term relationship with her RA partners. She has been very difficult for partners and supervisors to deal with. I see no further realistic possibility of changing SA Turner's erratic approach to people, and her work product. This is particularly true give her distance from supervision.

Performance

SA Turner's performance in all three critical elements has been in the ~~in the~~ MA/UA range during recent months. I believe that it is declining. Her last file reviews have reflected a caseload which is top heavy with IC matters that have been investigated by others. Interviews with Ft. Berthold law enforcement officials which are documented below, further illustrate her ineffectiveness. SA Turner seldom generates any self initiated cases which require significant innovative work by her. This issue has been raised in the past but she has failed to make efforts to take leadership roles in her IC caseload.

Recent information developed just prior to, and during, the October Minneapolis Division inspection documented reasons for her lack of performance. SA Turner does not have effective liaison, has a poor work ethic, and has offended fellow law enforcement officers, including members of the squad to the point where some prefer not to work with her. In addition, there is a major issue involving the lack of trust.

To: Minneapolis From: Minneapolis
Re: 67E-HQ-780275, 10/30/1999

Ineffective Liaison/People Skills; Poor Work Ethic; Trust

Ward County Sheriff-Vigestad Matter:

Reference is made to SA Turner's 9/24/99, EC. That document details instances of unprofessional comments by SA Turner to Ward County Sheriff Vern Erck and Ward County States Attorney Douglas L. Mattson. The EC clearly demonstrated that SA Turner's approach to resolving an inter agency conflict was harsh commentary followed by an abrupt departure. The EC also contains gratuitous derogatory comments about SA Larry Brubaker and attempts to shift responsibility for her lack of professionalism to SA Warfield.

Her actions required involvement by the SSRA, ASAC and SAC in order to attempt to patch up relations between the FBI and the two offices impacted by her actions. The damage was too significant.

In order to make every effort to reduce the impact of SA Turner's 9/23/99, comments/actions, I met separately with Ward County Sheriff Vern Erck, Captain John Glibota, Sheriff's Department Investigative Commander, and States Attorney Doug Mattson at Minot on 9/29/99.

Sheriff Erck told me that during the 9/23/99, meeting in which SA Turner attempted to get involved with a newsworthy Sheriff's Department child abuse investigation, SA Turner portrayed herself as an expert in child abuse while mentioning factors which seemed rather basic to him. SA Turner referring to herself and Customs SA Onstad said, "you've got two experts right here." After she failed to achieve immediate access into the ongoing investigation, SA Turner told Sheriff Erck "I'm out of this thing" and "stormed out" of his office.

Sheriff Erck had never seen SA Turner like that before. He sees her at law enforcement meetings two or three times per year. He noted that she is not a frequent visitor at his office.

A day after the incident SA Turner began a series of calls to him at his home and office. She apologized to him and asked him to write a statement that her comments in his office were not unprofessional. He declined stating that he would simply provide anyone from the FBI who visited with him with an account of the events. He also declined her offer of coffee to further

discuss the matter. Her follow up actions made him feel uncomfortable. In my view, the effort to have Sheriff Erck prepare a letter favorable to SA Turner is self serving and diminishes any effort to deliver a sincere apology.

Sheriff Erck said that he was a strong administrator and SA Turner's comments had not affected him. However, he was sure that her actions/comments affected the ability of his investigative division to work with SA Turner. His Investigative Captain did not get along with SA Turner prior to this incident and this most recent incident had certainly not helped matters.

Captain John Glibota, Investigative Commander, was interviewed. During the course of the interview he requested his two investigators Todd Kelly and John Wayne to sit in on the conversation.

Captain Glibota said that whenever SA Turner calls his office, an alarm goes off in the back of his head. He does not trust her. She is the only FBI Agent he has had trouble dealing with in his 20 plus year career. She is the only FBI Agent he has qualms about. She makes it tough on other Agents.

