# FEDERAL BUREAU OF INVESTIGATION

Precedence: DEADLINE 11/22/1999 Date: 10/19/1999

To: Minneapolis Attn: SAC Douglas J. Domin

From: Inspection Division
Contact: Inspector-in-Charge Zachary T. Lowe

Approved By: Lowe Zachary T

Drafted By: Casey James

Case ID #: 297-HQ-A1271777-A

Title: MINNEAPOLIS DIVISION INSPECTION
10/12/1999 - 10/22/1999
SA JANE A.T. TURNER,
PERFORMANCE MATTERS;

Synopsis: To report inspection findings that SA Turner of the Minot, North Dakota Resident Agency (RA) was not performing her duties and responsibilities commensurate with her grade level and experience.

Details: During the course of the Minneapolis Division Inspection, a review was conducted of the Minot, North Dakota, RA, to include the work performance of the Special Agents assigned to the RA. The inspection determined SA Jane A. T. Turner was not performing her duties consistent with her grade level and experience. This determination was based on reviews of cases assigned, performance documentation by the supervisor, and interviews of SA Turner, SSRA Craig R. Welken and outside contacts in the Minot RA territory.

REVIEW OF FILES:

On 10/15/1999, a review of SA Turner's pending investigations determined she had 14 cases pending at the time of the inspection. Of those cases, two had been open for less than a month. The remaining twelve cases contained no or minimal FBI

CC: 1 - Inspector-In-Charge Lowe
1 - ASD (Attn: Performance Recognition and Awards Unit)
1 - SAC, Minneapolis

1 - Inspection Management Unit
1 - Minneapolis Green Folder

investigative action which had been conducted by SA Turner. These files also reflected a pattern of covering police reports with an FD-302 and adopting the investigation, and, while there were statistical accomplishments, those accomplishments were the result of investigative activity by other Agents and outside agency personnel.

An investigation conducted during the inspection period, opened on 06/17/1997 and closed on 01/08/1999, was an example of a cooperative effort between SA Turner and a Tribal Investigator. However, SA Turner initiated an unauthorized polygraph, utilizing a North Dakota Bureau of Criminal Investigations (BCI) polygraph examiner, and delivered evidence to the North Dakota State Laboratory for examination instead of the FBI Laboratory. These actions were unsatisfactory because of established rules regarding polygraph examinations and the lack of the technology at the state laboratory to perform DNA testing and other more complex procedures. SA Turner was counseled by her supervisor concerning her actions in these mattes.

SA Turner also participated in an investigation concerning a highly publicized murder of a small child in Bowman, North Dakota, on 05/31/1995, by the child's father. The subject subsequently confessed to Bowman Police Chief Don Huso and other law enforcement authorities while participating in an Internet Chat Room. The subject's computer was seized in San Diego, CA. North Dakota BCI requested assistance from SA Carl Florez of the Minot RA due to his role as a CART examiner. SA Florez developed significant facts corroborating the subject's confession and linking him to Internet based child pornography. SA Turner became involved when she, unilaterally, contacted the USAO's office and informed that office she possessed unique expertise in the area of child sexual abuse. This visit resulted in a letter being generated from the USAO's office specifically requesting SA Turner be assigned to the case based on her expertise.

SA Turner's actions in this matter placed the supervisor in an untenable position, causing him to reallocate resources to cover the Minot RA territory while SA Turner worked on this case. This action was done only to appease the USAO, as SA Turner did not possess a higher level of expertise than other Agents on the squad. This assignment contributed to negative squad morale, as did an instance when SA Turner insisted on conducting interviews in the Rapid City RA territory while asking RA Agents to handle the task of serving subpoenas. SA Turner also jeopardized the integrity of the investigation by the following: use of a Customs Service polygraph examiner without making an appropriate and timely request to division management;



JAN-19-2007 14:13 FBI/OGC 2022209353 P.003

use of the USAO's office for the polygraph when a secure room was available at the prison where the subject was housed; the subject was left alone with an unarmed secretary in the USAO for a period of time; and making continuous contacts with the subject, who was in custody, without providing appropriate warnings of rights. SA Turner continued those contacts after being advised by her supervisor to the contrary. The situation required an EC from the CDC advising SA Turner her actions were not legally appropriate.

