**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**01-CV-1407 (JMR/FLN)**

| | | |
|---|---|---|
| **JANE A. T. TURNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **DEFENDANT'S RESPONSE TO** |
| **v.** | ) | **JANE TURNER'S APPLICATION** |
| | ) | **FOR ATTORNEY'S FEES and** |
| **ALBERTO GONZALES,** | ) | **COSTS** |
| **ATTORNEY GENERAL, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ________________________________ | ) | |

## TABLE OF CONTENTS


Standards for the Award of Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Government Staffing of the Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. The Court Should Adopt the Hourly Rates Submitted by Engdahl as Reasonable in This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II. In Calculating the Lodestar, the Court Should Disallow Recovery by Plaintiff's Counsel for Hours Not Reasonably Spent. . . . . . . . . . . 18

A. The Klimaski Law Firm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. The Kohn Law Firm.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C. The Hill Law Firm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III. The Limited Success Plaintiff Achieved in This Litigation Militates Strongly in Favor of a Substantial Reduction in the Amount of Fees Requested by Klimaski, Kohn, and Hill.. . . . . . . . . . . . . . . . . . . . . . 26

A. Plaintiff's success on the merits of her Title VII litigation is limited to the narrow claim of the June 1999 interim file review/Performance Summary Assessment.. . . . . . . . . . . . . . 27

B. Consideration of the *Johnson* factors supports a fee reduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Defendant Alberto Gonzales, by and through his undersigned counsel, submits this response to plaintiff Jane A. T. Turner's Application for Attorney's Fees and Costs. Ms. Turner brought the underlying case under Title VII of the Civil Rights Act of 1964, alleging sex discrimination, hostile work environment, and retaliation. During the course of this litigation, plaintiff was represented by four different law firms: initially by Klimaski & Associates, P.C. (Klimaski) of Washington, DC, with Metcalf, Kaspari, Howard, Engdahl & Lazarus, P.A. (Engdahl) of Minneapolis, MN, serving as local counsel. After June 2002, plaintiff was represented by Kohn, Kohn & Colapinto, LLP (Kohn) of Washington, DC, with Hill & Associates (Hill) of Eden Prairie, MN, serving as local counsel. Plaintiff now seeks attorneys' fees and costs amounting to over $1.6 million, broken down among the various law firms as follows:

| | | |
|---|---|---|
| **Klimaski:** | **$ 233,689.00** | **fees** |
| | **$ 3,517.51** | **costs** |
| **Engdahl:** | **$ 16,747.50** | **fees** |
| | **$ 207.40** | **costs** |
| **Kohn:** | **$1,068,789.00** | **fees** |
| | **$ 60,225.60** | **costs** |
| **Hill:** | **$ 171,337.50** | **fees** |
| | **$ 978.28** | **costs** |
| **Plaintiff:** | **$ 61,852.41** | **fees and costs to be reimbursed** |

Plaintiff seeks recovery of these fees and costs for litigation of sex discrimination, hostile work environment, and retaliation claims raised in five Equal Employment Opportunity (EEO) complaints, spanning nearly a decade of supervisory decisions taken by her supervisors and managers at the Federal Bureau of Investigation (FBI). Despite the numerous claims she raised in her original Complaint (filed in August 2001) and Amended Complaint (filed in November 2004), Turner only received judgment on a single allegation: that the "Minimally Acceptable/Unacceptable" interim Performance Summary Assessment (PSA) she received as a Special Agent in her standard 90-day investigative file review constituted retaliation by her immediate supervisor.

The government opposes entry of an order requiring payment of $1.6 million in fees/costs Turner now seeks for several reasons. First, the hourly rate requested by Klimaski, Kohn, and Hill is excessive when compared to the ordinary rate for similar work in the Minnesota area. The hourly rate of $350 requested by Ms. Engdahl should be used to determine the lodestar. This hourly rate is especially appropriate in this case, where there were no novel issues of Title VII law presented, Ms. Engdahl has considerable expertise in plaintiff-side Title VII litigation, and there is no compelling reason recognized by Eighth Circuit precedent to justify payment of the $500 out-of-town hourly rate requested by Klimaski and Kohn or the $450 hourly rate sought by Hill.

Second, plaintiff's fee petition requests reimbursement for hours which

were not "reasonably expended" under *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983) and its Eighth Circuit progeny. Given the government's limited staffing of this case and the fact that defendant prevailed on the preponderance of plaintiff's claims, plaintiff's case was clearly overstaffed. This case was not the Microsoft anti-trust or the Phillip Morris tobacco litigation and did not require multiple law firms and lawyers, law clerks and paralegals. This was a garden-variety Title VII case, albeit one which was very important to Ms. Turner personally. This overstaffing resulted in an excessive number of attorney work hours, especially among the newer associates and law clerks whose efficiency in litigation falls short of more experienced counsel. In addition, there are hours claimed for tasks not reasonably expended, including Mr. Kohn's time in focus group "moot courts" of his opening argument; Mr. Kohn's and Mr. Parnesse' time and the costs associated with their "Power Point" presentations and equipment, when the government has already provided an electronically-equipped courtroom; and Ms. Nikki Carlson's services as a jury consultant and "surveyor" of anti-trust attorney hourly rates to support a fee petition in this Title VII case. Indeed, the Title VII experience and expertise of Metcalf, Kaspari, Howard, Engdahl & Lazarus, P.A. throws the necessity of plaintiff's using paired out-of-town and local counsel into serious question.

Finally, the factors articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) and recognized by the Eighth Circuit provide

additional guidance to support the government's position that requested fees and costs should be discounted considerably. For all these reasons, set forth fully below, defendant recommends that the Court adopt a $350 hourly rate as a ceiling for what is reasonable in this case. Defendant does not contest the reasonableness of Ms. Engdahl's requested fees, in light of her Title VII expertise, her detailed billing statements, and her economical assignment of staff to tasks. With respect to the Klimaski, Kohn, and Hill firms, the government recommends that an award of fees be substantially reduced from the amount requested. This reduction should reflect a reduction in the hourly rate to no more than $350 and eliminate compensation for excessive work hours and those hours not reasonably expended. Importantly, the government asks that the Court take a significant reduction in its fee award to Klimaski, Kohn, and Hill to reflect the limited relief Ms. Turner achieved on her claim regarding the June 1999 file review/PSA in comparison to the scope of the litigation as a whole. The standards of *Hensley v. Eckerhart* and Eighth Circuit case law require this result.

**Standards for the Award of Attorneys' Fees**

In order to recover attorney's fees under 42 U.S.C. §1988, a plaintiff must be a "prevailing party." *Hensley*, 461 U.S. at 433. To qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of her claim. *Farrar v. Hobby*, 506 U.S. 103, 113 S. Ct. 566 (1992). Having obtained an

enforceable judgment against the defendant, Turner qualifies as a prevailing party. *Farrar v. Hobby*, 506 U.S. at 111. Having met this requirement, however, Turner only crosses the statutory threshold to establish her eligibility for a fee award. *Farrar, 506 U.S.* at 114. It remains for the district court to determine what fee award is "reasonable." *Hensley*, 461 U.S. at 433. The amount of the fee is determined on the facts of each case. *Hensley,* 461 U.S. at 429.

