MR. KOHN: Yes, Your Honor. Jane Turner would like to call Clare Hochhalter.

THE COURT: Sir, would you please step forward. Would you raise your right hand. You get to stop about there because you're going to be seated over there.

(Witness sworn.)

THE COURT: Would you please be seated. And would you please tell us your name and spell your last name.

THE WITNESS: Clare Hochhalter. Last name is spelled H-O-C-H-H-A-L-T-E-R.

THE COURT: And, sir, what town do you live in?

THE WITNESS: I live in Bismarck, North Dakota.

THE COURT: Counsel.

MR. KOHN: Yes.

**Clare Hochhalter**

DIRECT EXAMINATION

BY MR. KOHN:

Q. Umm, Mr. Hochhalter, what is your current job?

A. I'm an Assistant United States Attorney in the Bismarck office of the United States Attorney for the District of North Dakota.

Q. And how long have you worked at that position?

A. I've been with the U.S. Attorney's Office since 1988. The spring of '88.

Q. Are you a licensed attorney?

DEFENDANT'S EXHIBIT NO. 3

violations that would take place on Indian reservations within North Dakota. There are four Indian reservations. The United States has what they call exclusive jurisdiction over major crimes that occur on Indian reservations. So we're the only prosecution authority that is allowed to prosecute major crimes involving Indians in Indian Country, which is a term of art used to describe, in this case, reservations.

Q. And when you started working for the U.S. Attorney's Office in 1988, did you ever come to know Jane Turner?

A. Yes.

Q. How did you come to know her?

A. Well, she was an FBI agent in the Minot Resident Agency, and I was a prosecutor in the Bismarck office, and not initially, but at some point I became the primary prosecutor for the Fort Berthold Indian reservation. Jane investigated offenses occurring in Indian Country, primarily at the Fort Berthold Indian reservation, so I would come in contact with her as she was investigating and presenting cases for prosecution.

Q. And in terms of Fort Berthold, was that essentially Jane Turner's reservation?

A. Yes, well she was, ah, she was, ah, the FBI agent who would be called when offenses occurred on that reservation in particular.

Q. And did you only work crimes on the reservation, or did you have other jurisdiction?
A. Any federal crime that occurred would be something within our prosecutorial jurisdiction, and the FBI investigated cases off the reservation as well. If there was a violation of federal law, and it was within the FBI's investigative jurisdiction, then we would work those cases as well.
Q. And were you involved in nonreservation cases with Jane Turner?
A. Yes.
Q. Why -- if you can describe in terms of your professional relationship with Jane Turner between 1988 and 2000, just what did she do for you professionally?
A. For me professionally, she would let me know when an offense had allegedly occurred so that I'd be in, so to speak, on the ground floor of the investigation. We would communicate with one another during the investigation, building a case to see whether there could be a prosecution, an indictment that might result. So we were communicating in advance of an indictment, and then in preparation for trials, umm, I would travel to the reservation to pretry witnesses and to continue the investigation with her until the time of trial or plea, as the case may be. And then also in preparation for sentencing and appeal if there was

to be one, she also was involved in that strategy-type work.
Q. During those 12 years, did you develop a friendship with her?
A. Yes.
Q. Would the fact that she became a friend of yours in any way influence your testimony today?
A. No.
Q. And since she left North Dakota in or about May of 2000, how many times have you actually seen Jane Turner?
A. Well, at the deposition was the last time that I saw her until today. Outside the courtroom.
Q. So that would mean two times?
A. Yes.
Q. And both --
THE COURT: Members of the jury, a deposition is a pretrial proceeding where information is exchanged. It is somewhat like a trial. The witness is under oath, there is usually a witness, frequently accompanied by an attorney, the lawyer for whichever side is examining will ask questions. It's taken down by a court reporter. Just thought I'd let you know what a deposition is.
BY MR. KOHN:
Q. In terms of your cases that you worked, how -- what percentage of your cases involved Jane Turner versus other FBI agents or other agents?

# Kohn, Kohn & Colapinto, LLP





## Major Cases




Since the mid-1980's the partners of Kohn, Kohn and Colapinto have litigated numerous cases on behalf of employee whistleblowers.

The following is a list of links and citations to some of the cases in which the Firm or its members have been involved. Some of these links may take you away from the KKC web site. Please use the back button on your web browser to return.

## False Claims Act

The False Claims Act is one of the most effective laws protecting whistleblowers who expose fraud in government contracting. The firm's clients have successfully exposed hundreds of millions of dollars in fraud against the United States.

The firm aggressively represents whistleblowers who have exposed fraud in government contracting. In June, 2005 the Department of Justice intervened in the firm's case against two contractors who sold faulty bullet proof vests to the police department throughout the United States. The whistleblower, Dr. Aaron Westrick worked as a senior manager for one of the largest bullet proof vest companies.

## Protections for FBI Whistleblower Whistleblowers

DEFENDANT'S EXHIBIT NO. 4

Since 1993, the Firm has represented whistleblowers employed by the Federal Bureau of Investigation exposing breakdowns in numerous programs which directly impact national security and

civil liberties. These include breakdowns in the post-9/11 counterintelligence programs and exposure of due process violations harming U.S. Citizens.



