UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
01-CV-1407 (JMR/FLN)

| | |
|---|---|
| JANE A. T. TURNER,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO GONZALES, *et al.*,<br>Defendant. | **AFFIDAVIT OF JANE TURNER** |

I, Jane Turner, hereby declare under penalty of perjury that the following statements are true and correct: to the best of my personal information, knowledge and belief:

1. My name is Jane Turner. I am the plaintiff in this case and I am submitting this statement in support of my petition for attorney fees and costs pursuant to Title 42 U.S.C. § 1988.
2. On or about 2000, I retained the services of an attorney to represent me in my administrative claims against the FBI filed in accordance with Title VII of the Civil Rights Act of 1964. I hired Mr. James Klimaski of the firm Klimaski & Grill, P.C., located in Washington, D.C.
3. Mr. Klimaski agreed to represent me on a reduced hourly rate, with an understanding that he could apply for attorney fees from the FBI under section 1988, and that I would be reimbursed for all costs and fees I advanced in this case.
4. At the recommendation of Mr. Klimaski, in 2001 I retained a local Minneapolis attorney to assist in the filing of a federal law suit. This attorney, Kathryn Engdahl, was of the firm Metcalf, Kaspari, Engdahl & Lazarus. My representation agreement with Ms. Engdahl was similar to that of Mr. Klimaski, i.e. I retained the Engdahl firm on a reduced hourly basis, with an understanding that I would be reimbursed for my payments to that firm from fees and costs obtained by the FBI, if I won the case.
5. In September, 2001 I was informed by Mr. Klimaski that his firm could not continue to represent me in the actual litigation of my case in federal court and he would attempt to obtain a quick settlement from the FBI.
6. Based on these representations I attempted to locate substitute counsel. I contacted two law firms based on referrals from FBI employees. One firm

that I contacted (out of Chicago) had experience with an FBI case. They declined the representation, and informed me that the claims took to long and took up to much of the firm's capital. I contacted a second firm, which also declined the case because they could not afford a claim against the FBI on a contingency basis. I was informed that the case would be "to big."

7. I then contacted a well-respected former FBI Special Agent, Dr. Frederic Whitehurst. Dr. Whitehurst had prevailed in a retaliation case against the FBI and his name was well known within the FBI community.
8. Dr. Whitehurst recommended that I contact the attorneys who represented him in his case against the FBI, the firm of Kohn, Kohn & Colapinto, LLP ("Kohn firm"). Dr. Whitehurst also informed me that he would recommend to the firm that the firm take my case.
9. I contacted the intake-attorney for the Kohn firm, and was informed that they were reluctant to take on a new retaliation case against the FBI due to the current demand for their services and client commitments.
10. However, after some persistence I was able to speak with a partner with the firm, Mr. Stephen Kohn. Based on my conversation with Mr. Kohn, and his review of my case, he agreed to represent me. The initial representation related to the above-captioned matter was primarily intended to provide me guidance in my attempt to settle my case with the FBI. Mr. Kohn did not attempt to substitute in as my counsel, and was very careful in instructing me to continue to fully cooperate and work with my then-attorney, Mr. Klimaski.
11. In early 2002 Mr. Klimaski informed me that his firm (and the Engdahl firm) would, in fact, withdraw as my counsel. I did not object to this withdrawal.
12. After I learned that Klimaski and Engdahl would in fact withdraw as my counsel, I asked that the Kohn firm substitute into the case as my attorneys. Mr. Kohn agreed to become my lead attorney in this matter.
13. Mr. Kohn also recommended that I retain the law firm of Hill & Associates as the local counsel in this matter. Mr. Robert Hill also had experience in employment retaliation cases, and one of the other partners in the Kohn firm, Mr. Michael Kohn, had met Mr. Hill. Upon learning the facts of my case, Mr. Hill agreed to become the local counsel and agreed to assist in all hearings and the trial on the merits, should the case ever go to trial.
14. I paid the Klimaski firm a total of $30,750.00 in attorney fees and costs related to the firm's exhaustion of my administrative remedies before the EEOC and the filing of an initial complaint in federal court. These fees are documented in Exhibit 5.
15. I paid the Engdahl firm $1251.01 in fees and costs related to that representation. These fees are documented in Exhibit 6.
16. Mr. Klimaski and his assistant also traveled to North Dakota to represent me in EEOC proceedings directly related to the above-captioned lawsuit.

These proceedings resulted in a deposition of my former supervisor, Mr. Welken. That deposition was used in the trial of my case. I directly paid the hotel expenses related to this trip. Copies of the receipts for these payments are attached as Exhibit 7. The total cost for these travel-related expenses was $543.76.