In this particular case SA Turner wanted to enter an existing high profile Sheriff's Department investigation. She did so when he was out of town by going directly to the sheriff. SA Turner portrays herself as an expert. He disagrees with her assessment of herself. He doesn't care to work with her, is uncomfortable around her and doesn't trust her. He is not interested in receiving an apology from her.

SA Turner previously caused some concern by her actions in connection with the 12/12/96, Richard Kuntz suicide which occurred at Burlington, ND. Kuntz was a juvenile who shot himself. His parents have subsequently appeared on a number of media programs discussing the link between certain types of music and teen suicide.

SA Turner was at the crime scene because she was a friend of the family. Because of her affiliation with the FBI she was afforded access to the scene. There was no FBI jurisdiction. While at the scene she asked if the body had been rolled over and if the area beneath the body had been checked. Investigator Kelly thought that she over stepped and should have let Sheriff's investigators do their job at their own pace.

Later, she apparently made a direct call to Dr. Smith who was to perform the autopsy. She learned of the time and place for the autopsy. Although SA Turner was not invited by the

To: Minneapolis From: Minneapolis
Re: 67E-HQ-780275, 10/30/1999

Sheriff's Department to attend the autopsy, she showed up and attended the procedure. Her conduct was viewed as unusual at best.

Several weeks later the Kuntz family began questioning the cause of death and suggested that it may have been a murder. The father implied that SA Turner may have been involved.

Investigator Wayne did confront SA Turner about the situation. She denied making any statements to the family which caused them to question the Sheriff's investigation.

Neither Investigator Kelly or Wayne have had occasion to work with SA Turner since. Investigator Wayne prefers not to work with her. He does not like her attitude. Investigator Kelly doesn't really trust her. He will never again allow her into one of his crime scenes.

Captain Glibota, along with Investigators Wayne and Kelly compose the entire investigative staff of the Ward County Sheriff's Department. They all agreed that the never see SA Turner. They have no liaison with her. They did speak very highly of the outstanding liaison efforts of SA Carl Florez.

State's Attorney Doug Mattson was contacted at his office in Minot on 9/29/99. He provided me with a three page letter dated 9/28/99, which was prepared at the request of SA Turner. It is self explanatory.

In summary, a great deal of time and effort was wasted by Minneapolis Division management, the State's Attorney, and members of the sheriff's department as a result of SA Turner's actions. Unfortunately, she is not deemed a worthy colleague by the Ward County Sheriff's Department investigators.

<u>Ft. Berthold Indian Reservation:</u>

While conducting the above described investigation at Minot on 9/29/99, I was contacted by Tribal Investigator Homer White Buffalo, New Town, ND. He heard that I was in town and wanted to meet with me prior to transporting a prisoner to Bismarck.

We met briefly at the Minot RA. Since I had a full schedule at the Ward County Sheriff's Department I promised to spend more time with him as soon as the Minneapolis Division Inspection was completed.

He did advise me that he had a complaint about SA Turner misrepresenting his actions to the BIA Chief of Police. White Buffalo furnished me with a draft copy of a letter he was preparing to the COP regarding the matter. He also told me that the BIA Chief of Police Elmer Four Dance should also be contacted regarding a number of issues relating to SA Turner. Investigator White Buffalo told me that the post inspection in person contact with me should be conducted away from the reservation so that the matter would receive proper confidentiality.

On Saturday 10/16/99, during the Minneapolis Division inspection, I was contacted by AIIP James Casey who advised that unspecified concerns had come up during the course of the inspection. He asked me to arrange in person outside contacts with the Ft. Berthold law enforcement including COP Elmer Four Dance. As I understand it, a telephone contact by AIIP Casey the previous week resulted in a reluctance by COP Four Dance to respond to the inspection outside contact questionnaire because SA Turner was in and out of his office during the call.

On 10/16-17/99, I scheduled separate meetings with Investigator White Buffalo, BIA COP Elmer Four Dance and BIA Police Captain Tex Fox. The interviews where set up for 10/18/99, at a location distant from the New Town law enforcement center. This action was taken at the request of Investigator White Buffalo who said that SA Turner told him she would be at the reservation on 10/18/99. White Buffalo also told me that SA Turner had requested positive comments during the course of the inspection because "they" were out to get her.