LIAISON MATTERS:

During the above investigation, SSRA Welken had to counsel SA Turner on matters relating to liaison. During the polygraph of the subject, SA Turner engaged in discourteous treatment of Deputy United States Marshals by directing them to pick up pizzas for the subject, obtain court clothing and arranging for transport of the subject back to jail. She also attempted to arrange for the subject to be allowed smoking materials in violation of prison policy.

In 1996, SSRA Welken received a complaint from Williams County Sheriff Stan Lyson that he was not satisfied with the level of service he was receiving from the FBI. During this time, SAs throughout the territory were assigned primarily to individual counties. SA Turner was assigned to Williams County. Partially in response the Sheriff's complaint, SSRA Welken found it necessary to assign these counties to the RAs as a whole, rather than to particular SAs.

On 09/24/1999, SA Turner wrote an EC entitled John Vigested; ITOM - Child Sexual Exploitation. In the EC she described how she and U.S. Customs SA Tony Onstead became aware of a local Minot investigation of the subject, and described their efforts to pursue potential federal violations. In the EC, SA Turner described herself as a nationally recognized expert of child sexual abuse. In an effort to pursue the matter, SAs Turner and Onstead met with Ward County Sheriff Vern Erck on 09/23/1999. Also present at the meeting was Ward County State's Attorney Douglas Mattson.

After having explained the federal interest in the investigation to Erck and Mattson, Sheriff Erck expressed reservations about moving too quickly because the lead local investigator on the matter was out of town and the Sheriff wanted his input prior to agreeing to federal search warrants and interviews. SA Turner writes that she, "quipped that Vern (Sheriff) had the ability to make decisions in cases, and she

questioned whether Glibota's, (the local investigator), sensitivities took precedence over a child molester." SA Turner advised in her EC that the Sheriff and the State's Attorney were concerned about additional federal intervention at the time because the subject had already consented to a plea agreement. They expressed concern that if the subject's defense attorney heard about federal interest in the matter, the agreement would be lost.

SA Turner was successful in telephoning the AUSA, and Sheriff Erck was able to telephonically contact the lead investigator. During discussions between the four, concern for the plea was again raised. SA Turner writes that she, "then asked States Attorney Mattson why he was so concerned about the plea agreement, and joked that it must be a re-election year. Sheriff Erck, who was on the phone at the time, appeared upset with the remark, and asked who SA Turner was referring to, and she responded Mattson." After a brief telephone conversation with the lead investigator, SA Turner wrote that she, "put the phone down, walked by Sheriff Vern Erck and stated, `Well, this is one less fed you'll have to worry about, I am out of here.' She then went down the stairs of the County building and sat outside the Ward County Jail."

After Customs SA Onstead left the building and rejoined SA Turner, she wrote in her EC, "SA Turner responded that she had gotten bad feelings from the encounter that morning, and as the recipient of harsh and unfair treatment from management on another highly publicized case (Froistad), SA Turner would wait for local law enforcement to ask for assistance." All of these statements by SA Turner, which she herself documented in the referenced EC, were unprofessional in nature and undermined the credibility of the FBI in western North Dakota. The incident upset Sheriff Erck to the extent he telephoned the SAC in Minneapolis and SSRA Welken in Fargo to register his displeasure. SSRA Welken immediately traveled to Minot to smooth things over with Sheriff Erck, and found it necessary to assign the matter to another investigator.

On 10/18/1999, three police officials were interviewed by the reporting Assistant Inspector In Place (AIIP) at the FT. Berthold Indian Reservation, New Town, ND. Investigator Homer White Buffalo is a retired Bureau of Indian Affairs (BIA) investigator, who is currently a contract investigator for the Tribal Police. He has worked Indian Country matters for more than 32 years and has known SA Turner since she arrived approximately 13 years ago. Elmer Four Dance is the Chief of Police for the BIA, and Tex Fox is a Captain - Investigator for the BIA.

All of these police officials were initially reluctant to discuss anything negative about the FBI's presence at the Reservation. However, Chief Four Dance advised, after having talked with the AIIP via telephone on 10/15/1999, he felt he needed to correct what was said during an earlier conversation on 10/15/1999. During the previous conversation, Chief Four Dance was very official with the AIIP, and gave brief answers to the questions that were asked. Chief Four Dance later telephoned the reporting AIIP to apologize for his brief answers and advised, during the previous conversation, SA Turner had been present in his office. In fact, he advised SA Turner had picked up the message from the AIIP, gave it to him, and insisted he immediately call while she was present. After the telephone conversation, SA Turner complained that Chief Four Dance had not been laudatory enough about her performance to the AIIP.