The *Hensley* decision set forth guiding principles in attorney's fees cases which are now axiomatic. The starting point for determining a reasonable fee award is the number of hours reasonably expended multiplied times a reasonable hourly rate. *Hensley* 461 U.S. at 433. This figure is referred to as the "lodestar." The party seeking an award of fees is required to submit evidence supporting both the hours worked and the rates claimed. Id. Where the documentation is inadequate, the district court may reduce the award accordingly. Id. The district court also should exclude hours that were not "reasonably expended," as evidenced by overstaffing the case with multiple lawyers; including in the fee petition hours that are excessive, redundant, or otherwise unnecessary; and billing hours that are not usually billed to one's client in the ordinary course of business. *Hensley*, 461 U.S. at 434.

After the reasonable hours/reasonable rates lodestar is determined, the inquiry next considers the degree of success obtained by the plaintiff. *Hensley,* 461 U.S. at 434-35. Two issues arise here: (1) whether the plaintiff failed to win

on claims that were unrelated to her successful claims and (2) did the plaintiff achieve a level of success that makes the reasonable hours expended a satisfactory basis for the fee award. Id. Where plaintiff has brought in a single lawsuit different claims for relief based on different facts and legal theories, counsels' work on one claim will be unrelated to another claim. A lack of success on these separate claims requires that the fee award be reduced accordingly. Id. Where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley*, 461 U.S. at 436.

Therefore, the district court must consider the relationship between the extent of success vis-a-vis the overall litigation and the amount of the fee award. *Hensley*, 461 U.S. at 438; *Farrar*, 506 U.S. at 112-116.[1] "A reduced fee award is

---

[1] See also *Fish v. St. Cloud State University*, 295 F.3d 849, 852 (8th Cir. 2002); *Standley v. Chilhowee R-IV School District*, 5 F.3d 319, 324 (8th Cir.1993). In *Fish*, the Eighth Circuit upheld a 15 per cent reduction in the lodestar to reflect the lack of complete success obtained by plaintiffs in class action sex discrimination case. Although the plaintiff class proffered affidavits describing the litigation results as "exceptional," no monetary payment was made to any plaintiff on the class claims dealing with promotion and tenure or terms and conditions of employment. Only one individual promotion was secured and the other promotion and tenure claims were dismissed.

In *Standley*, the Eight Circuit upheld a seventy per cent reduction in the amount of the requested attorneys' fees award. The case involved a four-count complaint brought under the First Amendment and state law by a group of teachers whose contracts were not renewed. The Court determined the reduction was appropriate where counsel spent a considerable amount of

appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley,* 461 U.S. at 440. See also *Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997) (the most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole).

In determining an appropriate fee award, the district court may also consider the various factors set forth in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717-719 (5th Cir. 1974). See *Zoll v. Eastern Allamakee Community School Dist*., 588 F.2d 246, 252 n.11 (8th Cir. 1978). These are: (1) the time and labor required; (2) the novelty or difficulty of the issues; (3) the skill required of the attorney to properly perform legal services; (4) preclusion of other employment due to acceptance of the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or by circumstances; (8) the experience, reputation, and ability of the attorney; (9) the undesirability of the case; (10) the nature and length of the professional relationship with the client; and (11) awards in similar cases. *Westendorp v. Independent School District No. 272 (Edina, MN)*, 131 F. Supp. 2d 1121, 1125 (D. Minn. 2000).

**Government Staffing of the Litigation**

The government's staffing of this litigation provides a necessary backdrop

---

time, both pretrial and during the jury trial pursuing unsuccessful claims.

against which plaintiff's fee petition must be weighed, in addition to the actual litigation activities. See Civil Docket Report, attached as Defendant's Exhibit (Def. Ex.) 1. Contrary to counsel's representations, the government's case was not presented by two "large law firms" – the Department of Justice and the FBI's Office of the General Counsel with "unlimited resources." Kohn Memo at 15. As the Court is aware, the government operates under a budgetary process that necessitates it to historically staff it cases with only the least number of attorneys and paralegals essential to present the government's case.

At the administrative stage in litigation before the Equal Employment Opportunity Commission (EEOC), the FBI was represented by Colleen Grzeskowiak, an Assistant General Counsel (AGC) assigned to the Employment Law Unit of the FBI's Office of the General Counsel (OGC).[2] All EEOC litigation against the FBI is handled as an individual case by an AGC. With some exceptions, all AGCs are assigned to FBI Headquarters in Washington, DC, and all AGCs conduct a nationwide practice, appearing before administrative judges in every EEOC district. AGC Grzeskowiak has specialized in employment discrimination law since July 1998. Prior to that, she served approximately ten years as a trial attorney with the U.S. Department of Justice's Civil Rights and Civil Divisions and, therefore, has experience with both plaintiff- and defendant-side civil rights litigation. Before the EEOC and opposite the Klimaski firm, AGC

[2] See 29 C.F.R. § 1614.109.

Grzeskowiak personally handled all the legal research, drafting of pleadings, discovery, and appearances before the EEOC on behalf of the FBI. Three paralegals in the FBI's Civil Discovery Review Unit (CDRU) were assigned seriatim to process the voluminous pages of documents responsive to Ms. Turner's multiple sets of requests, redacting classified and otherwise privileged information. During Ms. Turner's deposition in early June 2001, a paralegal and another AGC sat in by way of preparing for the mid-June 2001 EEOC hearing. This was their only involvement in Ms. Turner's EEOC litigation. Ms. Turner later withdrew her request for an EEOC hearing shortly before the scheduled date and opted to proceed to district court.

After Ms. Turner filed in federal district court in August 2001, the U.S. Attorney's Office (USAO) in Minnesota recused itself from serving as government defense counsel. This was due to the factual predicate then underlying plaintiff's case, specifically her third EEO complaint which challenged FBI actions taken after her transfer to Minneapolis in April 2000. A number of Assistant U.S. Attorneys (AUSA) there were potential witnesses (Jeanne Graham, Robert Small, Clifford Wardlaw, and later, John Marti). The Executive Office for United States Attorneys (EOUSA) reassigned the case to the USAO for the Northern District of Iowa (N.D. Iowa). AUSAs Martha Fagg and Lawrence Kudej were assigned as lead counsel. AUSA Fagg, who is assigned to the USAO's Sioux City branch office, is a member of the Missouri (1985) and Iowa (1988) bars. She has served

as an AUSA for the past eight years conducting civil defensive litigation. AUSA Kudej is the Civil Chief of the USAO, N.D. Iowa; his office is in Cedar Rapids. He is a member of the Iowa bar and has been an AUSA since 1989.