Dr. Frederic Whitehurst became the first major whistleblower from the FBI. Represented by the Firm.

In 1997, the Firm won a landmark victory and was responsible for a historic presidential directive ordering the U.S. Attorney General to implement regulations protecting FBI whistleblowers. The representation of Dr. Frederic Whitehurst, the FBI scientist who "blew the whistle" on misconduct within the FBI crime lab resulted in extensive laboratory reforms.

Whistleblower Protection for Federal Bureau of Investigation Employees--28 CFR PART 27

# Establishing Rights for Corporate Whistleblowers




Since its formation, KKC has represented corporate whistleblowers. In the wake of the corporate scandals that rocked Wall Street in early 2000, the Firm's partners successfully urged Congress to enact protections for corporate whistleblowers.




These protections, enacted into law as part of the Sarbanes-Oxley Act, are among the strongest and most effective federal whistleblower laws. The Firm's partners also authoredfirst book to explain and analyze the impact and implications of this legislation, especially as it pertains to the rights of whistleblowers- those who dare to come forward with evidence of wrongdoing.

# The 16th Amendment

Since 1996 Kohn, Kohn & Colapinto has vigorously opposed the taxation of damages designed strictly to make whistleblower "whole" for the damages they suffer. In a recent court victory whistleblower Marrita Murphy successfully challenged the constitutionality of taxing compensatory damages in civil rights/whistleblower cases. In August, 2006, a unanimous panel of the U.S. Court of Appeals for the District of Columbia Circuit ruled in favor of Ms. Murphy, and declared unconstitutional a

special tax Congress had passed in 1996, which targeted civil rights victims who received compensation for emotional distress damages. Before the Court of Appeals, Marrita Murphy was represented by KKC partners David Colapinto and Stephen Kohn.

That decision, *Murphy v. United States,* has now been hailed by a leading tax expert as a "momentous" and "epochal" decision. Mr. Robert Wood, the author of the leading books on taxation of damage claims, set forth ten major benefits all wrongfully discharged whistleblowers obtained from the decision, including facilitating settlement of cases, permitting victims of civil rights violations to obtain tax refunds and ensuring that all Americans who suffer retaliation can be made fully whole.

Analysis & Perspective, Employment Discrimination Report, BNA 10-04-06

D.C. Circuit Strikes Down Tax On Emotional Damages
ABA Journal 2006

D.C. Circuit Finds Tax on Emotional Damages Awards Unconstitutional
The Associated Press, 08-23-2006

Court Ruling in Damages Case Deals Big Setback to the IRS
WSJ, August 30, 2006

Murphy v. United States

- Appellant's Brief
- IRS Brief
- Appellant's Reply Brief
- Amicus Brief
- Appellees' Request for Rehearing En Banc
- Response to Request for Rehearing En Banc

# Government Ethics



Whistleblowers play an instrumental role in ensuring that public employees serve the public interest. Kohn, Kohn and Colapinto strongly defends employees who risk their careers when they appropriately report government misconduct. In addition to the Firm's well documented successes in ensuring accountability at the FBI, the EPA, and the NRC, the Center has



Contracting official Bunnatine Greenhouse exposed corporate misconduct with Army Contracts.

defended employees across the federal government. An example of this work is Ms. Bunnatine Greenhouse, and the prevention of her removal as the highest ranking government contracting official who exposed improper contract agreements between the Army and Halliburton inIraq and the Balkans.

## Public Health and Safety




Beginning in 1984, KKC's founding partners worked with numerous clients, public interest organizations and congressional oversight committees in revolutionizing the protection afforded to environmental and nuclear safety whistleblowers. The Firm successfully represented the first nationally recognized nuclear weapons whistleblowers, abolished "hush money" payment in environmentally sensitive industries and won numerous precedent setting cases expanding whistleblowers legal protections. Kohn, Kohn and Colapinto has protected employees who have exposed numerous threats to public health and safety, including illegal storage of hazardous waste, dioxin toxicity, waste water pollution, illegal discharge of raw sewage into public waterways, and numerous violations of nuclear safety law. One of the Firm's partners, Stephen Kohn, authored the first manual setting forth the legal protections afforded environmental whistleblowers.



Phil Donahue and KKC's Michael Kohn discuss protections for environmental whistleblowers.

**Bertacchi v. City of Columbus** , 03-WPC-11 (ALJ, August 26, 2005)

Bobreski v. D.C. Water and Sewer Authority , 2001-CAA-6 (ALJ, July 11, 2005)

*Charvet v. Eastern Ohio Regional Wastewater Authority, 96-ERA-37 (ALJ, 7-2-98)*

*Khandelwal v. Southern California Edison, 97-ERA-06 (ARB,11-20-00)*

*Jayko v. Ohio Environmental Protection Agency, 99-CAA-05 (ALJ, 10-02-00)*

*Doyle v. Hydro Nuclear Services*, 89-ERA-22 (ARB, 9-9-96), reversed on other grounds.