17. I also paid for the airfare related to this trip. Copies of the receipts for these payments are attached as Exhibit 8. The total cost for these travel-related expenses was $ 853.00.
18. After the Klimaski and Engdahl law firms withdrew as my attorneys in this matter, they continued to send me bills for the time and expenses they incurred in representing me. The Klimaski firm has sent me bills indicating that I owe $66,811.32 for services his firm rendered prior to his withdrawing as my attorney. (Exhibit 9.) The Engdahl firm currently claims that I owe that firm $3433.50. (Exhibit 6.) I hereby request that the FBI either be required to pay these bills, or that this Court issue an order that I am not required to pay these bills.
19. The Engdahl firm paid the initial $150.00 filing fee in this matter. I request that the Engdahl firm be reimbursed for this cost.
20. I incurred numerous postal charges related to the above-captioned case or my allegations that the FBI retaliated against me. I did not save all of my receipts. However, I was able to locate some of these receipts. The total postal charges for which I have receipts come to $657.13. These charges are reflected in Exhibit 10 .
21. I incurred numerous photocopy charges related to the above-captioned case or my allegations that the FBI retaliated against me. I did not save all of my receipts. However, I was able to locate some of these receipts. The total copy charges for which I have receipts come to $857.15. These charges are reflected in Exhibit 11.
22. I incurred numerous long distance telephone charges related to the above-captioned case or my allegations that the FBI retaliated against me. I did not save all of my phone receipts. However, I was able to locate some of these receipts. The total phone charges for which I have receipts come to $2395.28. These charges are reflected in Exhibit 12.
23. I incurred numerous travel-related charges related to the above-captioned case or my allegations that the FBI retaliated against me. I did not save all of my receipts. However, I was able to locate some of these receipts. The total travel-related charges for which I have receipts come to $5658.13. These charges are reflected in Exhibit 13.
24. I incurred numerous out-of-pocket expenses related to the jury trial. I did not save all of my receipts. However, I was able to locate some of these receipts. The total out-of-pocket expenses related to the jury trial for which I have receipts comes to $1,103.74. These charges are reflected in Exhibit 14.

25. I directly paid 4,182.50 for a number of the depositions taken by (or defended by) my counsel in this case. Receipts for most of these depositions are attached at Exhibit 15. The amounts I paid are reflected as follows:

| | |
|---|---|
| Ray Morrow | $214.50 |
| James R. Trudeau | $586.00 |
| Janice Morley & Clare Hochhalter | $1,063.00 |
| Combined bill for the depositions Of Peter Klokstad, James Casey, James Burrus, Douglas Doman, Carl Florez and Elmer Fourdance | $2319.00 |

26. Per request by my counsel I was asked to get an MRI to ensure that my psychological problems were not based on any physiological ailments. My attorneys recommended this action in order to insure that the testimony of the expert psychologist was accurate and in order to make sure that the psychological problems I had identified were not caused by another ailment. The cost incurred by me for the MRI was $6,968.00. Attached as Exhibit 23 is the bill from a debt collection agency (Colltech) for approximately for one-half the MRI charge, and a receipt for the initial charge for the MRI.
27. I paid an initial retainer fee to secure the services of expert witness Dr. Carter. The retainer came to a total of $2212.50. Exhibit 25. I hereby request a payment for this retainer fee. The law firm of Kohn, Kohn & Colapinto, LLP directly paid Dr. Carter for his witness/testimonial fees in this matter.
28. I do not object to the Klimaski and Engdahl firm's obtaining payment for the services rendered to my in accordance with the statutory fee provisions of 42 U.S.C. section 1988, provided that I am repaid for the fees and costs I advanced those firms and that I am not required to pay any further fees or costs to those firms. In this regard, I do not object to the Klimaski and Engdahl firm's directly petitioning the Court for a payment of fees and costs they are owed, and I do not object to the Court requiring the FBI to directly pay those firms for their attorney fees and costs. I request that the FBI directly reimburse me for the payments I have already made to the Klimaski and Engdahl firm's.
29. Between January 19, 2007 through January 28, 2007 (including January 19th and 28th) the law firm of Kohn, Kohn & Colapinto, LLP had two law clerks and one paralegal fly to Minneapolis and assist in the preparation for my trial. I provided these two clerks with a place to stay and made a cash payment in order to cover the meal and incidental costs associated with these two clerks and the one paralegal. I paid them at the standard per/diem rate for meals and incidental expenses (i.e.

$64.00 per/day for each clerk). Exhibit 21 is the official GSA per/diem rate chart. The total paid for these two clerks and one paralegal was $1920.00. Because the payments were in cash, I do not have receipts. However, I do have a receipt associated with cashing a check for $1000.00 on January 18, 2007. This check was cashed as part of the payments made for the meal and incidental costs associated with the two law clerks and one paralegal. A copy of this receipt is attached as Exhibit 22.

30. Depositions were conducted in the EEO proceeding directly related to this matter. These depositions were conducted between March 5-8, 2001by my prior attorney, Mr. Klimaski. I paid directly for these depositions. However, I cannot locate my receipts for these depositions. My current counsel requested the information from Mr. Klimaski, but he did not provide the information. I contacted the court reporter, but was informed that the billing records were destroyed after five years. My best *conservative* estimate for the cost of these depositions is $2500. Although Mr. Klimaski did not represent me at the trial, I am aware that my current attorney, Mr. Stephen Kohn, relied upon these depositions when preparing for the trial. The deposition of Mr. Waldie was used for the Waldie stipulation. Also, Mr. Kohn did not need to depose Mr. Welken, as he relied on the EEO deposition of Welken for the trial.

I hereby declare under the pains and penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

Jane A. Turner

4/4/07

Jane Turner Date St. Paul, MN

651-690-4000