Interviews were subsequently conducted 10/18/99, by AIIP Casey and me. Investigator White Buffalo was interviewed first. COP Four Dance and Captain Fox arrived together in the same vehicle and were interviewed jointly.

All expressed concern about the confidentiality of their comments indicating that they were concerned that SA Turner would in some way retaliate against them. While no promises were made, they were urged to bring any retaliatory actions to the immediate attention of SSRA Welken.

All three men indicated that they had worked with SA Turner for many years. Her interest and work ethic dropped significantly since her daughter was born. All were unanimous in their belief that SA Turner was no longer effective in providing the level of FBI service needed at the Ft. Berthold Reservation. They pointed out that she was sometimes hard or impossible to reach, no longer puts in sufficient time at the reservation to accomplish the mission, is sometimes demeaning to them and her

To: Minneapolis From: Minneapolis
Re: 67E-HQ-780275, 10/30/1999

FBI colleagues, and does not carry her share of joint investigations. All agreed that the reservation would be better off with another more energetic FBI Agent. All expressed concern that SA Turner not be terminated by virtue of their comments. But they did feel that the reservation would be better off with a different Agent working there.

More disturbing were comments which indicated that the officers had a lack of trust and confidence in SA Turner.

Investigator White Buffalo said that SA Turner arrived in North Dakota years ago as an aggressive and often effective Agent who sometimes crossed the line a bit perhaps by virtue of her New York experience. He recognized her for handling interviews of young children who were associated with child abuse cases. He is not comfortable handling such interviews and was complimentary about SA Turner's efforts in taking on those contacts.

He said that at first he enjoyed a very good relationship with SA Turner. That has deteriorated over the years. The first breach took place about ten years ago during the course of a multi defendant reservation drug investigation.

During that investigation SA Turner and White Buffalo were working with a source who was making drug buys. The source's car would be searched for drugs prior to a departure to a nearby location to make a drug buy. In one instance White Buffalo was unable to search the car because people were nearby. He expressed his concern to SA Turner who indicated to the effect let's not and say we did.

Investigator White Buffalo was chagrined to find that SA Turner had prepared an FD-302 stating that he had in fact searched the car prior to the source's departure for the buy. That was not the case and she knew it. The AUSA asked him about his actions while preparing the case. He told that AUSA that the FD-302 was not correct and he would not testify to erroneous information. It created some awkward moments for him.

Over the years he grew tired of some of SA Turner's approaches. He was hoping that she would be promoted to the North Dakota FBI supervisor's (SSRA) position several years ago. That would have required her to move and another Agent would have been assigned to the reservation.

SA Turner's work habits changed dramatically with the birth of her child. Her time at the reservation has been limited. When she does travel to the reservation, she arrives in the late

To: Minneapolis From: Minneapolis
Re: 67E-HQ-780275, 10/30/1999

morning, goes to lunch and leaves again by mid afternoon. Since some people work and have to be contacted at night, her schedule does not meet the investigative needs of some cases. She does not like to be called at off hours and can be hard to reach. During one recent incident, she was called prior to 10:00pm because approximately ten interviews needed to be conducted, She arrived after 1:00am and was obviously not happy to have been called out. She conducted a couple of interviews and left for Minot.

There have been several instances where she has blamed others for her mistakes. That does not generate trust.

The most recent negative encounter with SA Turner occurred when SA Turner inaccurately advised COP Elmer Four Dance that White Buffalo had taken action to have a sexual assault case declined. According to White Buffalo, SA Turner told COP Four Dance that "Homer sand bagged us on that one. He wrote Clare (AUSA Clare Hochhalter) and asked for a declination." This caused a significant breach in White Buffalo's relationship with COP Four Dance and Captain Tex Fox.

According to White Buffalo SA Turner had advised him that the AUSA had declined prosecution.