All three officials advised, during the last few years, it had become increasingly difficult to work with SA Turner. They advised they had a hard time contacting SA Turner after business hours and on weekends, and she was, therefore, unavailable to respond to crime scenes as needed. They further advised this failure of SA Turner to respond caused them to deal directly with the USAO on significant criminal matters, which caused the USAO to request in writing they initially deal more closely with the FBI. The Indian police officials felt they were put in a difficult position as they did not want to report to the USAO the problems being suffered with SA Turner.

INTERVIEW OF SA TURNER:

During the Executive Management (EM) interview with SA Turner, she became visibly upset at the managers of the division, and advised it was obvious what they were trying to do. She showed the interviewing AIIP a list of her investigations, and apologized for the small number of cases, further advising she was forced to close a number of investigations due to the fact her supervisor, SSRA Welken, was "papering her." She stated, "Isn't that what they do when they want to get rid of someone, just paper them."

SA Turner accused the managers of the division of purposely throwing away her FBI communications in an effort to make her investigations inferior, and thus rate her lower. SA Turner advised the FBI is punishing her for exposing important and relevant facts in the Waco investigation. She expanded that she was on TDY assignment to FBIHQ/CID/VCMO/CGR during the Waco incident and thus had knowledge the FBI was "sandbagging" AG Janet Reno. Due to a recent FBIHQ communication requesting

information relating to the Waco investigation, SA Turner stated she had been obligated to respond to FBIHQ with these facts.

SA Turner advised the interviewing AIIP she was the complainant in an EEO action involving the managers of the division. She stated the action involved all manner of her assignments, her PARs, file review evaluations and her being denied statistical accomplishments in 198 matters. SA Turner advised her supervisor, SSRA Welken, denied her statistical accomplishments on Indian Country matters by claiming she was not doing enough substantive investigation to warrant the statistic. She advised it had long been a tradition in FBI Indian Country matters for SAs to claim an accomplishment for work that either local or tribal police do, when there is any FBI assistance. She felt she was the only SA who was being singled out for this treatment.

SA Turner spoke at length about her internationally recognized expertise in the area of child sexual abuse. She explained her significant role in obtaining a confession from a middle aged subject who had been recently arrested for sexual abuse of a two year old female child. SA Turner referred in graphic details to the trauma of the child's genitalia on four occasions, which the AIIP found to be excessively detailed for the matter at hand, and appeared intended to shock. SA Turner advised that on the way down to the holding cell she was advised, (either directly or indirectly,) the AUSA did not want the subject interviewed because he had obtained counsel. She detailed how she was able to have a tribal investigator go in and talk to the subject to generate his (subject's) interest in talking with SA Turner. She then advised how she was able to secure the confession from the subject "as I knew I would." It is noted the FD-302 made no mention of the circumstances surrounding the interview as mentioned to the interviewing AIIP, but instead consisted only of a typed, 19 line confession from the subject. The FD-302 gave no indication the subject had been advised of his rights.

SA Turner requested a 49 page document produced by her be included as part of her EM interview. The reporting AIIP reviewed the entire document which included a number of disturbing statements by SA Turner. For example, SA Turner claimed credit for the arrest of Christopher Boyce while she was assigned as a first office agent in the Seattle Division. She continued in the document to make grandiose claims about her work including statements: "I was so aggressive in making cases that I made history right off the bat in North Dakota... I knew I was a pioneer of sorts...I was the most significant statistical producer in the Minneapolis Division." In reference to her two week assignment to FBIHQ/CID at the time of the Waco incident she

wrote, "It was a unique place, a unique time, and I had a chance to observe unique people interacting. I know I was lucky to be in the right place at the right time."

In other areas of the document, SA Turner made statements that made it seem she was paranoid about her assignments and the management of the Minneapolis Division. Some examples of these statements included: "I had also been discouraged by the fact that memos, ECs and other communications were not going into the files...On 5/7/98, I was also not invited to breakfast with the ASAC. I knew then that he was not up to heal, but to kill. I was dead meat, and knew it...The ASAC was very negative about the Minot RA, he never took the time to notice that in all the years I had spent in the RA, I had accomplished White Collar Work that was unique, innovative, and highly publicized. I could see the plan was to make me look as bad as possible...I knew I had no support, and no one cared I was the first, or the only one in the Minneapolis Division...I knew then that no one cared whether the first woman SRA in the Bureau lost that role."