During the pre-trial phase, AUSA Fagg handled the day-to-day litigation tasks required in this case as lead counsel of record. AGC Grzeskowiak served AUSA Fagg as agency counsel: subject matter expert on FBI procedure, policy, and witnesses and the liaison between AUSA Fagg and the FBI's CDRU with respect to discovery production. AUSA Fagg handled all court appearances, settlement conferences and oral arguments (both district and appellate courts); communications with plaintiff's counsel, litigation strategy, and depositions of plaintiff's and FBI witnesses. AUSA Fagg and AGC Grzeskowiak shared drafting of various briefs and court filings in the district court; AUSA Fagg handled appellate briefing. During the pre-trial phase, AUSA Fagg was also assisted by Carol McEntaffer, a senior paralegal who took care of court filings, exhibit preparation, and legal research.

AUSA Kudej's pre-trial participation was more limited, due to his managerial responsibilities as Civil Chief and his handling of other cases. AUSA Kudej attended court-sponsored settlement conferences and some of the depositions of witnesses. He took no substantive role in the depositions, however; his attendance was to familiarize himself with the facts of the case in the event of trial.

Following appeal in the Eighth Circuit, in which the government succeeded in upholding dismissal of plaintiff's sex discrimination and hostile work environment claims, AUSA Fagg continued as lead counsel and AUSA Kudej sat "second chair." The pretrial tasks of exhibit preparation, in limine motions, fact and deposition stipulations were shared among AUSA Fagg, AGC Grzeskowiak, and Ms. McEntaffer. AUSAs Fagg and Kudej handled the pre-trial statements and jury instructions. In mid-January 2007, AGC Grzeskowiak was designated by EOUSA as a Special Assistant U.S. Attorney in order that she could participate as a member of the trial team, presenting and cross-examining witnesses, given her substantive expertise in Title VII law and the facts underlying Ms. Turner's claims. However, upon the argument of plaintiff's counsel in the final pre-trial conference, the Court disallowed SAUSA Grzeskowiak's participation as trial counsel for the government. As a result, the government's case was presented by AUSAs Fagg and Kudej. SAUSA Grzeskowiak performed as a senior paralegal during the trial: coordinating witnesses' appearance in court, monitoring exhibits introduced into evidence and meeting with Aaron Parnesse to prepare the jury room exhibit book, typing final versions of deposition stipulations, and taking notes of witness testimony in support of the government's closing argument.

Since entry of judgment, SAUSA Grzeskowiak has researched and drafted all of the government's post-trial motions and reply/opposition briefs and

coordinated with the Civil Division's Appellate Section at the Department of Justice on the government's appeal. AUSA Fagg has handled administrative matters associated with the FBI's appeal of the verdict and post-trial filings. AUSA Kudej has resumed his responsibilities as Civil Chief, which includes reviewing the government's post-trial filings.

**Argument**

**I. The Court Should Adopt the Hourly Rates Submitted by Engdahl as Reasonable in This Case.**

The government does not contest that the Court, in determining a reasonable hourly rate, should rely on current hourly rates, rather than counsel's historic rates used since 2000 when Ms. Turner initiated her EEOC litigation. See *Missouri v. Jenkins*, 491 U.S. 274, 283, 109 S. Ct. 2463 (1989) (payment of attorneys' fees several years after the services were rendered is not equivalent to the same dollar amount which could have been received at the time services were provided); *Standley*, 5 F.3d at 324. However, both Kohn and Klimaski of Washington, D.C. have requested an hourly rate of $500 for their services as counsel, with appropriately lesser rates for associate lawyer and paralegal staffing. Hill, whose firm is located in the Minneapolis area, seeks a $450 hourly rate. The Court should reject these rates as unreasonable.

A reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated. *Fish*, 295 F.3d at 851. When

determining reasonable hourly rates, the district court may rely on its own experience and knowledge of prevailing market rates. *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005), citing *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005). See also *Bailey v. Wood*, 708 F. Supp. 249 (D. Minn. 1989) (reasonable rate may be determined by looking to prevailing market rates in the relevant community). These precepts do not require that out-of-town counsel always be limited to lower local rates. See *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140 (8th Cir. 1982). Out-of-town rates can be appropriate where plaintiff shows that she has been unable to retain local counsel through diligent, good faith efforts in the district where the case is tried. *Avalon Cinema*, 689 F.2d at 140-41.

The arguments put forth by Klimaski and Kohn regarding the need for Washington, DC counsel are not persuasive. See Klimaski Memo at 2; Kohn Memo at 8-9. Although AGC Grzeskowiak, as the FBI's representative in the EEOC administrative proceedings, is assigned to FBI headquarters, the employment law practice of the FBI's Office of the General Counsel is nationwide. AGCs have appeared before all of the EEOC's many district offices and are expected to travel to conduct defensive administrative litigation. Plaintiff's EEOC litigation was conducted out of the EEOC's Denver district office with the June 2001 hearing to be held in Minot, ND. Def. Ex. 2. The bulk of plaintiff's claims dealt with actions taken in North Dakota and Minneapolis. Consequently, the

locus of responsive documents and relevant witnesses was North Dakota and Minneapolis, as the choice of venue in this district supports. Under the venue provisions of Title VII, this case could not have been appropriately filed in the District of Columbia.

Plaintiff is entitled to her choice of counsel but her affidavit fails to show diligence in retaining local counsel. See Affidavit of Jane Turner, Exhibit 4 to Kohn Fee Petition (Turner Aff.) at ¶¶ 2-13. She sets forth no information regarding her efforts to secure counsel in North Dakota or Minneapolis. Any possible claim that she could not find counsel in North Dakota or Minneapolis is not credible. In North Dakota, plaintiff could easily have consulted Assistant U.S. Attorneys Clare Hochhalter and Jan Morley. Both testified on her behalf at trial and AUSA Hochhalter in particular has a long-standing social friendship with plaintiff. Def. Ex. 3, Transcript (Tr.) at 74-78. As this Court can surmise, it would not have been difficult for AUSA Hochhalter, on plaintiff's behalf, to consult discreetly with his Civil AUSA colleagues for referrals of plaintiff-side employment law counsel. Furthermore, plaintiff received her transfer orders from North Dakota to Minneapolis in mid-December 1999. She did not retain Klimaski until March 2000. Knowing in December 1999 that she soon would re-locate to the Minneapolis region, she could have searched for and likely retained counsel there.

Furthermore, her efforts to secure the Kohn firm (Turner Aff. at ¶¶ 7-10)

were connected to her whistleblower activities – legal work in which Mr. Kohn's firm specializes. See Def. Ex. 4, Kohn, Kohn & Colapinto, LLP Website Profile. In view of the Kohn firm's own advertisements, one can fully appreciate his assertion that the firm "is recognized as being a superior firm with particular acuity in the area of employment retaliation" (emphasis supplied) and the repeated references to his "nationwide employment retaliation practice." Kohn Memo at 18. Not Title VII – employee whistleblower retaliation cases. While whistleblower and Title VII cases may share the same genus as employment cases, they are a different species.[3] The Kohn firm became plaintiff's counsel in the Title VII case simply by default, after Klimaski voiced his desire to withdraw.