*Doyle v. Hydro Nuclear Services*,89-ERA-22 (ARB, 5-17-00) , reversed on other grounds.

*Gaballa v. Atlantic Group*, 94-ERA-9 (ALJ, 5-16-95)

*Gaballa v. Atlantic Group*, 94-ERA-9 (SOL, 1-18-96)

*Hobby v. Georgia Power Co.*, 90-ERA-30 (SOL, 8-4-95)

*Hobby v. Georgia Power Co.*, 90-ERA-30 (ALJ, 9-17-98)

*Hobby v. Georgia Power Co.*, 90-ERA-30 (ARB, 2-9-01)

*Hobby v. Georgia Power Co.*, 90-ERA-30 (ARB, 4-20-01)

*Georgia Power Co. v. USDOL*, No. 01-10916 (11th Cir. Sept. 30, 2002) (unpublished)

*Jenkins v. EPA*, 92-CAA-6 (ALJ, 12-14-92) *Kansas Gas & Electric Co. V. Brock*,780 F.2d 1505 (1985) (Not available on Internet)

*Leveille v. N.Y Air National Guard*, 94-TSC-3/4 (SOL, 12-11-95)

*Marcus v. EPA*, 96-CAA-03,07 (ALJ, 12-15-98)

*Marcus v. EPA*, 92-TSC-5 (SOL, 2-7-94)


Since 1996 the Firm has represented Dr. David Lewis in his successful campaign to ensure the EPA's regulations do in fact protect the public health and safety.

*Marcus v. EPA*, 92-TSC-5,(ALJ, 12-3-92)

*Mitchell v. Arizona Public Service*, 91-ERA-9 (ALJ, 7-2-92)

*Mosbaugh v. Georgia Power Co.* 91-ERA-1/11 (SOL, 11-20-95)

*Nunn v. Duke Power Co.*, ***1984-ERA-27 (SOL, 7-30-87)***

*Rhyne v. Brand Utilities Services, Inc.* 94-ERA-33 (ALJ, 5-15-95),

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995)(en banc)

*Thomas v. APS*, *89-ERA-19 (ALJ, 4-13-89)*

*Thomas v. APS*,89-ERA-19 (SOL, 9-17-93)
*Garner v. Morrison Knudsen Corp.*, 456 S.E. 907 (S.C. 1995)

(Not available on Internet)

*In the Matter of Arizona Public Service*, 36 NRC 338 (1992)
(Not available on Internet)

*In the Matter of Georgia Power Company, et al.*, 37 NRC 105 (1993)
(Not available on Internet)

*In the Matter of Georgia Power Company, et al.*, 39 NRC 105 (1994)
(Not available on Internet)

*In the Matter of Georgia Power Company, et al.*, 41 NRC 404 (1995)
(Not available on Internet)

*In Re Texas Utilities Elec. Co.*, 37 NRC 477 (6-4-93)
(Not available on Internet)

## Restrictive or "Hush Money" Settlements

The firm has successfully represented clients who challenged the use of contracts to limit or restrict the ability of employees to expose official misconduct and safety violations. These challenges revealed the widespread use of ¿hush money agreements¿ in environmentally-sensitive industries and government agencies, and sparked various administrative and judicial decisions "voiding" such contracts. Moreover, due to such practices being exposed to the public and lawmakers, as a result of the Firm's efforts, the Nuclear Regulatory Commission was forced to issue rules prohibiting such contracts and obtained a Department of Labor ruling banning such hush money agreements.

Carolina Power and Light v. Secretry of Labor,
43 F.3d 912 (4th Cir. 1995)

*In Re Texas Utilities Elec. Co.*, 37 NRC 477 (6-4-93)
(Not available on Internet)

*Macktal v. Secretary of Labor*, 923 F.2d 1150 (5th Cir. 1991), LEXIS 16708
(Not available on Internet)



Brown and Root whistleblower, Joseph Macktal's cases set the precedent abolishing "hush money" in the nuclear industry.

*Macktal v. Brown & Root*, 86-ERA-23 (SOL, 10-13-93)

*Macktal v. Brown & Root*, 86-ERA-23 (SOL, 7-11-95)

*Thompson v. U.S. Department of Labor*, 885 F.2d 551 (9th Cir. 1989)

(Not available on Internet)

## First Amendment Protections

The firm has regularly relied upon the First Amendment to protect public employees from retaliation for whistleblowing and to ensure the public's "right to know" about government misconduct.

*Avirgan v. Hull*, 118 F.R.D. 257 (D.D.C. 1987)
(Not available on Internet)

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995)(en banc)




William Sanjour's landmark case established the First Amendment rights of federal employees to "blow the whistle" on their employer.




In 1987, KKC partner Stephen Kohn successfully represented the Village Voice newspaper in securing the public's right to know about official investigation in the Iran-contra scandal.

## Freedom of Information

KKC has filed innumerable successful Freedom of Information Act requests and lawsuits on behalf of numerous clients ranging from network officials and television stations, to wrongfully discharged whistleblowers. The Firm's FOIA cases have resulted in the public release of hundred of thousands of government documents.