In order to try to patch things up with COP Four Dance White Buffalo felt the need to send a letter to Four Dance.

Excerpts from the draft letter authored by White Buffalo, furnished to me on 9/29/99, during our Minot meeting, are quoted below:

> " Here is a law enforcement officer who takes all the credit when things go right, but when things go wrong, it's someone else's fault. I've told you several times never bump heads with the FBI because you will lose. I'm going against my advice and hope that my reputation for honesty, integrity, and fairness in the local law enforcement community will sustain me.
>
> " Ms. Turner has put me in tough situations before, but I've never complained, because I took an oath of office. I also swore I will cooperate with all law enforcement agencies. I just can't stand by and do nothing when a lie is perpetuated...
>
> "I'm afraid of Jane Turner. Instead of things getting better between her and I, they're steadily getting worse. If she can torpedo me and her fellow agents and laugh about it, I'm easy pickens.

" I'm going to try and distance myself from her like she tried to distance herself from the Bearstail murder case."

The draft letter went on to recount an incident where White Buffalo was in his office waiting for SA Turner per her request for a 10:00 am meeting. She called a couple of times to say she was running late. She finally arrived at 1:55pm. She subsequently returned to Minot at 4:45pm. White Buffalo felt that he had wasted an entire day because of her lack of consideration.

White Buffalo went on to ask COP Four Dance to assign an officer to accompany her around the reservation. White Buffalo stated that SA Turner is uneasy about operating alone on the reservation. She needs someone to be with her. He believes that more could be accomplished if each would go separate ways to cover various aspects of an investigation. SA Turner has advised Investigator White Buffalo, "If you think I'm going to go around by myself on this reservation, you're crazy."

Although White Buffalo stated that he toned down his final version of the letter which was in fact sent to COP Four Dance, his comments are very revealing and reflect a total breakdown of an investigative partnership between SA Turner and the lone tribal investigator. This incident also shows that substantial time, and effort were required as White Buffalo tried to resolve a situation involving SA Turner.

White Buffalo and SA Turner eventually had a discussion about the situation. She apologized. He forgave her. He raised other issues. She then simply started saying "I'm sorry" in an insincere repetitive manner which left him frustrated and of the opinion that she didn't care and offered the apology simply to get the matter behind her.

BIA COP Elmer Four Dance and Captain Tex Fox echoed Investigator White Buffalo's comments about SA Turner's availability and reservation work habits. Both mentioned her tendency to blame others for everything that goes wrong. In addition to the above mentioned situation regarding the declination, they cited a recent example which took place at a FBI sponsored IC class at Rapid City.

SA Turner publically criticized their agency's handling of a homicide. They felt the comments were unfair and were made in such a manner as to cause embarrassment. The statements were made in front of other attendees and FBI representatives who were putting on the class. They resented her comments.

There were general comments about SA Turner taking credit for the work of others while always blaming others for investigative problems.

Captain Fox initially expressed great reluctance about speaking candidly about the quality of FBI service being provided to the reservation. He made comments to the effect that those who speak ill of the FBI suffer consequences. He was assured that he should feel free to speak candidly.

He commented to the effect that SA Turner was the least trustworthy law enforcement officer with whom he had ever worked.

He noted that she is difficult to find when an after hours emergency arises. This includes matters late at night when most people are at home in bed. A recent example included a vehicular homicide which took place 2-3 weeks prior to the interview.

Ironically, SA Turner has accused her fellow Agents of "reservation jumping" when they respond to Ft. Berthold in instances where she has been unavailable. A recent example includes the Lansing case which involved a stand off between the subjects and law enforcement.

BIA COP Four Dance concurred with the above comments regarding SA Turner's availability, and work habits. He acknowledged that he did not feel he could speak honestly with AIIP Casey about FBI performance on the reservation with SA Turner near his office. He believes that the reservation would be better served by assigning SA Turner to other matters so that a different Agent could work with Ft. Berthold law enforcement.