SA Turner made note in the document, on two occasions, to taking medication for clinical depression. She said, "On 9/24/96, I started taking 50 mg. of Zooloft for clinical depression...On 5/8/98 I went to 100 mg. of Zooloft." A review of the Physicians Desk Reference showed that Zoloft (correct spelling) is a Pfizer drug used in doses of 50 mg. to 200 mg. for the treatment of depression, obsessive compulsive disorder and panic disorder.

Another theme throughout this document was SA Turner's apparent attempts to leave the Minot RA. For example, she says; "I decided it was time to try and get out. I was tired of working Indian Country Crime. I had made a formidable mark on my territory and was ready to go. I always said that when I lost respect for the citizens I was working for, it was time to leave. I had lost that respect. I was tired of the drinking, the drugs, the child victims, the woman victims, the cavalier attitude about violence, the late night and seven day a week phone calls."

She also said she asked SAC Wheeler to "help get me out of the Minot RA." During the previous Minneapolis inspection in the summer of 1996, she claimed she talked to an Inspector's Aide and "I told him I was tired of working Indian Country Crimes and I wanted out." She advised she had requested an additional PRL transfer 03/24/1997.

These last four statements were significant in that during a 09/13/1999 meeting between SAC Domin and SA Turner concerning SA Turner's performance, SAC Domin wrote he was

concerned about SA Turner's assignment in a remote Resident Agency, where meaningful job counseling/coaching would be impeded. SAC Domin, continued that he discussed the performance matters with ASAC Burrus, and instructed him to determine if SA Turner would consider a transfer to Headquarters City. SAC Domin thought this course of action to be fair and appropriate in an effort to restore this Agent's productivity. Furthermore, given the hardship status of the Minot RA, the transfer offered to SA Turner was considered to be in her best interest. In the course of meeting with SAC Domin, SA Turner said she was not prepared for a transfer at this time.

It was also significant, during her 10/14/1999 interview with the reporting AIIP, SA Turner stated she would never let them drive her out, she had dug in her heels and she was determined to stay. These statements by SA Turner about her resolve to stay in the Minot RA were not in concert with her written communication detailing her efforts to leave.

CONCLUSION:

In summary, SA Turner's performance was Ineffective and Inefficient, and negatively affected the ability of the Minot RA to effectively perform its extremely difficult mission. An objective review of SA Turner's performance, including a voluminous amount of information provided by SA Turner herself, interviews with her, her supervisor, co-workers and liaison contacts, disclosed SA Turner had recently developed an inability to successfully interact with these individuals, which was critical to her successful job performance.

In addition to the 49 page document SA Turner authored and provided to the interviewing AIIP, she also provided a 128 page document written by FBI Honors Intern Corrie Westbrook, entitled <u>The Effects Working Indian Country Has on Special Agents.</u> Additionally, SA Turner mentioned this stress factor to the interviewing AIIP, noting she had been working Indian Country matters in the Minot RA for more that 13 years.

RECOMMENDATIONS:

That SAC, Minneapolis, seek the immediate transfer of SA Turner to an entity which would allow for closer supervision.

That SAC, Minneapolis, refer SA Turner to EAP and seek to afford SA Turner with a fitness for duty evaluation.

That SAC, Minneapolis, afford SA Turner with a new PAR incorporating findings reported during this inspection.

NOTIFICATION:

By 11/22/1999, SAC, Minneapolis, should advise the Assistant Director, INSD, Attention: Office of Inspections, Inspection Management Unit (IMU), Room 7903, of all corrective actions taken by the division relative to each instruction and recommendation. These responses should conform to the instructions provided in the EC dated 10/12/1999, from Inspector-In-Charge Zachary T. Lowe to SAC Douglas J. Domin. Transmit the response via EC in a sealed envelope, to include an original and one copy of each response, and a 3.5" diskette in WordPerfect 6.1 format.

To: Minneapolis From: Inspection Division
Re: 297-HQ-A1271777, 10/19/1999

Lead (s):

Set Lead 1: (Adm)

MINNEAPOLIS

AT MINNEAPOLIS, MN

The SAC, Minneapolis, will review the recommendation for appropriate action, as set forth in this EC.

♦♦