The Hill firm is associated with this case not because of a substantive expertise in employment law but because of "civil trial work of many different varieties." Hill Aff. (Exhibit 3 to Plaintiff's Fee Petition) at ¶ 6. Indeed, one look at the firm's Website confirms the firm's and Mr. Hill's lack of expertise in Title VII law. Def. Ex. 5, Robert Hill & Associates, Ltd. Website Profile. The Hill firm,

[3] As this Court is aware, employment discrimination and whistleblower retaliation cases arise under different statutory schemes. For an FBI employee whistleblower, the circumstances are even more particularized: litigation is conducted under a distinct regulatory scheme (28 C.F.R. Part 27) rather than the statutes governing private and other public sector employee whistleblowers. For whistleblower litigation, a nationwide practice has little impact on case law precedent from the Merit Systems Protection Board and the Federal Circuit. Not so with Title VII litigation, where Supreme Court precedent receives nuanced interpretation from Circuit to Circuit. The Title VII standards applied by the D.C. Circuit vary issue-by-issue from those applied by the 8th Circuit, with the D.C. Circuit being perceived as plaintiff-favorable and the 8th Circuit less so.

"Relentless Advocates for Property Taxpayers," promotes itself as "work[ing] hard on behalf of commercial and industrial property owners to ensure fair market value property valuations and tax assessments" and claims as its expertise "complex property valuation litigation" achieving "precedent-setting tax reductions and case law." Id. Mr. Hill's practice specialty is commercial real estate law, not employment discrimination.

After reading the fee petitions submitted by the Klimaski and Kohn firms to rationalize plaintiff's retention of Washington, DC counsel at a $500 hourly rate and a $450 rate to the Hill firm, one concludes there is no counsel competent and experienced in Title VII law in Minnesota or North Dakota. The Eighth Circuit's observation in the *Avalon Cinema* case – made in 1982 -- is particularly apt:

> The bar of [any state in the Eighth Circuit] is neither so timid nor so parochial as plaintiff implies. . . . there are a number of lawyers who will cheerfully attack the 'establishment' on constitutional grounds for a reasonable fee, or even, in some cases, no fee at all. The willingness to take on controversial cases is one of the glories of the bar, and the day has not yet come when a civil rights plaintiff must go out of state to get representation.

*Avalon Cinema*, 689 F.2d at 141. Twenty years later, those words apply with even greater force, as employment discrimination law has become a recognized litigation specialty. See Engdahl Aff. at ¶¶ 4-7. Consequently, the Court must also reject the Kohn and Hill firms' misplaced reliance on anti-trust litigation as a benchmark – and the fees associated with Nikki Carlson's survey of anti-trust firms to determine a reasonable rate in a Title VII case. See Kohn Aff. at ¶¶ 26-

27, Carlson Aff. at ¶¶ 14-19.

The government therefore urges the Court to adopt the $350 hourly rate for an experienced employment law attorney requested by the Engdahl firm as the ceiling for what is an appropriate hourly rate for experienced employment law attorney and reduce the rates for associate attorneys, paralegals, and law clerks accordingly. Ms. Engdahl is a veteran attorney in the field of employment law, having litigated plaintiff-side Title VII and other employment issues for 22 years. She has also served as state bar chairman and a Continuing Legal Education lecturer and presenter in the area of employment law. Engdahl Affidavit at ¶¶ 6-7. Her considerable expertise and the apparent ease with which Mr. Klimaski obtained her services as local counsel shows that Ms. Turner did not have to resort to more expensive Washington, DC counsel to represent her. With experienced local counsel familiar with Eighth Circuit Title VII precedent, there would have been no need to staff plaintiff's garden-variety case with multiple layers of law firms and numerous law clerks to conduct legal research or incur the travel costs associated with out-of-town counsel.

## II. In Calculating the Lodestar, the Court Should Disallow Recovery by Plaintiff's Counsel for Hours Not Reasonably Spent.

In determining what is a reasonable number of hours, the Court is required to examine the billing statements supporting a fee petition. Where the documentation is inadequate – generalized, non-specific entries of tasks –

*Hensley* allows the Court to reduce the fee award by discounting those hours. *Hensley,* 461 U.S. at 433. The Court is also allowed to exclude hours not reasonably expended as a result of overstaffing, redundancy, excessive time committed to tasks, and otherwise unrelated to the litigation at issue.

Here again, the government does not contest the hours for which Engdahl requests compensation for her and her paralegal. Because of her substantive expertise in Title VII law (see Engdahl Affidavit at ¶¶ 3-7), Engdahl's firm exercised both efficiency and economy in its staffing this case, limiting it to one seasoned attorney and one paralegal. Her billing statements in support of the petition show detailed accounting of the subjects addressed in each task she and her paralegal performed. This detail enables both the Court and the government to conclude quickly that the tasks she performed were, in fact, related and necessary to this litigation. The government would not recommend any reduction in the hours claimed by the Engdahl firm to take into account the lack of success Ms. Turner achieved in her overall suit: the issues Engdahl handled (service on federal agency, revisions on the complaint to comport with the local rules, identification of proper party defendant, etc.) would all have been necessary regardless of the number of claims Ms. Turner had pursued or the unrelatedness of her winning allegation to the several claims she lost. This is not, however, the case with the Klimaski, Kohn, and Hill firms.

**A. The Klimaski Law Firm**

During his tenure on Ms. Turner's administrative and district court case, the Klimaski firm staffed the litigation with a senior attorney (Klimaski), three associate attorneys (Grill, Miller and D'Agostino, who served as a law clerk pending bar admission), and a paralegal (Pinkus). Given the government's lean staffing of this case and the lack of success Ms. Turner achieved in her litigation overall, this assignment represents an over-commitment of legal personnel. A review of the billing statements of the Klimaski firm shows numerous generic entries for both the administrative and district court proceedings: "research," "research discovery," "draft affidavit," "teleconference," and "read docs." For example, as a law clerk, D'Agostino clocked 35.5 hours on generically-described "research" or "discovery research" in the administrative proceedings. There were no motions to compel discovery or for protective orders by either side. The parties also entered into a Privacy Act Protective order to safeguard the disclosure of then-SA Turner's medical records so there were no discovery disputes arising from plaintiff having put her emotional & medical condition at issue for damages. Generic entries like these are facially inadequate to inform the Court and the government about the necessity of the task at hand, the reasonableness of the hours expended, and whether there was an unnecessary duplication of effort among personnel.