***Whitehurst v. FBI***, order dated 02-05-97
***Edmonds v. FBI***, order dated 12-03-02
***Edmonds v. FBI***, 417 F.3d 1319 (D.C. Cir. 2005)

## Public Interest Litigation



KKC's attorneys have donated thousands of hours of pro bono legal work advocating the public interest. They have represented public interest organizations and numerous amici curie briefs filed with the U. S. Supreme Court on a wide variety of issues, including cases in which the Supreme Court has protected the rights of whistleblowers under the False Claims Act, protected federal witnesses from retaliation, prevented mandatory arbitration, and prevented private employers from abusing the federal pre-emption doctrine to undermine state whistleblower laws.

***English v. General Electric Co.***, 110 S.Ct. 2270 (1990). Represented Amicus Curiae in U.S. Supreme Court case rejecting the federal preemption doctrine in nuclear whistleblowers cases. See, Tony Mauro, "Long fight ends in victory for N.C. whistle-blower," *USA Today (June 5, 1990).*

***Equal Employment Opportunity Commission v. Waffle House***, 122 S.Ct. 724 (2001) Representation of public interest *Amicus Curiae in case concerning impact of an arbitration agreement on EEOC's authority to seek relief for victims of discrimination.*

***Haddle v. Garrison***, 525 U.S. 121 (1998). Lead attorney for public interest Amicus Curiae in case establishing employee-witness protection under 42 U.S.C. § 1985(2).

***Kansas Gas & Electric v. Brock***, 780 F.2d 1505 (10th Cir. 1985). Representation of public interest *Amicus Curiae* in precedent setting case on scope of protected whistleblower activity.

***Vermont Agency of Natural Resources v. U.S. ex rel. Stevens***, 529 U.S. 765 (2000). Lead attorney for public interest Amicus Curiae in case establishing the applicability of the False Claim Act on state agencies.

*Kansas Gas & Electric Co. V. Brock*, 780 F.2d 1505 (1985) (Not available on Internet)

# Privacy Act Protection for All Americans

*Tripp v. Department of Defense*, 99-2554(August 28, 2002) (pdf version only)

*Tripp v. Department of Defense*, 01-157(April 26, 2002) (pdf



In 2003, the firm successfully obtained one of the largest Privacy Act settlement agreements on behalf of Linda Tripp, whose confidential security files were illegally leaked to the press by the Department of Defense.

version only)

*Tripp v. Executive Office of the President*, 99-2554(April 5, 2001); (pdf version)

# CONGRESSIONAL HEARINGS



Dr. Frederic Whitehurst (center) and Attorney Stephen Kohn (right) at Senate Judiciary committee hearing on FBI Oversight.

Since 1988, the Firm has represented numerous clients in Congressional oversight investigations and hearings. In addition, members of the Firm have, pro bono, represented public interest organizations and whistleblowers at policy and legislative hearings.

Hearings before the Senate Committee on Governmental Affairs, "Hearing on S. 1538, the Federal Employee Protection of Disclosures Act" (November 12, 2003) (Testimony on behalf of National Whistleblower Center).

Hearings before the Committee on Science of the House of Representatives, "EPA's Sludge Rule: Closed Minds or Open Debate" (March 22, 2000) (Testimony on behalf of National Whistleblower Center).

Hearings before the Subcommittee on Administrative Oversight and the Courts of the U.S. Senate Judiciary Committee, "Administrative Oversight of the Investigation of TWA Flight 800" (May 10, 1999) (Attorney for witness).

Hearings before the Subcommittee on Administrative Oversight and the Courts of the U.S. Senate Judiciary Committee, "Oversight Hearings on the FBI Crime Lab" (September 29, 1997) (Testimony as attorney for witness).

Hearings before the Subcommittee on Crime of the House of Representatives Judiciary Committee, "Oversight Hearings on the Activities of the Federal Bureau of Investigation" (May 13, 1997) (Attorney for witness).

Joint Hearings before the Environment, Energy, and Natural Resources Subcommittee and Legislation and National Security Subcommittee of the House of Representatives Committee on

Government Operations, "Elevation of the Environmental Protection Agency to a Cabinet-Level Department" (May 6, 1993) (Testimony on behalf of National Whistleblower Center).

Hearings before the Subcommittee on Administrative Law and Governmental Regulations of the House of Representatives Committee on the Judiciary, "Office of Government Ethics Regulation on Private Travel Payments" (March 5, 1992) (Testimony on behalf of National Whistleblower Center).

Hearings before the Subcommittee on Nuclear Regulation of the U.S. Senate Committee on Environment and Public Works, "Secret Settlement Agreements at Nuclear Power Plants" (May 4, 1989) (Representation of witness).

LexisNexis Martindale-Hubbell

This may be considered AN ADVERTISEMENT or Advertising Material under the Rules of Professional Conduct governing lawyers in the Distri Columbia.This web site is designed for general information only. The information presented at this site should not be construed to be formal l advice nor the formation of a lawyer/client relationship.

Kohn, Kohn & Colapinto, LLP website is powered by LexisNexis Martinc Hubbell.