Relations With RA Partners/Squad Members

During the past twelve plus years in which I have been associated with SA Turner, I noted that she never enjoyed a cordial long term relationship with any of the Agents assigned to the Minot RA. Three Agents have transferred to other assignments during that period. A fourth is still working at the RA and a young first office Agent is under transfer to Minot. I have found SA Turner to be near the center of internal controversy and ill will in too many instances. She is not a peace maker nor is she a role model for younger Agents. She stirs the pot. With a new FOA under transfer I am very concerned that she not have a negative impact on another less experienced Agent and his family.

SA Turner has been unable to sustain genuine professional relationships. This inability to work well with

others is reflected by at least one RA partner who requested that in case of the need for an emergency notification, that his spouse be contacted by members of the Bismarck RA, not SA Turner.

She fostered the concept that as SRA of Minot that she was the supervisor of other Agents assigned there. Other Agents were surprised to learn from those outside the FBI that they were SA Turner's subordinates.

While never to my knowledge offering to assist on the Turtle Mountain Indian Reservation, she has recently taken it upon herself to inquire directly of the BIA at Turtle Mountain whether other members of the RA were investigating a specific child abuse case. She should have approached her partners or me directly with any bona fide question. Word of course got back to other members of the RA, who were suspect about her motivation. This type of conduct does not exist in the other RAs under my supervision. But it is an example of an atmosphere generated by SA Turner on an all too regular basis.

Two of the four partners have received promotions to FBIHQ. In at least one instance, SA Turner's response to their good news was a suggestion that the promotion was not based on the merit of the individual Agent.

In another recent instance she told a partner that a lead was sent to the RA by another member of the squad because the other squad member did not want the partner to get the lead. That was not correct and was a statement made without benefit of any contact with the Agent who set out the lead. But is did require involvement by the case Agent and the SSRA to make sure that no feelings were hurt.

While a lack of harmony might be attributed to personality differences, I believe that working with SA Turner in a small RA requires more than any Agent should have to endure. I am particularly concerned since the current situation involves a young on board Agent with a new first office Agent under transfer. Past experience coupled with the information contained in this EC, clearly suggests that two young Agents will not be receiving the necessary leadership, mentoring, and example if SA Turner remains assigned to the RA.

Conclusion/Recommendations

Given the information cited above, I recommend that the following action be taken:

To: Minneapolis From: Minneapolis
Re: 67E-HQ-780275, 10/30/1999

1. That SA Turner's responsibilities at the Ft. Berthold Indian Reservation be terminated. Her IC caseload should be temporarily re-assigned to a Bismarck Agent. Further, given her actions with Sheriff Erck and States Attorney Mattson along with the mention by Ft. Berthold officials regarding their concerns about speaking badly of the FBI, that she be admonished against further contact at the reservation.

2. That she be afforded a mandatory psychological fitness for duty (FFD) evaluation pursuant to Bureau policy. (See: SAC Memo 23-97, 10/21/97, "Psychological Fitness For Duty (FFD) Evaluations").

The basis for this recommendation is that SA Turner's conduct has exhibited "otherwise unexplainable irrational, bizarre, or aberrant behavior or conduct, which prevents the employee from suitably performing the essential functions of their position and/or calls into question their trustworthiness to maintain their security clearances."

Since it is known that SA Turner was diagnosed with depression, it is possible that her performance deficiencies are in part attributable to "any illness, including any mental condition, ... which may cause a significant defect in judgment or reliability". Further, it is possible that some of her work related problems might be linked to the medication she is taking. If additional treatment or alteration/change of medication can positively impact her performance, the FFD might be able to assist in that process.

It is noted that removal from the workplace, administrative and sick leave are options available under existing policy.

3. That irrespective of any FFD findings, SA Turner be transferred from the Minot Resident Agency. This action is necessary in order to permit an immediate effort to resolve the problems listed above, and to ensure that the internal and external operations of the Minot RA are altered to reflect a muc more positive approach to operations and relationships.