In addition, there are hours included in the Klimaski fee petition which are

not compensable as a result of this Title VII litigation. First, in spring 2001, "Turner identified herself as a whistleblower concerning FBI activities." Klimaski Mem. at 3. Whistleblowing by federal employees is not a "protected activity" under Title VII and, indeed, FBI employees specifically are protected in whistleblowing activities by 28 C.F.R. Part 27, the Department of Justice regulations providing for administrative litigation of alleged whistleblower reprisal.[4] The hours spent by the Klimaski firm on Turner's whistleblowing activities – meeting with the Department of Justice Office of Professional Responsibility (OPR) and the Inspector General (IG) – should be excluded from this fee petition as non-compensable under Title VII. These whistleblower hours include: Klimaski: 9.6 hours; Grill and D'Agostino as associate attorneys: 6.3 hours; and D'Agostino as a law clerk: 15.2 hours.

Second, Klimaski voluntarily withdrew as plaintiff's counsel, due to his apparent fractured relationship with plaintiff.. As a result, Ms. Turner was required to obtain new counsel. Once the Kohn firm became familiar with the case, it filed an Amended Complaint which essentially changed plaintiff's litigation strategy. In the original complaint, plaintiff challenged all FBI actions up to and including the Fitness for Duty (FFD) issues and related administrative leave. Complaint, ¶¶ 49-50. In the Amended Complaint, after defendant's Rule 26 Initial

---

[4] Plaintiff filed a Request for Corrective Action under 28 C.F.R. Part 27 in November 2003. That administrative litigation continues.

Disclosures in fall 2001 and extended discovery thereafter on all FBI actions, the Kohn firm chose not to litigate any FBI actions arising after April 2000, as originally pled by the Klimaski firm. Plaintiff also successfully moved in limine to exclude all evidence challenging her FFD evaluation and post-transfer (April 2000) performance issues. Def. Ex. 1 at Entries 101(Motion to Exclude Evidence Re; Fitness for Duty) and 102 (Motion to Exclude Evidence Concerning Performance Issues After May 2000). The government should not have to bear the burden, in the form of fee payment, of counsel's difficulties with plaintiff, changed litigation strategy in the district court action, and claims from the original Complaint abandoned by new counsel.

Accordingly, certain hours should be deducted from the Klimaski fee petition. With respect to the psychological FFD evaluations, the following should not be compensated: Klimaski: 9.7 hours; Grill and D'Agostino as associate attorneys: 7.3 hours; and D'Agostino as a law clerk: 53.9 hours. These hours represent work performed by the Klimaski firm during the pendency of the FFD process under FBI internal rules. With respect to post-transfer performance issues, the government is hard-pressed to identify what work during discovery Klimaski spent on these issues, due to the generic billing descriptions. However, the following hours specifically pertain to the February 6, 2001 "Does Not Meet Expectations" Performance Appraisal Report (PAR) which plaintiff received: Klimaski: 5.5 hours; Grill and D'Agostino as associates: 10.3 hours. This work

was done on Turner's challenge to this PAR rating under the FBI's internal grievance process. In her Amended Complaint, plaintiff abandoned her claims of sex discrimination, hostile work environment, and retaliation in connection with the February 2001 PAR and the psychological FFD evaluation.

**B. The Kohn Law Firm**

As counsel to plaintiff, the Kohn firm staffed this case at various times with a senior attorney (Kohn), two associate attorneys (Parnesse and Michaelchuck), two paralegals (Perkey, a non-admitted lawyer, and Chriswell), and a number of law clerks. Kohn Aff. at ¶¶ 19-30. In addition, the Kohn firm retained the services of a jury consultant, Nikki Carlson. Id. at ¶ 26. Plaintiff's trial team consisted of two senior attorneys (Kohn and Hill), an associate attorney (Parnesse), a paralegal (Chriswell), two unnamed law clerks, and Ms. Carlson. Id. at ¶¶ 23-26.

The bills presented by the Kohn firm enable this Court to determine whether the time spent on this case was reasonably expended. At the onset, the government observes that its representation at trial consisted of three attorneys, who among themselves handled all tasks associated with the case. The fact that the government won half of the verdict at trial attests to the excessive staffing of this case by the Kohn firm.

With respect to pre-trial and discovery, the Court should deduct the fees generated by the depositions of Assistant Special Agent in Charge (ASAC) James Burrus and SAC Douglas Domin as redundant and duplicative. Both were

Turner's supervisors and both were deposed by Mr. Klimaski during the EEOC proceedings in March 2001. At that point in time, Ms. Turner was out of the office on administrative leave due to her FFD evaluation. After February 6, 2001, Burrus had no contact with her; Domin's contacts were limited. Burrus transferred from Minneapolis in July 2001 and Domin retired in August 2001. Between their March 2001 EEOC depositions and their later depositions by Kohn, there were no substantive changes in their testimony. Neither of them had subsequent involvement with her to give rise to substantial change or addition to their testimony. Turner's direct supervisor, Welken, was also deposed in March 2001 by Klimaski but Kohn did not re-depose him.

Consequently, the following hours should be discounted as unnecessary duplication of work: on the Burrus deposition, 8.45 hours for Mr. Kohn and 18.7 hours for the law clerks; on the Domin deposition, 5.33 hours for Mr. Kohn and 12.6 for the law clerks.

With respect to the trial itself, there are a number of fees and costs which can only be described as "overkill" in the presentation of this garden-variety Title VII case. These hours should be deducted from the fee award as not reasonably necessary and excessive. These include the hours expended developing counsel's "power point" presentation. The government has provided the District of Minnesota with a fully equipped electronic courtroom; it should not now have to bear the cost of counsel's preference to use his own equipment. Importantly, this

power point presentation added nothing substantive to the display capabilities of the courtroom equipment. The difference: color graphics and fade-in/fade-out highlighting. The hours associated with this include: 46.32 hours for Mr. Parnesse, 12 hours for Mr. Chriswell, and 5 hours for the law clerks.

Second, the fees associated with Ms. Carlson and Mr. Kohn's various "moot courts" should be discounted as excessive. A telephone call to the Minnesota State Bar Association or to various employment discrimination law firms identified through Martindale-Hubbell would have accomplished in a couple of hours by a law clerk what Ms. Carlson invested considerable energy in. The "moot court" preparation is simply overkill. As a result, the government urges this Court to disallow recovery for all of Ms. Carlson's 103 hours and the 15 hours expended by Mr. Kohn and 4.33 expended by Mr. Parnesse.

**C. The Hill Law Firm**

Mr. Hill has submitted detailed billing statements which enable the Court and government to assess the reasonableness of the expended hours. These statements show that Mr. Hill expended 20.25 hours in familiarizing himself with the district court proceedings once Mr. Klimaski withdrew as plaintiff's lead counsel. Some discount in these hours is appropriate, given that this time would not have been spent by the Hill firm had the Klimaski firm and plaintiff not gone their separate ways. Between July 25, 2002 and September 5, 2003, Mr. Hill spent a total of 7.5 hours reading various extension motions and orders adopting

new discovery deadlines as they arose. For an experienced litigation attorney, this represents an unreasonable, excessive amount of time on simple procedural matters. This is particularly true where the revised deadlines had been negotiated already with AUSA Fagg by Mr. Kohn on plaintiff's behalf as lead counsel.