Click Here to Enter Site

DEFENDANT'S EXHIBIT NO. 5



## PRACTICE

Robert Hill & Associates works hard on behalf of commercial and industrial property owners to ensure fair market value property valuations and tax assessments.

The firm represents a broad range of businesses – from retailers and office parks to manufacturing plants and farm cooperatives – across the United States.

Robert Hill & Associates has expertise in complex property valuation litigation, and has represented clients in precedent-setting tax reductions and case law.

LexisNexis Martindale-Hubbell

This web site is designed for general information only. The information presented at this site should not be construec formal legal advice nor the formation of a lawyer/client relationship.

Robert Hill & Associates, Ltd. website is powered by LexisNexis Martindale-Hubbell.

## Robert Hill & Associates, Ltd. Profile

Your access to and use of the information displayed on lawyers.com is subject to Terms and Conditions.

Email this listing

# Robert Hill & Associates, Ltd.

Law Firm in Eden Prairie, Minnesota

LexisNexis Martindale-Hubbell Peer Review Rated For Ethical Standards and Legal Ability 2007

**Location**
12700 Anderson Lakes Parkway
Eden Prairie, Minnesota 55344-7652
(Hennepin Co.)
View Map

**Contact Information**
Phone: 952-426-7373
Facsimile: 952-426-7370
URL: http://www.roberthilllaw.com

**View WebSite**

(Main Office)

**Robert Hill & Associates, Ltd. practices in the following areas of law:**
Property Tax Appeals, Construction Law, Eminent Domain, Mold Litigation, Commercial Litigation, Mediation, Employment Law.

**Year Established:** 1995

**Firm Size:** 2

**Representative Clients:**
Hormel Foods; Walgreens; Medtronic; ADC Telecommunications; CVS Pharmacy; CB Richard Ellis.

**Robert A. Hill** (Member) born St. Cloud, Minnesota, April 25, 1958; admitted to bar, 1986, Virginia; 1988, District of Columbia; 1989, U.S. District Court, Eastern District of Virginia; 1991, Minnesota. **Education:** University of Minnesota (B.A., 1982); Georgetown University (J.D., 1986); Georgetown University School of Foreign Science (M.S., 1990). Phi Beta Kappa. **Member:** Washington County, Minnesota State and American Bar Associations; Minnesota Trial Lawyers Association. **Practice Areas:** Commercial Litigation; Tax Appeals; Mediation; Employment Law; Construction Law; Condemnation; Mold Litigation. *Email: Robert A. Hill*

**Amy Darr Grady** (Member) born Minneapolis, Minnesota, September 17, 1957; admitted to bar, 1982, Minnesota and U.S. District Court, District of Minnesota. **Education:** University of Wisconsin (B.A., 1978); University of Minnesota (J.D., 1982). Sigma Epsilon Sigma. **Practice Areas:** Real Estate Tax. *Email: Amy Darr Grady*

U.S. Department of Justice

# Complaint of Discrimination

*(See instructions on reverse)*

PRIVACY ACT STATEMENT: 1. AUTHORITY- The authority to collect this information is derived from 42 U.S.C. Section 2000e-16; 29 CFR Sections 1614.106 and 1614.108. 2. PURPOSE AND USE-This information will be used to document the issues and allegations of a complaint of discrimination based on race, color, sex (including sexual harassment), religion, national origin, age, disability (physical or mental), sexual orientation or reprisal. The signed statement will serve as the record necessary to initiate an investigation and will become part of the complaint file during the investigation; hearing, if any; adjudication; and appeal, if one, to the Equal Employment Opportunity Commission. 3. EFFECTS OF NON-DISCLOSURE-Submission of this information is MANDATORY. Failure to furnish this information will result in the complaint being returned without action.

1. Complainant's Full Name: Jane A. T. Turner
Street Address, RD Number, or Post Office Box Number: 1561 Osceola Ave. F005538
City, State and Zip Code: St Paul, MN.

2. Your Telephone Number *(including area code)*
Home: 651-690-4000
Work: 612-376-3200

3. Which Department of Justice Office Do You Believe Discriminated Against You? FBI
B. Street Address of Office: 111 Washington Ave S. Suite 1100
C. City, State and Zip Code: Minneapolis, MINN

4. Current Work Address: 111 Washington Ave S. Suite 1100 Minneapolis.
A. Name of Agency Where You Work: Federal Bureau of Investigation
B. Street Address of Your Agency: 10th 4 Pennsylvania
C. City, State and Zip Code: Washington D.C.
D. Title and Grade of Your Job: GS 13-9

5. Date on Which Most Recent Alleged Discrimination Took Place

| Month | Day | Year |
|---|---|---|
| 12 | 05 | 2000 |

6. Check Below Why You Believe You Were Discriminated Against?
- ☐ Race or Color *(Give Race or Color)*
- ☐ Religion *(Give Religion)*
- ☑ Sex *(Give Sex)* ☐ Male ☑ Female
  - ☐ Sexual Harassment
- ☐ Age *(Give age)*
- ☐ National Origin *(Give National Origin)*
- ☐ Disability ☐ Physical ☐ Mental
- ☐ Sexual Orientation
- ☑ Reprisal

RECEIVED 2000 DEC 29 A 10:12 OFFICE OF EEO AFFAIRS

7. Explain How You Believe You Were Discriminated Against *(Treated differently from other employees or applicants)* Because of Your Race, Color, Sex (including sexual harassment), Religion, National Origin, Age, Disability (physical or mental), Sexual Orientation or Reprisal. *(You may continue your answer on another sheet of paper if you need more space.)*

Head of EEO, FBI HQ had advised my management that Director Freeh had contacted them regarding my matter. List of actions taken against this agent are attached.