In addition, Mr. Hill clocked eight hours to "Review case for Eighth Circuit argument" and "Prepare oral argument; meeting with client" in late June 2005, when Mr. Kohn appeared on behalf of plaintiff and made the appellate oral argument. Furthermore, Mr. Hill appears to have participated with Mr. Kohn and plaintiff in a two-hour post-mortem of the appellate argument on June 24, 2005. The hours attributed to the extension motions, scheduling orders, and preparation for an oral argument that Mr. Hill himself did not make illustrates precisely the excessive, unnecessary time spent as a result of multiple layers of lawyers.

Based on the foregoing, the government urges that the Court take the identified reductions in the hours presented by plaintiff's counsel in their fee petition.

## III. The Limited Success Plaintiff Achieved in This Litigation Militates Strongly in Favor of a Substantial Reduction in the Amount of Fees Requested by Klimaski, Kohn, and Hill

*Hensley v. Eckerhart* directs that when "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will

be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley*, 461 U.S. at 436. Although counsel point to the $360,000 judgment (remitted under law from $565,000) as providing plaintiff with an "excellent" result, the judgment in Ms. Turner's favor on the limited June 1999 PSA claim of retaliation presents the proverbial "tail wagging the dog." Both Supreme Court and Eighth Circuit precedent require that a reduced fee award be entered if plaintiff's relief, however significant, represents only a limited share of the litigation as a whole. *Hensley*, 461 U.S. at 440; *Jenkins v. Missouri*, 127 F.3d at 716. The government therefore urges this Court to make a realistic assessment of the extent to which plaintiff succeeded on her case overall in determining the fee award for counsel, notwithstanding the dollar figure of the judgment.

### A. Plaintiff's success on the merits of her Title VII litigation is limited to the narrow claim of the June 1999 interim file review/Performance Summary Assessment.

The FBI successfully defended the vast preponderance of plaintiff's claims, both in district court and on appeal, and the government's overall success in this case – attained by far, far fewer lawyers – should not be ignored.

As plaintiff's administrative EEO complaints show, she alleged wide-ranging claims of sex discrimination, hostile work environment, and retaliation. Plaintiff's first EEO complaint, filed June 22, 1998, alleged gender-based hostile work environment and reprisal, "due to [her] unique position of being the first

woman [Senior Resident Agent (SRA)] in the FBI and the first woman to work Indian Country crimes full time." Def. Ex. 2 at 2-15. The claims raised in this complaint included her non-selection for a supervisor's position in 1995, performance appraisal issues, her resignation as SRA in March 1998, allegedly disparate mileage reimbursement, and non-assignment of a Bureau vehicle she requested. Id. On March 11, 2000, Ms. Turner filed a second EEO complaint, alleging sex discrimination, gender-based (non-sexual) harassment, and reprisal. Def. Ex. 2 at 3-4. The claims encompassed in this complaint included an Office of Professional Responsibility referral regarding her position as a Minot, North Dakota, Housing Authority Commissioner; her transfer to the Minneapolis field office; the fall 1999 referral by Domin for a psychological FFD evaluation (which FBIHQ rejected); and various performance-related matters, including the multiple deficiencies in her performance identified by the FBI's Inspection Division. Id. Plaintiff then filed a third complaint on December 20, 2000, alleging sex discrimination and retaliation. Def. Ex. 6. This complaint concerned "a series of reprisals and retaliation" occurring between August and December 2000. Id. All of these claims were carried into district court by the Klimaski law firm. See Complaint.[5]

---

[5] After she filed this district court action, plaintiff filed two additional EEO complaints. In April 2002, plaintiff filed an EEO complaint alleging gender discrimination and reprisal to challenge the February 6, 2001 "Does Not Meet Expectations" PAR issued to her by Special Agent in Charge Domin. In late January 2003, Turner filed a fifth complaint alleging retaliation in connection with a January 2003 "Does Not Meet Expectations" PAR issued by an

The Kohn firm filed an Amended Complaint which cut off the allegations raised by plaintiff as of April 2000, following her transfer to Minneapolis. This represented a change in plaintiff's litigation strategy and an abandonment of claims previously raised in the litigation and subject to prior discovery by both the Klimaski and Kohn firms. The Amended Complaint raised six counts, as follows:

(1) sex discrimination (¶¶ 19-56) covering plaintiff's 1995 non-selection for supervisor, 1996 efforts to transfer her out of Minot, non-receipt of a Quality Step Award in 1998, training and travel issues, and her 1998 resignation as SRA;

(2) retaliation (¶¶ 57-180) of a systemic, FBI-wide nature covering her April 1999 PAR grievance, contacts with Director Freeh and others, training, the October 1999 Minneapolis Division inspection, disparate treatment in the FBI's alleged failure to discipline or down grade "less competent male agents" assigned to the *Charette* and *Vigestad* crimes against children

---

entirely new set of FBI supervisors assigned to Turner when she returned from administrative leave in January 2002. This fifth complaint was amended in late April 2003 with a new claim of reprisal stemming from the FBI's April 11, 2003 proposed removal from her SA position for unacceptable performance. The allegations of the fifth complaint form the basis for plaintiff's whistleblower administrative litigation under 28 C.F.R. Part 27.

Thereafter, starting in spring 2003, plaintiff's counsel (the Kohn firm) attempted to utilize the Title VII litigation to obtain documents and deposition testimony relevant to plaintiff's separate whistleblower litigation. The government objected to these requests as not related to the district court action, pending amendment of the initial Complaint.

cases, and Domin's request for an FFD evaluation in late fall 1999;

(3) reprisal (¶¶ 181-187) alleging a denial of "promotional opportunities" and a November 2001 salary increase as a result of unsatisfactory performance ratings beginning in 1999;

(4) retaliatory transfer (¶¶ 188-229) as a result of the December 1999 transfer to Minneapolis and the subsequent loss of Indian Country and crimes against children case assignments, her removal as a relief supervisor, her isolation by colleagues, and performance issues;

(5) permanent medical damage (¶¶ 230-238);

(6) hostile work environment (¶¶ 239-252), alleging a systemic FBI law enforcement culture which is hostile to female employees and those who file EEO complaints.