8. What Corrective Action Do You Want Taken on Your Complaint?

Retaliation, Reprisals, Intimidation To stop.

DEFENDANT'S EXHIBIT NO. 6

280A-HQ-1331158-1

9. A) I Have Discussed My Complaint With an Equal Employment Opportunity Counselor
DATE OF FIRST CONTACT: 12 | 8 | 00
DATE OF LAST INTERVIEW: 12 | 21 | 00
B) Name of Counselor: Kelly Hanken
☐ I Have Not Contacted an EEO Counselor

10. Date of This Complaint:

| Month | Day | Year |
|---|---|---|
| 12 | 21 | 2000 |

11. Sign Your Name Here: Jane Turner

(Postmark)

[signature] 12/21/00

A series of reprisals and retaliation have occurred since my forced transfer to Minneapolis, effective April 1, 200.

Although I was brought to Minneapolis with the understanding that I would be working Crimes Against Children (CAC), and was to help the program succeed, it became apparent that the transfer was punitive in nature, with the intent to harass due to prior EEO and corruption of management complaints.

On 8/9/00, I had a meeting with the AUSA wherein I presented plans regarding the Crimes Against Children Program, and asking assistance on prosecutive guidelines.

On 8/23/00, I notified management that I did not get statistics that I was due from North Dakota cases, which had a great deal of investigative work done.

On 8/29/00, there was conflict regarding an alleged meeting between myself and the ASAC where my PAR was discussed.

On 8/30/00, the SAC advised me that the United States Attorney had complained regarding a comment I had allegedly made in the meeting of 8/9/00, and I was not to contact the AUSA who was at the meeting. The SAC also stated that support personnel had made complaints regarding a cartoon figure that I had received as a first office agent. He also stated I had made remarks concerning a first office agent in the Minneapolis Division.

On 8/31/00, the other AUSA present in the meeting of 8/9/00, advised that there was nothing of an offensive nature that I allegedly said. The FBI Agent present in the meeting advised me that an official "inquiry" was underway, and he could not speak to me regarding the issue. This put a "chilling effect" on the other FBI agent and I, which proved a negative impact on the CAC.

On 9/5/00, although I was notified nothing concerning me would go through ASAC Burrus, or SSA Welken due to EEO allegations, and issues of corruption, I discovered an e-mail that Welken and Burrus had, in which SSA Welken put a negative spin on a program I was trying to implement in the Minneapolis Division.

I was also advised that the Squad 5 Supervisor had "pressured" a support personnel to lodge a complaint against me.

On 9/6/00, sent the SAC an e-mail advising that if I was hurting the CAC program, I should be taken off, as the program was more important than the individual.

On 9/7/00 the SAC e-mailed me a response stating that he was going to take action. On same date, the SSA advised me that it was not a performance issue, but a management issue. I was also advised not to talk to support personnel concerning my situation. I was asked to take the Fitness for Duty exam, and I responded I had already done that. The response in return was that was like letting the Ramsey's (Colorado) use their own polygrapher. I advised I was not aware I had killed anyone.

On 9/8/00, when I advised that I had tested positive for TB, and was concerned, the response was that management had "mentioned I was using this (positive TB test) for litigation purposes".

On 9/15/00 an issue comes up regarding missing informant paperwork. The Principal Legal Advisor (PLA) advises that she removed it from the Informant Coordinators desk, and gave it to the SAC.

On 9/18/00, a sensitive FD-302 was returned, with the admonishment that it needed to be changed.

On 9/22/00, I was advised by squad members that before I even arrived in the Division, they had gotten the word that I was to be avoided. The word was that I would "sue anybody, anytime, for anything".