The parties briefing of summary judgement resulted in a complete dismissal by the district court of all plaintiff's claims. Plaintiff appealed. The Eighth Circuit upheld the district court's dismissal of Ms. Turner's sex discrimination, gender-based hostile work environment claims, and all reprisal allegations except the June 1999 "performance rating downgrade" and her involuntary transfer to Minneapolis. *Turner v. Gonzales*, 421 F.3d 688, 695 (8th Cir. 2005). This result presents a significant vindication of the FBI's personnel actions with respect to Ms. Turner. Important to the Court's analysis here is the Eighth Circuit's finding that plaintiff's claims of sex discrimination and hostile work

environment lacked merit entirely. Id. After extensive discovery on these issues and despite the litigation strategies of two separate senior attorneys (Klimaski and Kohn), plaintiff still failed to make a prima facie case on these two claims. As this Court is aware, a prima facie showing in a Title VII case presents a very low hurdle to a plaintiff. Ms. Turner failed that hurdle – a point which clearly demonstrates the correctness of the government's vigorous defense of this case.

On remand to the district court, two retaliation issues were tried: the June 1999 file review/PSA and the December 1999 involuntary transfer. Gone from the case were plaintiff's numerous other retaliation allegations, including the systemic FBI-wide retaliation alleged in Count Two of the Complaint. After trial on these two issues, the jury returned a split verdict. It found that the June 1999 file review/PSA constituted retaliation. The jury also found that the FBI's December 1999 transfer of plaintiff to Minneapolis was not retaliatory.

The foregoing overview of the comparative results obtained by the government and plaintiff here shows the minimal degree of success plaintiff secured. Despite plaintiff's arguments about the interrelatedness of the claims, the Eighth Circuit limited remand and the eventual trial result demonstrate that her various claims are severable. The government therefore requests that this Court recognize its efforts in successfully defending the bulk of plaintiff's claims. The government also recommends that a significant discount, ranging from 75 - 85 percent, be taken in the fees and costs awarded the Klimaski, Kohn, and Hill

firms to reflect plaintiff's limited overall success. See *Standley,* 5 F.3d at 319, 324 (8th Cir. 1993) (seventy per cent reduction in requested fee award upheld where counsel spent considerable time pre-trial and trial pursuing unsuccessful claims).

**B. Consideration of the Johnson factors supports a fee reduction.**

As further guidance in its determination of an appropriate fee award, the Court may consider the various factors set out in a 1974 Fifth Circuit decision, *Johnson v. Georgia Highway Express, Inc.*, which the Eighth Circuit has adopted and this Court has employed. See *Zoll,* 588 F.2d at 252 n. 11*; Westendorp*, 131 F. Supp. 2d at 1125.

These are as follows:

1. The time and labor involved: As a result of the Klimaski firms' withdrawal as plaintiff's counsel, an unexpected amount of time and labor was expended by the Kohn firm "getting up to speed" on plaintiff's Title VII claims over a year after her case was initially filed. This duplication of effort and orientation of new counsel to Ms. Turner's claims is in no way attributable to the government's defense of the litigation. Mr. Klimaski has represented Ms. Turner during the administrative litigation. Thus, as a result of his firms's review of approximately 10,000 pages of documents produced and deposition of all the principal FBI witnesses, he was fully conversant with his client's claims once she proceeded to district court. Defendant's Rule 26 Initial Disclosures to plaintiff consisted of duplicate copies of

all documents previously disclosed to Ms. Turner. The government informed the Klimaski firm that these initial disclosures were the same documents he received during the administrative litigation and the duplicate copies were being provided to ensure the government's full compliance with Rule 26(a).[6]

This pre-existing understanding of plaintiff's case and the FBI's defenses on the part of Mr. Klimaski would have lent itself to a speedier resolution of this case. The government should not be penalized for the breakdown in the relationship between the Klimaski firm and his client and plaintiff's need to secure new counsel. The Court should make reductions for the duplication of effort resulting from plaintiff retaining new counsel.

For this reason, these proceedings were unnecessarily prolonged. As the case docket report shows, the pretrial schedule first agreed to by counsel in December 2001 was repeatedly modified by uncontested or joint motions. Ex. 1, numbers 12, 14, 26-29, 32 and 35. These scheduling changes were usually initiated by plaintiff's counsel.

2. The novelty and difficulty of the questions: This case presented a garden-variety Title VII case. The claims involved did not raise difficult substantive

[6] Counsel's complaint about the voluminous document production (Kohn brief at 2) is therefore misplaced. Counsel is correct that the documents were not Bates-stamped or indexed. However, each separate body of documents had an attached cover sheet which identified the source or creator of the documents (i.e., "Documents Maintained by SAC Domin," "Documents Maintained by Welken – 1999") and the specific number(s) of the Request(s) the documents were responsive too. The documents were produced by the individual custodian as he or she maintained them in the ordinary course of business.

and/or procedural issues or present matters of first impression in the Eighth Circuit. In short, plaintiff's sex discrimination, hostile work environment, and retaliation claims did not engage this Court or any of the attorneys in an exploration of unmapped legal terrain. Nor did this case present constitutional questions or challenge a systemic, institutional practice or condition requiring immediate Court intervention in the form of a preliminary injunction (PI) or temporary restraining order (TRO).

Although the Supreme Court's decision in *Burlington Northern and Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006) was issued between appellate argument and trial in this case, following remand, plaintiff's counsel did not choose to conduct additional discovery in the wake of *Burlington Northern*. Working with the facts already at hand, counsel artfully shaped Ms. Turner's testimony to reflect the "before and after" impact of her involuntary transfer, as *Burlington Northern* indicates: the loss of Indian Country and crimes against children assignments, the loss of prestige as the "lady FBI agent"and the "face of the FBI" in Minot, and the lost opportunity to use her special cultural expertise regarding Native Americans. Def. Ex. 7, Tr. at 118-124. Notwithstanding the presentation of plaintiff's testimony to meet the *Burlington Northern* analysis, plaintiff still lost at trial on the involuntary transfer issue.

Moreover, the Kohn firm's claim that an understanding of "a large bureaucracy" such as the FBI added to the complexity of the case is unavailing.

Every federal entity – whether it's the Department of Agriculture, State, Defense, or another administrative agency – has its own unique culture. Given the number of busy civil AUSAs nationwide, these unique agency cultures pose no impediment to suits by other plaintiffs against the government. Furthermore, the Kohn firm by its own admission has been litigating against the FBI for years. Def. Ex. 4. The idiosyncracies of FBI organization, policy and procedures are well-known to the Kohn firm.[7]

3. The skill requisite to perform the legal service properly: Contrary to plaintiff's assertion that defendant applied "unlimited legal resources" (Kohn Memo at 15), the bulk of the work during the litigation before the Eighth Circuit's post-appeal November 2005 remand was handled with a high degree of success by AUSA Fagg and AGC Grzeskowiak. The multiple levels of lawyers and paralegals used in this case by plaintiff were excessive to pursue plaintiff's claims. Even the presiding trial judge recognized this, referring to the collection of personnel as a "clack." Def. Ex. 8, Tr. at 588.