On 10/4/00, my Supervisor talked to me for three hours, advising me that I should not hug clerical, that some people said I was "evil", that I was "intimidating". I was not to talk to clerical. He asked if I made statements to "shock" people.
On 10/19/00, SSA McCleary advises me that he "lost" the written statement that I had provided him at an earlier date.
On 10/20/00, I e-mail and mail a second copy of a signed statement.
On 11/7/00 the SAC called me into his office and advised me that he had sent a recommendation to FBIHQ two months earlier that asked for three possible actions regarding me. Although FBIHQ legal counsel had advised him not to tell me, he was letting me know that he had asked for 1. Removal from the rolls of the FBI, and placed on administrative leave, 2. Fitness for Duty Exam, or 3. Drop down to a GS-12. He advised that I did not accept responsibility for my actions, that I was seen as obnoxious, and there were people glad to see me gone from Minot, North Dakota. He advised that he took my informant paperwork, because it showed how things could get lost. He mentioned I called him a liar at the Women's Focus Group, and he asked me why I remained with the FBI, why did I not "just leave?". He advised me that whatever I once had for the FBI, was now gone, and I should leave. The SAC also mentioned that I had originally told him I had not named him in my original complaint, and that was not true, that he had been named. I responded that I had done that based on advice from legal counsel.
On 11/9/00, a manager asked if I would be willing to negotiate "middle ground".
On 11/21/00, my Supervisor advised that I was not to contact Patty Wetterling, from the Jacob Wetterling Foundation. I had been working very closely with Patty concerning the Child Abduction Alert Program.
On 11/27/00, was advised that for "program purity", the Crimes Against Children Program would be moved to the six squad (under SSA Welken).
On 11/28/00, the SAC advised he was going to call OPR and see where his recommendations of months ago were at, because it was not "fair" to keep me "hanging". I asked why the recommendations were with OPR, and he advised me that OPR handles other matters than misconduct. The SAC advised me that the CAC Program was moved to to Squad 6 due to the fact that he was looking for "longevity" with the program.
On 12/5/00, I was removed from presenting the Child Abduction Program presentation in the a.m., right before the meeting. This was done in front of FBI personnel, and I was also advised that, according to the SAC, I could not even be in the room during the presentation. I was told to leave the room. This was allegedly due to the fact that the Executive Director for the Minnesota Sheriffs' Association had lodged a complaint after a briefing I had given him a week earlier. . I was notified during the afternoon of 12/5/00 that I was not to establish contact with the Executive Director for any reason.

Jane Turner

A. We have primary jurisdiction, so I have the ability to advise my BIA, Bureau of Indian Affairs, investigator, who I worked with (gesturing) that any death on the reservation should be reviewed by us, especially children. Also that rapes no longer were to be the lowest priority, that we needed to do something about those. And also violent crime, ah, a lot of times that was just ignored.

Q. The skill set you either brought into Minot or were developing while working on these type of violent crimes, in -- was that skill set applicable in Minneapolis?

A. Not that I consider, umm -- it could be applicable to, ah, certain situations, like crime scenes, but you don't have a lot of situations here where the FBI investigates your drive-by shootings or let's say a college student that gets thrown off the bridge over here. We just are not involved, ah, usually in those kind of crimes.

Q. Now, there are offenses of, crimes against children offenses that are within federal jurisdiction. In other words, off the reservation, the FBI can investigate, correct?

A. That is correct.

Q. And generally what's your understanding what those crimes are?

A. Usually those are computer crimes, crimes on the Internet, child porn, and usually you have forensic computer



DEFENDANT'S EXHIBIT NO. 7

training to do that. You go back and get training on how to retrieve things from a computer.
Q. Did you have any forensic computer training?
A. Absolutely none.
Q. In terms of the work you did on the reservation, was Internet pornography one of the major criminal activities occurring there?
A. No, because I was never in a Native American home that had a computer at that time.
Q. Now, I -- if you can -- can you explain to the jury just what you mentioned training in profiling. What does that mean? What is profiling?
A. Well, it's not kind of like what you see on TV. Umm, but nothing really is, right? Profiling, what happened back there when I was, ah, nominated to attend a profiling, psychological profiling in-service is that the Bureau had noticed we had some really remarkable people, we had Roy Hazelwood, Restler, (phonetic) really wonderful people back, Quantico who started noticing that there were certain things you could find at crime scenes that might paint the picture of the offender. So what they had done was they tasked to bring all these people back, one from each Headquarter City, so you would have roughly 50 some, and, umm, to come back and train us on how to interview and, ah, these really violent offenders, Roy Hazelwood was in, ah, he wrote all

the books on rape.

MS. FAGG: Objection, unresponsive, narrative, and relevancy, 401.

THE COURT: I think we're getting far afield here, counsel. As a matter of fact, I think this would probably be a good time for us to take a break. We'll take about 15 minutes. We're in recess.

(Recess.)

THE COURT: Counsel.

MR. KOHN: Thank you, Your Honor.

BY MR. KOHN:

Q. In -- when you were at the Minot Resident Agency, did you work any public corruption cases?

A. Yes, sir.

Q. And what was your understanding if you went to Minneapolis whether you would work those type of cases?

A. No, sir, I would not.

Q. Now, can you just describe for the jury when we talk about working for the FBI in Minot, what was that office, how many people, where was it located? Just give us a feel for what that was, what that was, the Minot Resident Agency?

A. Well, oftentimes the Minot Resident Agency was the butt of many jokes because I guess it's so far up there, so far north and kind of isolated, I personally, ah, am from the midwest, and I love the midwest, and that's where I wanted

to come back to. Umm, like I said before, Native Americans are not individuals that I have any concerns about being hurt or anything like that. My mother was down the road in Rapid City. It's isolated, but, ah, that, I would rather have that any day than over New York. And, umm, it's a small community, which I like, and it's a great place to raise kids. And, ah, it gave me a tremendous amount of autonomy. I was known as the lady FBI agent up there in that corner, and I was known throughout the community and in the law enforcement circles throughout North Dakota.