Given the straightforward nature of the Title VII issues in this case, this litigation could have been handled properly and efficiently by mid-level to senior associates and supporting paralegals. There were no discovery motions filed by

---

[7] Counsel's objection that the FBI "required Ms. Turner to submit detailed justifications simply to attain the testimony of the AUSA witnesses" (Kohn Memo at 3) is not unique to the FBI. Every federal agency has *Touhy* regulations which set forth the procedures for obtaining third-party government employee witnesses.

either side. The parties entered into a stipulated protective order at both the EEOC and district court level (Ex. 1 at 39) governing the use of plaintiff's medical records in this litigation. As this Court is aware, plaintiff's emotional and medical condition in a Title VII case is fertile grounds for motions practice. By entering into the stipulation, counsel eliminated this customary source of discord.

4. The preclusion of other employment: The government has no basis on which to challenge the assertions made by the Klimaski and Hill firms regarding the impact of this case on those firms' ability to take on other employment. The Kohn firm, however, has represented numerous other FBI clients during the pendency of this case in whistleblower proceedings, Freedom of Information Act and Privacy litigation, and Title VII, including John and Brenda Roberts, Dorothy Wehrly, Bassem Youssef, and Sibel Edmonds.

5. The Customary Fee: As argued above, the rates requested by the Klimaski, Kohn, and Hill firms for this Minneapolis-based Title VII case are excessive.

6. Whether the fee is fixed or contingent: As plaintiff concedes, the case law no longer allows a fee enhancement due to the contingent nature of an attorney's representation. Kohn Memo at 17.

7. The time limitations imposed by the client or the circumstances: Given the repeated extension of the discovery deadlines through modification of the original scheduling order (usually at the request of plaintiff's counsel), plaintiff is hard pressed to assert that circumstances and time limitations impacted counsel's

handling of the case. Significantly, there were no PI or TRO motions in this case, as occurs in other civil rights cases where fees are recoverable under 42 U.S.C. § 1988. See Def. Ex. 1. As a result, plaintiff's counsel was not forced to muster legal personnel and develop work product under short deadlines or meet the demands of time-sensitive changing circumstances.

8. The experience, reputation, and ability of the attorney: The government does not contest Mr. Klimaski's experience in the field of employment law. As noted previously, the Kohn firm specializes in employee whistleblower cases and related litigation. Def. Ex. 4. Accordingly, the Kohn firm used numerous law clerks and associates to perform basic research and tasks – thus generating billable time – that an experienced Title VII attorney would not require. Mr. Hill's presence in the case stems from his experience in civil trial work. Hill Aff. at ¶ 6. According to his firm's advertisements, his practice specialty is commercial real estate. Def. Ex. 5. Counsel's lack of experience in the Title VII realm is borne out by the success achieved by the government in defending the preponderance of plaintiff's claims.

It is also worth noting that, during the trial, the Court repeatedly advised both Mr. Kohn and Mr. Hill from the bench that their presentation of evidence was "wide of the mark" as proof of retaliation. See Tr. 162-63, Tr. 378-79, 495-96 (Judge Rosenbaum's remarks regarding retaliatory transfer, in which government prevailed). Additionally, the Court repeatedly advised Mr. Hill regarding the

impropriety of leading questions when presenting plaintiff's witnesses. See Tr. at 72-73 (sidebar reprimand); 262 (sua sponte ruling on leading questions and hearsay); 263 (objection to leading question sustained); 266 (objection to leading question sustained); 268 (sua sponte ruling on leading questions); 275-276 (sidebar reprimand); 283 (objection to Hill's leading question, question withdrawn before ruling). This recurrent mistake violates elementary trial practice and is one which every "experienced" civil litigator has outgrown. In sidebar, the Court also reprimanded Mr. Hill for congratulating Mr. Kohn in front of the jury after cross-examination of plaintiff's supervisor. Def. Ex. 8.

In submitting their fee petition, both Mr. Hill and Mr. Kohn have overstated their abilities in the Title VII realm. Further evidence of this overstated ability lies in Mr. Kohn's need to participate in four mock jury focus groups to rehearse his trial arguments.

9. The undesirability of the case: Plaintiff provides only a conclusory affidavit from James Gilbert, based on information provided to him by Turner's counsel, to establish that hers was an "extremely undesirable" complex civil case. Notwithstanding Mr. Gilbert's legal credentials, the affidavit is self-serving and provides this Court with little to no insight into plaintiff's case.

10. The nature and length of the professional relationship with the client: The Klimaski firm's representation of plaintiff in the administrative proceedings put that firm in the best position to move forward with her district court case in an

effective and efficient manner. His voluntary withdrawal from the case required a duplication of effort by the Kohn firm in taking over the Title VII case. The Engdahl firm's substantive expertise in Title VII also fell by the wayside as that firm was replaced with the Hill firm. The withdrawal of the Klimaski and Engdahl firms had a direct impact on the efficient pursuit of plaintiff's case, as the prolonged proceedings and eventual result in the litigation overall showed. The Kohn firm, representing plaintiff in the whistleblower context in which it specializes, became Title VII lead counsel by default.

11. Awards in similar cases: Plaintiff relies on Ms. Carlson's survey of anti-trust litigators in the Minneapolis area and the Gilbert Affidavit to establish a justification for a $500 and $450 hourly rate. In addition, they present the Laffey matrix used by the U.S. District Court for the District of Columbia. As argued previously, the Court should look to the $350 hourly fee request by the Engdahl firm as the ceiling for what is an appropriate fee award for veteran Title VII practitioners and adjust other requested fees as appropriate.

**Conclusion**

For the foregoing reasons, defendant recommends that the Court calculate its fee award to plaintiff's counsel based on a ceiling of $350 hourly rate. A commensurate reduction in the hourly rate of less-experienced associate counsel and the paralegal staff should also be taken, based on the $350 rate for veteran counsel Ms. Engdahl and $175 rate for Ms. Humphrey. Thereafter, the Court

should disallow payment for duplicative, excessive, and unreasonable hours billed and the overstaffing of this case by plaintiff. Finally, the Court should impose a minimum discount of 75-85 percent to reflect the limited success plaintiff achieved in her overall litigation.[8]

Respectfully Submitted,

MATT. M. DUMMERMUTH
United States Attorney

/s/ Martha A. Fagg
MARTHA A. FAGG
Assistant United States Attorney
600 4th Street, Suite 670
Sioux City, Iowa 51101
Telephone: (712) 255-6011
Fax: (712) 252-2034
martha.fagg@usdoj.gov

COLLEEN B. GRZEŚKOWIAK
Special Assistant United States Attorney
935 Pennsylvania Avenue, N.W.
Room PA-400 North
Washington, DC 20535
Telephone: (202) 220-9311
Fax: (202) 220-9355
Colleen.Grzeskowiak@IC.fbi.gov

[8] Defendant filed a Notice of Appeal in this case on May 29, 2007. However, the government does not contest that this Court retains jurisdiction to decide this motion for attorneys fees and costs.

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on June 15, 2007.

UNITED STATES ATTORNEY

BY: s/Michelle Schwebach

COPIES TO:

Stephen Kohn
Aaron Parness
Robert Hill