Q. Now, when you say working at a resident agency would give you more autonomy, what do you mean by that, if you could explain what that, the difference in the work environment, why you'd have more autonomy?

A. Well, take for example, if you work out of the Minneapolis office, normally there's a time you come in, the great bulge of people come in at a certain time, and they go home at a certain time, and oftentimes that is the traffic jam in and the traffic jam out. Up in Minot I was under 24-hour call, seven days a week, and it was exciting for me. I, I, I saw it as exciting, first of all, because I love being an FBI agent, and secondly, you never knew what would come up. It could be a little FCI, somebody who came into a, ah, military area, you know, they have missiles up there, it could be a bank robbery throughout those counties, it

could be -- every day was different. And Sundays sometimes you could start early in the morning, I got calls on weekends all the time. And it was just a real challenge and I really enjoyed it, because I was the face of the FBI, and that's something I really liked. I really liked being the face of the FBI.

THE COURT: You said it might be an FCI. What is an FCI?

THE WITNESS: I'm sorry, Your Honor, foreign counter intelligence.

THE COURT: That's -- that'll do.

THE WITNESS: Thank you, sir.

BY MR. KOHN:

Q. Did you, working in Minot, were you like on a desk specializing in a certain like type of crime?

A. No. I, I, we were in the post office building, which was a historic place right on main street. There's a little teeny office. And two of us worked out of there. I had a partner by the name of Dan Rogenbach (phonetic), and we just really respected and liked each other. And we'd cover for one another, and, ah, he'd be going this way and I would -- and we would help each other. It was really nice.

Q. Now, in terms of I'd say working in the Minneapolis office of the FBI on a desk, do they have like a desk called general crimes, you know, anything going on stop here, or is

it more specialized?
A. No, it's usually specialized. Bank robberies might be one, foreign counter intelligence, FCI, might be another one, white collar. They just, depends on the size of the office. Like in New York they might have two of like organized crime we had four different squads, five, excuse me, I believe, because there were five families in organized crime. But, yes, that is your main impetus, that's what you work on, and that's where you're at.
Q. Now, in Minot, how many square miles was the territory that your resident agency had jurisdiction over?
A. I believe it was 25,000 square miles.
Q. And how many counties?
A. I believe it was 14.
Q. And then how many Indian reservations?
A. Two, Fort Berthold, and Turtle.
Q. And were you -- was your job there like a desk job?
A. Oh, no. It -- no. Definitely not. I, I was, we, in our case, you usually operate out of your car. You're on the road, and your office is the trunk of the car. And RA people are usually known as very resilient, resourceful, kind of take-charge people, and we joke that, ah, you know, we can do things they do down in Headquarter City with rubber, gum and, or gum and rubber bands. We take great pride in being resourceful and handling that much. I mean,

that's incredible, if you think about that much.
Q. Now having worked, now you worked the more typical desk on a squad in Seattle and New York?
A. That is correct.
Q. Now, having worked in a city on a squad versus working in a resident agency of Minot, which did you like better?
A. Oh, there was no two ways about it. I loved RA.
Q. In terms of the type of work you did, the level of skill, you know, in other words, your actual work, how would you compare how you were challenged in Minot versus your experience of having been on a desk in Seattle and New York?
A. Ah, I did do criminal profiling in New York. I did the preppy killing in Central Park. I did, I taught 'em different things, but my skill set and my kind of personality and my love for the job, I was a perfect fit for Minot. And the love for the area.
Q. Now, can you just, we heard testimony from, ah, Clare Hochhalter about the U.S. Attorney's Office, but would you just please from your perspective explain your role as an FBI agent and the work of the United States Attorneys Office in western North Dakota?
A. From my perspective?
Q. Yeah. In other words, how did you interface with the United States attorneys?
A. I am not a lawyer. My background is psychology, I had a

then explained to Ms. Turner what SAC Domin said. Mr. Waldie said to Ms. Turner --

THE COURT: Excuse me. Counsel, I want to come to side bar.

(Side bar discussion.)

THE COURT: Tell that clack sitting behind you that if there's one more word spoken between them I'll kick the whole bunch out. Okay? And you may have thought he did a nice job in cross, he doesn't need you in front of a jury to shake his hand. That is just flat out of line. Cut it out.

(Open court.)

THE COURT: You may continue.

MS. GRZESKOWIAK: Mr. Waldie said to Ms. Turner, you know I specialize in child pornography cases. Mr. Waldie knew that Ms. Turner's area of expertise was crimes involving abuse of children, things that she had been in contact with at the reservation, crimes that he had investigated, but he recognized that he did not have nearly as much experience with those cases as Ms. Turner. He told Ms. Turner, they're moving both of us to Minneapolis, and we're going to be on this new squad. Mr. Waldie understood that he and Jane Turner would be investigating crimes against children and that the two of them would be the nucleus of the squad investigating those crimes. According



DEFENDANT'S EXHIBIT NO. 8